DRRC multi-media Consent Decree

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| STATE OF MISSOURI | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | CONSENT DECREE |
| | ) | |
| THE DOE RUN RESOURCES | ) | |
| CORPORATION; THE DOE RUN RESOURCES | ) | |
| CORPORATION d/b/a THE DOE | ) | |
| RUN COMPANY; and | ) | |
| THE BUICK RESOURCE | ) | |
| RECYCLING FACILITY, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DRRC multi-media Consent Decree

## TABLE OF CONTENTS

I.     JURISDICTION AND VENUE ................................................................-3-

II.    APPLICABILITY .................................................................................-5-

III.   DEFINITIONS ....................................................................................-8-

IV.    CIVIL PENALTY ................................................................................-17-

V.     COMPLIANCE REQUIREMENTS: CLEAN AIR ACT............................-19-

       A.   Sulfur Dioxide and Lead Emissions Compliance Schedule and
            Interim Limits at the Herculaneum Lead Smelter ............................... -19-

       B.   Prohibition on Netting Credits or Offsets From Required Controls ...................-25-

       C.   Installation of Pressure Drop Monitor at the Buick Mine/Mill..........................-26-

VI.    COMPLIANCE REQUIREMENTS: CLEAN WATER ACT .....................-27-

       A.   Overview of CWA Requirements ......................................................-27-

       B.   Compliance Measures for all CWA Facilities  ...................................-31-

VII.   CLEAN WATER ACT PERMITS: RESOLUTION OF MISSOURI STATE
       OPERATING PERMIT APPEALS AND COMPLIANCE DEADLINES ................-52-

       A.   CWA Permitting Obligations ...........................................................-52-

       B.   Resolution of Pending MSOP Appeals .............................................-53-

       C.   Identification of Remaining Permit Appeal Issues  ............................-60-

       D.   Site-Specific and Permit-Specific Limitations  .................................-62-

       E.   WET Sampling and Testing Procedures  ..........................................-72-

       F.   Special Master and Consultant to the Special Master Appointment and
            Decision-Making Process  ..................................................................-74-

-ii-

DRRC multi-media Consent Decree

G. Procedures for Permit Appeal Issues Before the Special Master ......................-77-

H. Procedures for Finality of Permit Appeal Resolution .........................................-79-

I. Schedule for Compliance With Missouri State Operating Permits ..................-80-

VIII. COMPLIANCE REQUIREMENTS: RCRA ...............................................................-84-

A. Buick Mine/Mill Facility .................................................................................-84-

B. Buick Resource Recycling Facility .................................................................-90-

C. Herculaneum Lead Smelter Facility ................................................................-92-

IX. SITE REMEDIATION - HERCULANEUM ...............................................................-94-

X. FINANCIAL ASSURANCES ......................................................................................-96-

XI. TRANSPORTATION ORDER .....................................................................................-102-

XII. COMPLIANCE REQUIREMENTS: APPROVAL OF DELIVERABLES ..............-104-

XIII. COMPLIANCE REQUIREMENTS: PERMITS .......................................................-107-

XIV. ADDITIONAL INJUNCTIVE RELIEF .....................................................................-109-

XV. ENVIRONMENTAL MITIGATION PROJECTS .....................................................-115-

XVI. REPORTING REQUIREMENTS ...............................................................................-119-

XVII. STIPULATED PENALTIES .......................................................................................-123-

XVIII. FORCE MAJEURE ....................................................................................................-135-

XIX. DISPUTE RESOLUTION ..........................................................................................-138-

XX. INFORMATION COLLECTION AND RETENTION .............................................-141-

XXI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ..................................-143-

XXII. COSTS .......................................................................................................................-154-

DRRC multi-media Consent Decree

XXIII. NOTICES .................................................................................................................. -155-

XXIV. EFFECTIVE DATE .................................................................................................... -157-

XXV. RETENTION OF JURISDICTION ......................................................................... -157-

XXVI. MODIFICATION ...................................................................................................... -158-

XXVII. TERMINATION ........................................................................................................ -158-

XXVIII. PUBLIC PARTICIPATION ..................................................................................... -160-

XXIX. SIGNATORIES/SERVICE ....................................................................................... -161-

XXX. INTEGRATION ......................................................................................................... -161-

XXXI. FINAL JUDGMENT ................................................................................................ -162-

XXXII. APPENDICES ............................................................................................................ -162-

DRRC multi-media Consent Decree

**WHEREAS**, Plaintiff United States of America, on behalf of the United States

Environmental Protection Agency ("EPA"), and the State of Missouri, at the relation of Chris

Koster, Attorney General, and the Missouri Department of Natural Resources, have filed a joint

complaint in this action concurrently with this Consent Decree alleging that Defendants The Doe

Run Resources Corporation, The Doe Run Resources Corporation d/b/a "The Doe Run

Company," and The Buick Resource Recycling Facility, LLC violated the following

environmental statutes and their implementing federal and state regulations at one or more of

each Defendant's lead smelting, recycling, mining, or milling facilities located throughout

Missouri: the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q for violations of (a) the

Federally-enforceable Missouri State Implementation Plan (the "Missouri SIP"), (b) Title V of

the Act, 42 U.S.C. §§ 7661-7661f, (c) the Prevention of Significant Deterioration ("PSD")

provisions of the Act, 42 U.S.C. §§ 7470-7492, (d) the New Source Performance Standards

("NSPS") of the Act, 42 U.S.C. § 7411, and (e) the Nonattainment New Source Review

("NNSR") requirements of the Act, 42 U.S.C. §§ 7501-7515; the Missouri Air Conservation

Law, Chapter 643, RSMo; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.

§§ 6901-6992k; the Missouri Hazardous Waste Management Law, §§ 260.350-260.434, RSMo;

the Clean Water Act ("CWA"), 33 U.S.C. §§1251-1387; the Missouri Clean Water Law, Chapter

644, RSMo; the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42

U.S.C. §§ 11001-11050; the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675; and the Administrative Order on Consent,

Docket No. RCRA-07-2007-0008;

DRRC multi-media Consent Decree

**WHEREAS**, the Complaint against Defendant alleges that the U.S. EPA has provided notice of the CAA violations alleged herein to the Defendants and to the State of Missouri pursuant to Section 113(a) of the CAA, 42 U.S.C. § 7413(a), and Defendants stipulate that they have received actual notice of the violations alleged in the Complaint and that they do not contest the adequacy of the notice provided;

**WHEREAS**, the Parties anticipate that the injunctive relief implemented by Defendants pursuant to this Consent Decree will achieve significant reductions in $SO_2$, lead, and other pollutant emissions, thereby improving air, water, and soil quality;

**WHEREAS**, as part of the overall settlement, and in approximately the same timeframe as this Consent Decree is lodged and notice thereof is published in the Federal Register, the U.S. Environmental Protection Agency is finalizing and providing public notice of two administrative orders on consent with The Doe Run Resources Corporation ("DRRC"). First, a modification to an existing administrative order, Docket No. RCRA-07-2007-0008, pertaining to DRRC's handling and transportation of concentrate, ore, and other lead-bearing materials, will address alleged violations of that order and continue to improve upon DRRC's transportation practices.  Second, a new administrative order, Docket No. RCRA-07-2010-0031, requires DRRC to implement actions consisting of sampling and cleanup of residential properties, churches and high child impact areas in and around DRRC's smelter in Herculaneum, Missouri, with lead soil concentrations exceeding 400 parts per million ("ppm");

-2-

DRRC multi-media Consent Decree

**WHEREAS**, by agreeing to entry of this Consent Decree, Defendants do not admit any liability to the United States or the State arising out of the transactions or occurrences alleged in the Complaint;

**WHEREAS**, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE**, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action and over the Parties pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367; Section 113(b) of the CAA, 42 U.S.C. § 7413(b); Sections 301, 309, and 402 of the CWA, 33 U.S.C. §§ 1311, 1319, and 1342; Section 3008 of RCRA, 42 U.S.C. § 6928; Sections 304, 313, and 325 of EPCRA, 42 U.S.C. §§ 11004, 11023, and 11045; and Sections 109(c) and 113 of CERCLA, 42 U.S.C. §§ 9609(c) and 9613.  Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Defendants conduct business in, this judicial District.  This venue is also consistent with Section 113(b) of the CAA, 42 U.S.C. § 7413(b); CWA Section 309(b), 33 U.S.C. § 1319(b); RCRA

-3-

DRRC multi-media Consent Decree

Section 3008(a), 42 U.S.C. § 6928(a); EPCRA Section 325(b), 42 U.S.C. § 11045(b); and

CERCLA Section 113(b), 42 U.S.C. § 9613(b).

2.      Solely for the purposes of this Consent Decree and any action to enforce this

Consent Decree, Defendants waive all objections and defenses that they may have to the Court's

jurisdiction over this action, to the Court's jurisdiction over Defendants, and to venue in this

judicial District.  Defendants shall not challenge the terms of this Consent Decree or this Court's

jurisdiction to enter and enforce this Consent Decree.

3.      For purposes of this Consent Decree, Defendants agree that the Complaint states

claims upon which relief may be granted pursuant to the following environmental statutes and

their implementing federal and state regulations: the CAA, 42 U.S.C. §§ 7401-7671q for

violations of (a) the Federally-enforceable Missouri SIP, (b) Title V of the Act, 42 U.S.C.

§§ 7661-7661f, (c) the PSD provisions of the Act, 42 U.S.C. §§ 7470-7492, (d) the NSPS

provisions of the Act, 42 U.S.C. § 7411, and (e) the NNSR requirements of the Act, 42 U.S.C.

§§ 7501-7515; the Missouri Air Conservation Law, Chapter 643, RSMo; RCRA, 42 U.S.C.

§§ 6901-6992k; the Missouri Hazardous Waste Management Law, §§ 260.350-260.434, RSMo;

the CWA, 33 U.S.C. §§1251-1387; the Missouri Clean Water Law, Chapter 644, RSMo;

EPCRA, 42 U.S.C. §§ 11001-11050; and CERCLA, 42 U.S.C. §§ 9601-9675.

4.      Notice of the commencement of this action has been given to the State of

Missouri as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and Section 113 of the

CAA, 42 U.S.C. § 7413.

-4-

DRRC multi-media Consent Decree

## II.  APPLICABILITY

5.      The obligations of this Consent Decree apply to and are binding upon the United States and the State, and upon Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

6.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any vendor, supplier, or contractor retained to perform work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

7.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, vendors, suppliers, or contractors to take any actions necessary to comply with the provisions of this Consent Decree unless Defendants establish that such failure resulted from a Force Majeure event under Section XVIII (Force Majeure) of this Consent Decree.

8.      Transfer of Ownership or Operation.

a.      No transfer of ownership or operation, in whole or in part, of any of the Doe Run Facilities, whether in compliance with the procedures of this Paragraph 8 or otherwise, shall relieve Defendants of their obligation to ensure that the terms of the Decree are implemented, except as provided in Paragraph 8e., below.  Any attempt to transfer ownership or operation of any of the Doe Run Facilities without complying with

DRRC multi-media Consent Decree

this Paragraph 8 (Transfer of Ownership or Operation) constitutes a violation of this Decree.

b.     If Defendants propose to sell or transfer ownership or operation, in whole or in part, of any of the Doe Run Facilities, they shall provide the prospective transferee with a copy of this Consent Decree at least sixty (60) Days before such sale or transfer, and shall simultaneously provide written notice of the prospective transfer, together with a copy of the prospective transfer agreement, to the Plaintiffs pursuant to Section XXIII (Notices) of this Consent Decree.

c.     No sale or transfer of ownership or operation, in whole or in part, of any of the Doe Run Facilities shall take place before the transferee, Defendants, and the Plaintiffs have executed, and the Court has approved, a modification pursuant to Section XXVI (Modification) of this Consent Decree making the transferee a party defendant to this Consent Decree and jointly and severally liable with Defendants for all requirements of this Decree, with the exception of the obligations set forth in Section IX (Site Remediation – Herculaneum), Section X (Financial Assurances), Paragraphs 155, 156, 158, 161, and 162 (Stream Mitigation provisions) of Section XIV (Additional Injunctive Relief), and Section XV (Environmental Mitigation Projects), which may be applicable to the transferred or purchased Doe Run Facilities, except as provided in Paragraph 8e., below.

d.     This Consent Decree shall not be construed to impede the transfer of any ownership interests as long as the requirements of this Consent Decree are met.  This

-6-

DRRC multi-media Consent Decree

Consent Decree shall not be construed to prohibit a contractual allocation – as between Defendants and any transferee – of the burdens of compliance with this Decree, provided that both Defendants and the transferee shall remain jointly and severally liable to the Plaintiffs for the obligations of the Decree applicable to the transferred or purchased Ownership Interests, except as provided in Paragraph 8e., below.

e.      If the Plaintiffs agree that the transferee has the technical and financial ability to assume the obligations and liabilities of the Consent Decree and consent, in writing, to release Defendants from the obligations and liabilities of this Consent Decree applicable to the transferred Doe Run Facilities, then the Parties and the transferee may execute a modification that relieves Defendants of their liability under this Consent Decree for, and makes the transferee liable for, all obligations and liabilities applicable to the purchased or transferred Doe Run Facilities.  Notwithstanding the foregoing, however, Defendants may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Doe Run Facilities, including the obligations set forth in Sections XV (Environmental Mitigation Projects) and IV (Civil Penalty).  Defendants may propose and the Plaintiffs may agree to restrict the scope of joint and several liability of any transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Doe Run Facilities, to the extent such obligation may be adequately separated in an enforceable matter.

f.      The Plaintiffs may refuse to approve the substitution of the transferee for Defendants if they determine that the proposed transferee does not possess the requisite

DRRC multi-media Consent Decree

technical and financial ability to assume the obligations and liabilities of the Consent

Decree.  The Plaintiffs' decision to refuse to approve the substitution of the transferee for

the Defendants shall not be subject to judicial review.

## III.  DEFINITIONS

9.      Terms used in this Consent Decree that are defined in the CAA, CWA, RCRA,

EPCRA, CERCLA, or state law, or in federal and state regulations promulgated thereunder shall

have the meanings assigned to them in the applicable CAA, CWA, RCRA, EPCRA, CERCLA,

or state law or such regulations, unless otherwise provided in this Decree.  Whenever the terms

set forth below are used in this Consent Decree, the following definitions shall apply:

a.       "12-Month Rolling Tonnage" means the sum of the tons of either Refined

Lead Metal Production, Sinter Production, or Blast Furnace Sinter Consumption in the

most recent complete Month and the previous eleven (11) Months.  A 12-Month Rolling

Tonnage shall be calculated for each new complete Month in accordance with the

provisions of this Consent Decree.  Calculation of the first 12-Month Rolling Tonnage

shall commence 12 Months after the applicable production limit takes effect;

b.      "Air Conservation Law" shall mean the Missouri Air Conservation Law,

Chapter 643, RSMo;

c.      "Blast Furnace" shall mean any reduction furnace to which sinter is

charged and which forms separate layers of molten slag and lead bullion;

d.      "Blast Furnace Sinter Consumption" shall mean the quantity of sinter

charged to the Blast Furnace;

-8-

DRRC multi-media Consent Decree

e.      "CERMS" or "Continuous Emissions Rate Monitoring System" shall

mean, for obligations involving $SO_2$ under this Consent Decree, the devices defined,

installed, calibrated, maintained, and operated in accordance with 40 C.F.R. § 60.13; 40

C.F.R. Appendix B, Performance Specifications 2 and 6, and 40 C.F.R. Part 60,

Appendix F;

f.      "Clean Air Act" or "CAA" shall mean the federal Clean Air Act,

42 U.S.C. § 7401-7671q, and its implementing regulations;

g.      "Clean Water Act" or "CWA" shall mean the federal Clean Water Act,

33 U.S.C. § 1251-1387, and its implementing regulations;

h.      "Complaint" shall mean the Complaint filed by the United States and the

State Plaintiff in this action;

i.      "Consent Decree" or "Decree" shall mean this Consent Decree and all

appendices attached hereto, but in the event of any conflict between the text of this

Consent Decree and any appendix, the text of this Consent Decree shall control;

j.      "CWA Facilities" shall mean the Buick Resource Recycling Facility, the

Glover Facility, the Herculaneum Lead Smelter Facility, the Brushy Creek Mine/Mill

Facility, the Buick Mine/Mill Facility, the Fletcher Mine/Mill Facility, the Sweetwater

Mine/Mill Facility, the Viburnum Mine/Mill Facility, the Viburnum Mine #35 (Casteel)

Facility, and the West Fork Unit Facility;

k.      "Day" shall mean a calendar day unless expressly stated to be a business

day.  In computing any period of time under this Consent Decree for submission of a

DRRC multi-media Consent Decree

report, plan, or other deliverable pursuant to Section XII (Compliance Requirements:

Approval of Deliverables), where the last day would fall on a Saturday, Sunday, or

federal or state holiday, the period shall run until the close of business of the next

business day;

l.      "Defendants" shall mean The Doe Run Resources Corporation; the Doe

Run Resources Corporation d/b/a "The Doe Run Company"; and the Buick Resource

Recycling Facility, LLC;

m.      "Demonstration Plant" shall mean the lead technology demonstration plant

Doe Run operates at the West Fork Unit Facility located in Bunker, Missouri to

demonstrate a hydro-metallurgical-electrochemical process for producing lead metal from

concentrates and is governed by the terms of the Missouri Department of Natural

Resources, Missouri Air Conservation Commission Permit to Construct 012007-019.

Pursuant to the Permit to Construct, the plant shall not process more than eight (8) tons of

lead concentrate per day nor emit more than 0.6 tons per year of lead.  The lead produced

from this plant is not subject to the Refined Lead Metal Production limit in Paragraph 19

as long as it is sent to the Buick Resource Recycling Facility located in Boss, Missouri for

further processing;

n.      "Doe Run" shall mean The Doe Run Resources Corporation and the Doe

Run Resources Corporation d/b/a "The Doe Run Company";

o.      "Doe Run Facilities" shall mean the following facilities: the Buick

Resource Recycling Facility located in Boss, Missouri; the Glover Facility located in

DRRC multi-media Consent Decree

Annapolis, Missouri; the Herculaneum Lead Smelter Facility located in Herculaneum, Missouri; the Brushy Creek Mine/Mill Facility located in Bunker, Missouri; the Buick Mine/Mill Facility located in Boss, Missouri; the Fletcher Mine/Mill Facility located in Bunker, Missouri; the Sweetwater Mine/Mill Facility located in Ellington, Missouri; the Viburnum Mine Facility located in Viburnum, Missouri; the Viburnum Mine #35 (Casteel) Facility located in Bixby, Missouri; and, the West Fork Unit Facility located in Bunker, Missouri;

p.        "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

q.        "Effective Date" shall have the definition provided in Section XXIV;

r.        "Financial Assurance" shall mean financial assurance for the benefit of EPA and MDNR as set forth in Appendices E, F, G, and L of the Consent Decree;

s.        "Flow Rate Sensor" shall mean the portion of the CERMS that senses the volumetric flow rate and generates an output proportional to that flow rate;

t.        "Herculaneum Lead Smelter" shall mean the Primary Lead Smelter owned and operated by Defendants located at 881 Main Street, Herculaneum, Missouri, and includes the Sintering Machine, Sinter Bed, Sintering Machine Discharge End, Blast Furnaces, and Sulfuric Acid Plant;

u.        "Lead-Bearing Materials" shall mean all granular or semi-granular product or waste material which contains more than 400 milligrams per kilogram ("mg/kg") of

DRRC multi-media Consent Decree

lead.  The Parties do not interpret this definition to include contaminated soils excavated

from residential yards, road edges, churches, vacant lots, or high child impact areas;

      v.      "Lodging Date" shall mean the date on which the United States initially

files the Consent Decree with the Court prior to commencement of the public comment

period required by Section XXVIII (Public Participation) of this Consent Decree;

      w.      "Malfunction" shall mean any sudden, infrequent, and not reasonably

preventable failure of air pollution control equipment, process equipment, or a process to

operate in a normal or usual manner.  Failures that are caused in part by poor maintenance

or careless operation are not Malfunctions;

      x.      "MDNR" shall mean the Missouri Department of Natural Resources;

      y.      "Missouri State Operating Permit" or "MSOP" shall mean MSOP No.

MO-0000337 for the Buick Resource Recycling Facility, MSOP No. MO-0001121 for the

Glover Facility, MSOP No. MO-0000281 for the Herculaneum Lead Smelter Facility,

MSOP No. MO-0001848 for the Brushy Creek Mine/Mill Facility, MSOP No. MO-

0002003 for the Buick Mine/Mill Facility, MSOP No. MO-0001856 for the Fletcher

Mine/Mill Facility, MSOP No. MO-0001881 for the Sweetwater Mine/Mill Facility,

MSOP No. MO-0000086 for the Viburnum Mine Facility, MSOP No. MO-0100226 for

the Viburnum Mine #35 (Casteel) Facility, and MSOP No. MO-0100218 for the West

Fork Unit Facility;

      z.      "Month" shall mean calendar month;

-12-

DRRC multi-media Consent Decree

aa.     "National Ambient Air Quality Standards" or "NAAQS" shall mean national ambient air quality standards that are promulgated pursuant to Section 109 of the CAA, 42 U.S.C. § 7409;

bb.     "Nonattainment NSR" or "NNSR" shall mean the nonattainment New Source Review program under Part D of Subchapter I of the CAA, 42 U.S.C. §§ 7501-7515, and the federal regulations codified at 40 C.F.R. Part 51, and the federally approved provisions of the Missouri SIP, 10 CSR 10- 6.060(7);

cc.     "NSPS" shall mean New Source Performance Standards within the meaning of Part A of Subchapter I of the CAA.  General NSPS requirements are codified at 40 C.F.R. Part 60, Subpart A.  NSPS requirements specifically for Primary Lead Smelters are codified at 40 C.F.R. Part 60, Subpart R;

dd.     "Paragraph" shall mean a portion of this Decree identified by an arabic numeral;

ee.     "Parties" shall mean Defendants, the State, and the United States of America, and "Party" means any one of the named "Parties;"

ff.     "Plaintiffs" shall mean the United States of America and the State of Missouri;

gg.     "Pollutant Analyzer" shall mean that portion of the CERMS that senses the pollutant gas and generates an output proportional to the gas concentration;

hh.     "Primary Lead" shall mean lead metal produced from the processing of lead ore concentrates;

DRRC multi-media Consent Decree

ii.     "Primary Lead Smelter" shall mean any installation or intermediate process engaged in the production of lead from lead sulfide ore concentrates through the use of pyrometallurgical techniques;

jj.     "Project Dollars" means Defendants' expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Section XV (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section XV (Environmental Mitigation Projects) and Appendix J of this Consent Decree, and (b) constitute Defendants' direct payments for such projects, or Defendants' external costs for contractors, vendors, and equipment;

kk.     "PSD" shall mean Prevention of Significant Deterioration within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, the federal regulations codified at 40 C.F.R. Part 51.166, and the federally approved provisions of the Missouri State Implementation Plan ("SIP"), 10 CSR 10-6.060;

ll.     "RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., and its implementing regulations;

mm.     "Refined Lead Metal Production" shall mean the quantity of pure Primary Lead produced and contained in corroding grade and alloy products;

nn.     "Section" shall mean a portion of this Decree identified by a roman numeral;

-14-

DRRC multi-media Consent Decree

oo.    "Shutdown" shall mean the cessation of operation of the Sulfuric Acid Plant or the Sintering Machine for any purpose;

pp.    "Sinter bed" shall mean the lead sulfide ore concentrate charge within a Sintering Machine;

qq.    "Sinter Production" shall mean the quantity of agglomerated product from the up-drafted Sintering Machine that is not fed back into the Sintering Machine;

rr.    "Sintering Machine" shall mean any furnace in which a lead sulfide ore concentrate charge or any other lead bearing materials are heated in the presence of air to eliminate sulfur contained in the charge and to agglomerate the charge into a hard porous mass called sinter;

ss.    "Sintering Machine Discharge End" shall mean any apparatus which receives sinter as it is discharged from the conveying grate of a Sintering Machine;

tt.    "$SO_2$" shall mean the pollutant sulfur dioxide;

uu.    "$SO_2$ Mass Cap" shall mean the maximum amount of $SO_2$ emissions from the Herculaneum Lead Smelter expressed in tons of $SO_2$ emitted during the most recent complete Month and the previous eleven (11) Months.  Compliance with the $SO_2$ Mass Cap shall be calculated for each new complete Month.  In determining compliance with the $SO_2$ Mass Cap, in accordance with the Emissions Monitoring requirements of Paragraph 20.d of this Decree, all $SO_2$ emissions from normal operations, Startup, Shutdown, and Malfunction of the Sintering Machine and Sulfuric Acid Plant shall be

DRRC multi-media Consent Decree

included.  Calculation of the $SO_2$ Mass Cap shall commence 12 Months after the emission limit takes effect;

vv.     "$SO_2$ Short-term Limit" shall mean a daily $SO_2$ emission limit at the Herculaneum Lead Smelter expressed as pounds of $SO_2$ emitted per Day.  Compliance with the $SO_2$ Short-term Limit shall be calculated in accordance with the Emissions Monitoring provisions of Paragraph 20.d of this Decree by calculating the sum of mass $SO_2$ hourly emissions from 12am to 12am on each Day.  In determining compliance with the $SO_2$ Short-term Limit, all $SO_2$ emissions from normal operations, Startup, Shutdown, and Malfunction of the Sintering Machine and Sulfuric Acid Plant shall be included.

ww.     "State Plaintiff" or "State" shall mean the State of Missouri;

xx.     "Startup" shall mean setting in operation of the Sintering Machine or Sulfuric Acid Plant for any purpose;

yy.     "Sulfuric Acid Plant" shall mean a process unit engaged in the production of sulfuric acid and related processes using the contact process at the Herculaneum Lead Smelter;

zz.     "Title V Permit" shall mean a permit required or issued pursuant to the requirements of Subchapter V of the CAA, 42 U.S.C. § 7661-7661f; 10 CSR 10-6.065; and  Section 643.078, RSMo;

aaa.    "Ton" or "Tons" shall mean short ton or short tons;

bbb.    "Unit" shall mean a piece of equipment or an emissions source that is subject to a requirement within this Consent Decree;

-16-

DRRC multi-media Consent Decree

ccc.    "United States" shall mean the United States of America, acting on behalf of the Environmental Protection Agency ("EPA").

## IV.  CIVIL PENALTY

10.    Within thirty (30) Days after the Effective Date of this Consent Decree, Defendants shall pay the sum of $3.5 million to the United States as a civil penalty.  One million dollars of this penalty amount is for violations of the Administrative Order on Consent, In the Matter of The Doe Run Transportation and Haul Routes, Southeastern Missouri, Docket No. RCRA-07-2007-0008.  Failure to timely pay the civil penalty required herein shall subject the Defendants to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Defendants liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

11.    Defendants shall pay the sum of $3.5 million required by Paragraph 10 to the United States by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Defendants, following the Lodging Date of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the Eastern District of Missouri, Thomas F. Eagleton U.S. Courthouse, 111 South 10th Street, Room 20.333, St. Louis, Missouri 63102, phone: (314) 539-2200.  At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States, et al. v. The Doe Run Resources Corporation, et al., and shall

DRRC multi-media Consent Decree

reference the civil action number and DOJ case number DJ# 90-5-2-1-07390/1, to the United

States in accordance with Section XXIII (Notices) of this Decree; by email to

acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio  45268

12.     Defendants shall not deduct any penalties paid under this Decree pursuant to this

Section or Section XVII (Stipulated Penalties) in calculating its federal, State, or local income

tax.

13.     Defendants shall pay to the State as a civil penalty the principal sum of $3.5

million.  Payment to the State shall be made in three installments.  The first payment of $1.5

million shall be due within thirty (30) Days after the Effective Date of this Consent Decree.

Failure to timely pay the civil penalty required herein shall subject the Defendants to interest

accruing from the date payment is due until the date payment is made at the rate prescribed by

28 U.S.C. § 1961, and shall render Defendants liable for all charges, costs, fees, and penalties

established by law for the benefit of a creditor or of the State in securing payment.  Subsequent

payments of $1 million shall be due one year thereafter until all payments have been made.  Each

installment payment of $1 million shall include the principle amount due plus an additional sum

for accrued interest on the declining principle balance calculated from the Effective Date at the

rate prescribed by 28 U.S.C. § 1961.  Defendants may accelerate these payments, and interest due

on the accelerated payments shall be reduced accordingly.  Each installment payment shall be

divided among the counties of Iron, Reynolds, Jefferson and Washington as follows: fifty (50)

-18-

DRRC multi-media Consent Decree

percent to Iron County; thirty (30) percent to Reynolds County; fifteen (15) percent to Jefferson

County; and five (5) percent to Washington County.  The checks for the civil penalty shall be in

the form of certified checks or cashier's checks made payable to the: (1) "State of Missouri (Iron

County School Fund)"; (2) "State of Missouri (Reynolds County School Fund)"; (3) "State of

Missouri (Jefferson County School Fund)"; and (4) "State of Missouri (Washington County

School Fund)".  The checks shall be mailed to:

> Collections Specialist
> Office of the Attorney General
> P.O. Box 899
> Jefferson City, MO 65102-0899.


## V.  COMPLIANCE REQUIREMENTS: CLEAN AIR ACT

**A.  Sulfur Dioxide and Lead Emissions Compliance Schedule and Interim Limits at the Herculaneum Lead Smelter**

**Election to Cease Smelting Operation**

14.     Rather than comply with required $SO_2$ best available control technology

("BACT") and lead lowest achievable emissions reduction ("LAER") emission limits through the

installation of emission control technologies, and because Doe Run is pursuing alternative

technology for processing lead concentrate, Doe Run has, for independent business reasons,

elected to permanently cease smelting operations of the Herculaneum Lead Smelter in

accordance with the schedule set forth in this Paragraph.  Doe Run shall:

> a.      retire and permanently cease delivery to and processing of all lead sulfide
>
> ore concentrates at the Herculaneum Lead Smelter and all associated handling equipment
>
> by no later than December 31, 2013;

DRRC multi-media Consent Decree

       b.     retire and permanently cease operation of the Sintering Machine and ancillary equipment by no later than December 31, 2013;

       c.     retire and permanently cease operation of the Sulfuric Acid Plant by no later than December 31, 2013; and

       d.     retire and permanently cease operation of the Blast Furnaces by no later than April 30, 2014.

15.    Upon the cessation of operation of the emissions units at Herculaneum Lead Smelter listed in Paragraph 14 of this Consent Decree, Doe Run shall surrender all portions of their air pollution permits related to the emissions units listed in Paragraph 14 of this Consent Decree through a written request to the MDNR within thirty (30) Days after cessation of operation, requesting removal of all such units from Doe Run's Title V Operating Permit.  Doe Run shall provide written notice of such surrender to the Plaintiffs as set forth in Section XXIII (Notices).

16.    By no later than February 28, 2012, Doe Run shall provide the State with documentation necessary to support an amendment to the Missouri State Implementation Plan that reflects the cessation of operation described in Paragraph 14 of this Consent Decree.

17.    In conjunction with and in a timeframe consistent with the 2008 Lead NAAQS rule (73 Fed. Reg. 66,964 (Nov. 12, 2008)), the State of Missouri shall submit to EPA a revision to the Missouri State Implementation Plan to include the cessation of operation described in Paragraph 14 of this Consent Decree.

DRRC multi-media Consent Decree

18.     In any permitting action involving the Herculaneum Lead Smelter, after the timeframes prescribed in Paragraph 14 of the Consent Decree, all emission units described in Paragraph 14 of the Consent Decree shall have baseline actual emissions (as defined in 40 C.F.R. § 52.21 (b)(48) and 10 CSR 10-6.060(1)(A)) of zero (0) tons per year.

**Interim Compliance Milestones Before Cessation of Smelting Operation**

19.     From the Lodging Date of this Consent Decree, Doe Run shall achieve, maintain and comply with the following production limit across all of its operations in the United States of America, with the exception of the Demonstration Plant at the West Fork Unit Facility, until cessation of operation of the Herculaneum Lead Smelter occurs in accordance with Paragraph 14: From the first Day of the Month following the Lodging Date, Refined Lead Metal Production shall not exceed a 12-Month Rolling Tonnage of 130,000.  To demonstrate compliance with this limit, Doe Run shall provide monthly logs that track refined lead metal produced on a daily basis, using the spreadsheet attached hereto as Appendix A, unless and until an alternative spreadsheet is approved by Plaintiffs, as well as monthly logs that track refined lead metal produced on a daily basis across Doe Run's operations in the United States of America, with the exception of the Demonstration Plant at the West Fork Unit Facility, as a part of the semi-annual status report required in Section XVI (Reporting Requirements).

20.     From the Lodging Date of this Consent Decree, Doe Run shall achieve, maintain and comply with the following emission and production limits at the Herculaneum Lead Smelter until cessation of operation occurs in accordance with Paragraph 14:

-21-

DRRC multi-media Consent Decree

a.      Sinter Production and Blast Furnace Sinter Consumption:  From the first

Day of the Month following the Lodging Date, the Sinter Production and Blast Furnace

Sinter Consumption at the Herculaneum Lead Smelter shall not exceed the production

limits set forth in Subparagraphs 20.a.i through 20.a.ii below.  To demonstrate

compliance with these limits, Doe Run shall provide monthly logs that track sinter

throughput and blast furnace sinter throughput on a daily basis, using the spreadsheet

attached hereto as Appendix A, unless and until an alternative spreadsheet is approved by

Plaintiffs, as part of the semi-annual status report required in Section XVI (Reporting

Requirements).

i.      Sinter Production shall not exceed a 12-Month Rolling Tonnage of

326,370 tons; and

ii.     Blast Furnace Sinter Consumption shall not exceed a 12-Month

Rolling Tonnage of 326,370 tons.

b.      Lead Emission Limits:  Emissions of lead from the Herculaneum Lead

Smelter shall comply with the 1.0 pound per ton of lead limit set forth in 40 C.F.R.

§ 63.1543.

i.      No later than January 15, 2011, Doe Run shall submit a testing

plan to EPA and MDNR in accordance with Section XXIII (Notices) of this

Consent Decree for review and approval by Plaintiffs pursuant to Section XII

(Compliance Requirements: Approval of Deliverables).  The testing plan shall be

in accordance with the test methods set forth in 40 C.F.R. § 63.1546 and will

-22-

specify the tests that will be performed, the test methods that will be utilized, and the emission points that will be sampled.  Doe Run shall make any modifications to the test methods or procedures requested by EPA or MDNR, subject to Doe Run's right to invoke Dispute Resolution.

   ii.      Doe Run shall conduct performance testing in accordance with 40 C.F.R. § 63.1546 within thirty (30) Days after Plaintiffs' approval of the testing plan.

   iii.      Within sixty (60) Days following completion of the performance test(s) specified in Paragraph 20.b.i. of this Consent Decree, Doe Run shall submit the results of the test in accordance with Section XXIII (Notices) of this Consent Decree.

   c.      <u>SO$_2$ Emission Limits at the Herculaneum Lead Smelter:</u>  By no later than the Lodging Date of this Consent Decree, Doe Run shall comply with the following SO$_2$ emissions limits at all times:

   i.      SO$_2$ Short-term Limit: 223,700 pounds of SO$_2$; and

   ii.      SO$_2$ Mass Cap: 18,501 tons of SO$_2$.

   d.      <u>Emissions Monitoring</u>

   i.      <u>CERMS Operation</u>:  By no later than the Lodging Date of this Consent Decree, Doe Run shall maintain and operate a CERMS on the main stack of the Herculaneum Lead Smelter capable of measuring the hourly mass rate of SO$_2$ emissions.  Except during CERMS breakdowns, repairs, calibration checks,

-23-

DRRC multi-media Consent Decree

and zero span adjustments, the CERMS shall be in continuous operation and shall be used at the Herculaneum Lead Smelter to demonstrate compliance with the $SO_2$ emission limits established in Paragraph 20.c. of this Consent Decree.

  ii. <u>CERMS Specifications:</u>  The CERMS shall be installed, calibrated, operated, maintained, certified, and audited in accordance with the provisions of 40 C.F.R Part 60, Appendix B, Performance Specifications 2 and 6 and 40 C.F.R Part 60, Appendix F.

  iii. <u>CERMS Breakdown</u>: Doe Run shall take all reasonable steps to avoid CERMS breakdowns and minimize CERMS downtime.  This shall include, but is not limited to, operating and maintaining the CERMS in accordance with best practices and maintaining an on-site inventory of spare parts or other supplies necessary to make rapid repairs to the equipment.

  iv. <u>Use of Substitute Data in the Event of CERMS Breakdown:</u>  For the purposes of determining compliance with the $SO_2$ emission limits established in Paragraph 20 of this Consent Decree in the event of CERMS Breakdown, Doe Run shall use the following substitute data procedures:

   (a) For any failure or out-of-control period of the $SO_2$ pollutant analyzer less than 24 hours, Doe Run shall substitute the previous Day's hourly average $SO_2$ emission rate for each one-hour period of missing data resulting from the outage.

   (b) For any failure or out-of-control period of the $SO_2$ pollutant

-24-

DRRC multi-media Consent Decree

analyzer greater than 24 hours, Doe Run shall provide substitute data by: (1) developing an emission factor in units of pounds of $SO_2$ per ton of lead sinter production by dividing the pounds of $SO_2$ emissions measured during the most recent full Day of CERMS operation prior to the outage and the lead sinter produced that same Day and (2) tracking hourly lead sinter production during the outage.

(c)  For any failure or out-of-control period of the flow rate sensor, Doe Run shall provide substitute data using engineering calculations of the hourly mass $SO_2$ emission rate based on the $SO_2$ concentration measured by the $SO_2$ pollutant analyzer and estimated stack flow rates.

21.     For the purpose of establishing whether or not Doe Run has violated or is in violation of any requirement under this Consent Decree, nothing in this Consent Decree shall preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether the Herculaneum Lead Smelter would have been in compliance with requirements of this Consent Decree if the appropriate compliance procedure had been performed.

22.     At all times, including periods of Startup, Shutdown, and Malfunction, Doe Run shall, to the extent practicable, maintain and operate the Herculaneum Lead Smelter in a manner consistent with good air pollution control practices for minimizing emissions.

**B.     Prohibition on Netting Credits or Offsets From Required Controls**

23.     Emission reductions generated by Defendants to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease

-25-

DRRC multi-media Consent Decree

for the purpose of obtaining a netting credit under the CAA's Nonattainment NSR and/or PSD programs.

24.     Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by MDNR or EPA as creditable contemporaneous emissions decreases for the purpose of attainment demonstrations submitted pursuant to CAA § 110, 42 U.S.C. § 7410, or in determining impacts on NAAQS, PSD increment, or air quality related values, including visibility in a Class I area.

**C.     Installation of Pressure Drop Monitor at the Buick Mine/Mill**

25.      Buick Mine/Mill is a lead, zinc, and copper mining and milling operation located at HC 1, Box 1390, Missouri Highway Route KK, Boss, Missouri 65440.  Buick Mine/Mill is subject to the requirements of Part 70 Operating Permit No. OP2003-011 which was issued on March 7, 2003, and was scheduled to expire on March 4, 2008 ("Permit No. OP2003-011").

26.     In addition to other requirements, Permit No. OP2003-011 contains emission unit specific emission limitations for the various emission units at the Buick Mine/Mill.  Permit No. OP2003-011 identifies Underground Concrete Batch Plant #1 as emission unit EU0020 at the Buick Mine/Mill.  Permit Condition EU0020-001 contains a number of conditions for emission unit EU0020, one of which is a requirement to install instruments to monitor the operating pressure drop across the baghouse.

27.     Within sixty (60) Days of the Lodging Date of this Consent Decree Doe Run shall install and operate a pressure drop monitor in accordance with the requirements of Permit Condition EU0020-001.

DRRC multi-media Consent Decree

28.     Following installation of the pressure drop monitor, with the next semi-annual status report required by Paragraph 176, Doe Run shall submit a report to EPA and MDNR that provides documentation that a pressure drop monitor has been installed and is operational in accordance with the requirements of Permit Condition EU0020-001.  The report shall contain the certification statement signed by a responsible corporate official pursuant to Paragraph 181 of Section XVI (Reporting Requirements) of this Consent Decree.

VI.  <u>COMPLIANCE REQUIREMENTS: CLEAN WATER ACT</u>

**A.      Overview of CWA Requirements**

29.     This Consent Decree requires injunctive relief and compliance with Missouri State Operating Permit effluent limits and permit conditions at ten facilities ("the CWA Facilities") as follows:

a.      **Buick Resource Recycling Facility** (MSOP No. MO-0000337, re-issued August 23, 2002, and modified February 23, 2007) is a secondary lead smelter and battery recycling plant located at 18594 HWY KK, Boss, Missouri 65440.  The facility discharges from three permitted outfalls to an unnamed tributary of Crooked Creek, then to Crooked Creek.  The sources of permitted discharges at the facility include industrial process wastewater, process stormwater, leachate from a slag landfill, purge water from groundwater well sampling, and employee-generated domestic wastewater.

b.      **Glover Facility** (MSOP No. MO-0001121, re-issued March 23, 2007) is an inactive Primary Lead Smelter that is currently used as a storage and transportation hub for hauling activities.  The Glover Lead Smelter Facility is located at 42850 Highway

-27-

DRRC multi-media Consent Decree

49, Route 1, Box 60, Annapolis, Missouri 63620.  The facility is authorized to discharge

from four permitted outfalls, three of which discharge directly to Scoggins Branch, which

flows to Big Creek.  The sources of discharges at the facility include stormwater from the

smelter grounds and slag piles, employee generated domestic wastewater, and non-

contact cooling water.

      c.      **Herculaneum Lead Smelter Facility** (MSOP No. MO-0000281, re-

issued February 28, 2003) is a Primary Lead Smelter facility located at 881 Main Street,

Herculaneum, Missouri 63048.  The facility is authorized to discharge to the Mississippi

River from five permitted outfalls.  The sources of the permitted discharges include

industrial process wastewater, process stormwater, acid plant non-contact cooling water,

no treatment/non-contact cooling water, stormwater runoff from slag storage areas, and

stormwater runoff from the facility railroad track and staging area.  A draft permit placed

on public notice on November 20, 2009, eliminates the stormwater emergency overflow

point at Outfall 002 and identifies the receiving stream for Outfall 004 as Joachim Creek.

      d.      **Brushy Creek Mine/Mill Facility** (MSOP No. MO-0001848, re-issued

February 26, 2010) is a lead, zinc, and copper mining and milling operation located on

Missouri Highway Route KK, Bunker, Missouri 63629.  The facility discharges from

three permitted outfalls to Bill's Creek, which flows to the West Fork of the Black River.

The sources of permitted discharges include mine dewatering, stormwater runoff from

mining and milling facilities, seep wastewater from the toe drain at the base of the tailings

-28-

DRRC multi-media Consent Decree

impoundment, and process wastewater from mining and milling activities.  The facility

includes a 227-acre tailings impoundment.

        e.     **Buick Mine/Mill Facility** (MSOP No. MO-0002003, re-issued September

25, 2009) is a lead, zinc, and copper mining and milling operation located at HC 1, Box

1390, Missouri Highway Route KK, Boss, Missouri 65440.  The facility discharges from

two permitted outfalls to an unnamed tributary of Strother Creek and to Strother Creek.

The sources of permitted discharges include process wastewater, including stormwater,

from mining, milling and mine dewatering, and employee-generated domestic

wastewater.  The facility includes a 627-acre tailings impoundment.

        f.     **Fletcher Mine/Mill Facility** (MSOP No. MO-0001856, re-issued

November 13, 2009) is a lead, zinc, and copper mining and milling operation located on

Missouri Highway TT, Bunker, Missouri 63629.  The facility discharges from three

permitted outfalls to an unnamed tributary of Bee Fork, which flows to Bee Fork.  The

sources of permitted discharges from the facility include mine dewatering, stormwater

runoff from mining and milling facilities, and process wastewater from mining and

milling operations.  The facility includes a 390-acre tailings impoundment.

        g.     **Sweetwater Mine/Mill Facility** (MSOP No. MO-0001881, re-issued July

10, 2009) is a lead, zinc, and copper mining and milling operation located at Route 1,

Box 416, Ellington, Missouri 63638.  The facility discharges from three permitted

outfalls to an unnamed tributary to Adair Creek and Adair Creek, which flow to Logan

Creek, and to an unnamed tributary to Sweetwater Creek, which flows to Sweetwater

DRRC multi-media Consent Decree

Creek.  The sources of permitted discharges from the facility include employee-generated domestic wastewater, process wastewater from mining and milling activities, and industrial stormwater from mining and milling activities.  The facility includes a 592-acre tailings impoundment.

h.      **Viburnum Mine/Mill Facility** (MSOP No. MO-0000086, re-issued December 4, 2009) is a lead, zinc, and copper mining and milling operation located at P.O. Box 500, Viburnum, Missouri 65566.  The facility discharges from five permitted outfalls to an unnamed tributary of Indian Creek and to Indian Creek.  The sources of permitted discharges from the facility include stormwater runoff from the mining and milling facility, mine dewatering, and process wastewater from mining operations.  The facility includes a series of tailings impoundments covering approximately 812 acres.

i.      **Viburnum Mine #35 (Casteel) Facility** (MSOP No. MO-0100226, re-issued March 19, 2010) is a lead, zinc, and copper mining operation located at Missouri State Highway 32, Bixby, Missouri 65439.  The facility discharges from three permitted outfalls to an unnamed tributary of Crooked Creek, which flows to Crooked Creek.  The sources of permitted discharges from the facility include mine dewatering, stormwater runoff from mining facilities, and employee-generated domestic wastewater.  The facility includes two mine dewatering basins.

j.      **West Fork Unit Facility** (MSOP No. MO-0100218, re-issued March 12, 2010) is a lead, zinc, and copper mining operation located at 6854 Missouri State Highway KK, Bunker, Missouri 63629.  The facility discharges from four permitted

DRRC multi-media Consent Decree

outfalls to the West Fork of the Black River.  The sources of permitted discharges from

the facility include mine dewatering, employee-generated domestic wastewater, and

process wastewater and stormwater from mining and milling facilities.  The facility

includes a 515-acre tailings impoundment.

30.     Summary of Relief.  To further the objectives of this Consent Decree, Defendants

shall perform the measures set forth in Subsection B, below.  Defendants, in consultation and

coordination with the EPA and MDNR, shall implement the plans that are required by

Subsection B, below, of this Consent Decree, including requirements pertaining to data

collection, development of Underground Water Management Plans, and development of Surface

Water Management Plans, the latter of which Defendants shall submit for approval pursuant to

Section XII (Compliance Requirements: Approval of Deliverables) of this Consent Decree, with

the goal of improving water quality in Defendants' mine water and surface water to aid in

achieving full compliance with current and future MSOPs.  Defendants will also work with

MDNR, in consultation with EPA, to resolve outstanding issues in appeals of certain terms and

conditions of MSOPs at the CWA Facilities by implementing the measures set forth in Section

VII (Clean Water Act Permits: Resolution of Missouri State Operating Permit Appeals and

Compliance Deadlines) below and will comply with the MSOPs for the CWA Facilities pursuant

to the terms of this Consent Decree, the CWA, and the Missouri Clean Water Law.

**B.      Compliance Measures for all CWA Facilities**

31.     Defendants shall achieve and maintain full compliance with the terms and

conditions of its MSOPs for its CWA Facilities, and any amendments or modifications thereto,

DRRC multi-media Consent Decree

subject to the provisions of Section VII, Subsection I, establishing the Schedule for Compliance

With the Missouri State Operating Permits.  Defendants shall comply with the provisions of the

CWA, 33 U.S.C. § 1251 et seq., the Missouri Clean Water Law, Chapter 644, RSMo, the

implementing regulations thereof, and the Compliance Measures set forth below in this

Subsection.

### 1.  Underground Water Sampling and Analysis Plan

32.    In order to provide mine water quality data needed to prepare plans to reduce

metals loadings associated with Defendants' CWA Facilities and to improve overall compliance

with its MSOPs, Defendants shall prepare and implement an Underground Water Sampling and

Analysis Plan ("UWSAP") at the Brushy Creek Mine/Mill, Buick Mine/Mill, Fletcher Mine/Mill,

Sweetwater Mine/Mill, Viburnum Mine/Mill, Viburnum Mine #35 (Casteel), and West Fork Unit

Facilities (collectively the "Mine and Mine/Mill Facilities").

33.    Submittal of UWSAP.  Within ten (10) Days of the Lodging Date, Defendants

shall submit to Plaintiffs for review and comment a UWSAP for all of the Mine and Mine/Mill

Facilities.  Plaintiffs may provide comments, if any, within thirty (30) Days of receipt of the

UWSAP.  Defendants may revise the UWSAP in response to any comments provided by

Plaintiffs.  Defendants shall implement the UWSAP within the time frame set forth in Paragraph

36.  The purpose of the UWSAP is to collect water quality and flow data from subsurface

locations at the Mine and Mine/Mill Facilities to evaluate water quality and assist with water

management.  The data will be used to characterize the quality and quantity of subsurface water

at the Mine and Mine/Mill Facilities, assist with mine water management and evaluate water

DRRC multi-media Consent Decree

chemistry.  The analysis of mine water will enable Defendants to determine the efficacy and

efficiency of underground metals loading reduction activities.  The UWSAP shall include, but is

not limited to, the following activities as appropriate for each Mine and Mine/Mill Facility:

a.      Sampling of major groundwater inflows, including, but not limited to

shafts and borings;

b.      Sampling of underground sumps;

c.      Sampling of flooded mine workings;

d.      Sampling in underground drainage channels flowing to pumping

equipment;

e.      Sampling of mine de-watering flows to surface facilities; and

f.      Development of a data set for use in evaluating underground mine and

surface water management programs to reduce metals loadings in water at the Mine and

Mine/Mill Facilities prior to discharge.

**2.  Surface Water Sampling and Analysis Plan**

34.     In order to provide surface water quality data needed to prepare plans to reduce

metals loadings associated with Defendants' CWA Facilities and to improve overall compliance

with its MSOPs, Defendants shall prepare and implement a Surface Water Sampling and

Analysis Plan ("SWSAP") at the CWA Facilities.

35.     <u>Submittal of SWSAP</u>.  Within ten (10) Days of the Lodging Date, Defendants

shall submit to Plaintiffs for review and comment a SWSAP for the CWA Facilities.  Plaintiffs

may provide comments, if any, within thirty (30) Days of receipt of the SWSAP.  Defendants

DRRC multi-media Consent Decree

may revise the SWSAP in response to any comments provided by Plaintiffs. Defendants shall implement the SWSAP within the time frame described in Paragraph 36. The purpose of the SWSAP is to collect water quality and flow data from surface locations at all CWA Facilities to evaluate water quality and assist with water management. The data will be used to characterize the quality and quantity of surface water at all CWA Facilities, assist with surface water management, and evaluate water chemistry compared to current and new MSOPs. The analysis of surface water will enable Defendants to determine potential options (if required) to improve water quality and meet applicable MSOPs at the permitted outfalls. The SWSAP shall include, but is not limited to, the following activities as appropriate at all CWA Facilities:

  a. Sampling of inflows to and outflows from surface facilities, including, but not limited to, tailing impoundments, clear water basins, and meander systems;

  b. Sampling of receiving streams;

  c. Sampling of stormwater discharges in accordance with EPA Industrial Stormwater Monitoring and Sampling Guide (EPA 832-B-09-003, March 2009) set forth at http://www.epa.gov/npdes/pubs/msgp_monitoring_guide.pdf;

  d. Sampling of inflows to and outflows from man-made surface water features, including, but not limited to, surface water conveyance channels, retention basins, and detention basins, and which may include storage units, such as tanks, as well as inflows to and outflows from treatment plants; and

DRRC multi-media Consent Decree

     e.     Development of a data set for use in evaluating underground mine and

surface water management programs to reduce metals loading in water at CWA Facilities

prior to discharge.

**3. Completion of UWSAP and SWSAP**

     36.     Defendants shall complete the first iteration of sampling and analysis under the

UWSAP and SWSAP within two hundred ten (210) Days after the Lodging Date, unless

Defendants choose to revise the UWSAP or SWSAP based on comments from the Plaintiffs.

Defendants shall submit revisions to Plaintiffs, if any, within forty-five (45) Days after receipt of

Plaintiffs' comments and shall complete the first iteration of sampling and analysis under the

UWSAP and/or SWSAP within one hundred eighty (180) Days thereafter.

**4. Quality Assurance Program Project**

     37.     <u>Quality Assurance Project Plan ("QAPP") for data validation and verification.</u>

Defendant will include in the UWSAP and SWSAP a QAPP that conforms to "EPA

Requirements for Quality Assurance Project Plans for Environmental Data Operations" (EPA

QA/R5. EPA/240/B-01/003 (March, 2001)) and "Guidance for Quality Assurance Plans" (EPA

QA/G5. EPA/240/R-02/009 (December, 2002)).  For analysis of samples pursuant to Sections VI

and VII of this Consent Decree, Defendants shall use laboratories that participate in a QA/QC

program compliant with these requirements and guidance.  Within ten (10) Days of the Lodging

Date, Defendants shall notify Plaintiffs of the laboratories selected by Defendants.  Defendants

shall retain a third-party independent contractor to audit all laboratories that Defendants will use

for analysis of samples pursuant to Sections VI (Compliance Requirements: Clean Water Act)

-35-

DRRC multi-media Consent Decree

and VII (Clean Water Act Permits: Resolution of Missouri State Operating Permit Appeals and Compliance Deadlines) of this Consent Decree prior to the initiation of any such sampling activities under this Consent Decree.  Defendants shall provide to EPA and MDNR a copy of reports of such laboratory audits within fourteen (14) Days after Defendants' receipt of each such audit report.

  38. <u>Laboratory Audits</u>. Upon EPA's request, Defendants shall notify a selected laboratory that EPA or an independent third-party contractor chosen by EPA will conduct a performance and/or QA/QC audit of the laboratories chosen by Defendants, whether before, during, or after sample analyses.  Upon EPA's request, Defendants shall have each of their laboratories perform analyses of up to 30 samples per calendar quarter provided by EPA or the third-party contractor to demonstrate laboratory QA/QC and performance.  If the audit reveals deficiencies in a laboratory's performance or QA/QC, Plaintiffs may require resampling and/or additional analysis, and Defendants shall submit a plan to address the deficiencies within ninety (90) Days of receipt of the results of the audit.  Unless Plaintiffs provide comments within thirty (30) Days of receipt thereof, Defendants shall implement the remedial plan in accordance with the schedule set forth therein.  If Plaintiffs provide comments requiring revision of the remedial plan, Defendants shall, subject to Defendants' right to invoke Dispute Resolution, within thirty (30) Days of receipt of Plaintiffs' comments, revise the remedial plan to address the comments and implement the revised remedial plan in accordance with the schedule set forth therein.

DRRC multi-media Consent Decree

### 5. UWSAP Report and SWSAP Report

39.     Defendants shall submit a UWSAP Report and a SWSAP Report with the results of the data from the first iteration of sampling and Defendants' analysis thereof to EPA and MDNR for review and comment within ninety (90) Days of completion of the first iteration of sampling and analysis under the UWSAP and the SWSAP.  The UWSAP Report and the SWSAP Report will each be reviewed by Plaintiffs based on completeness and presentation of information demonstrating full implementation of the UWSAP and the SWSAP, respectively. Any deficiencies in gathering information or accurate analysis of data collected pursuant to the UWSAP and/or SWSAP will be borne by Defendants and shall not be used as a basis for modification of any schedule to meet an interim or final compliance deadline for CWA Facilities under this Consent Decree.  The UWSAP Report and the SWSAP Report shall provide:

a.      Summaries of the data collected at each sampling location;

b.      Descriptions of all substantive deviations from the UWSAP or SWSAP, including any changed, deleted or additional sampling locations;

c.      A QAPP data validation report; and

d.      A discussion of whether the collected data is sufficient to satisfy all of the requirements to achieve the objectives of the UWSAP and the SWSAP.

40.     Until the date that Defendants submit the UWSAP Report and the SWSAP Report, if, after consultation with Plaintiffs, Defendants conclude that the data collected are not sufficient in quantity, quality, or scope to satisfy the requirements of or to achieve the objectives of the UWSAP and/or the SWSAP or the QAPP, then Defendants shall include in the UWSAP

DRRC multi-media Consent Decree

Report and/or the SWSAP Report and submit for Plaintiffs' review and comment a plan and

schedule for additional proposed sampling that will achieve those objectives and/or satisfy the

requirements as expeditiously as possible.  Unless Plaintiffs provide comments they identify as

significant regarding the plan and schedule for additional sampling within thirty (30) Days of

submission, Defendants shall implement the plan and schedule for additional sampling as

submitted.  If Plaintiffs provide significant comments regarding the plan and schedule for

additional sampling, Defendants shall, subject to Defendants' right to invoke Dispute Resolution,

revise the plan and schedule for additional monitoring to address such comments and resubmit it

to Plaintiffs, and shall thereafter implement the revised plan and schedule.  Extension of the

UWSAP and/or SWSAP sampling schedule pursuant to this Paragraph shall not be used as a

basis for modification of any schedule to meet an interim or final compliance deadline for CWA

Facilities under this Consent Decree.

**6.    Underground Water Management Plan**

41.    <u>Master Underground Water Management Plan</u>.  Within thirty (30) Days after the

Lodging Date, Doe Run shall prepare and submit to EPA and MDNR for review and comment a

Master Underground Water Management Plan ("UWMP").  The Master UWMP shall provide a

framework to evaluate the feasibility, practicality, and effectiveness of procedures and

methodologies to reduce metals loadings in mine water and underground process water at Doe

Run's Mine and Mine/Mill Facilities.  If EPA and/or MDNR provide comments on the Master

UWMP within thirty (30) Days of Doe Run's submittal of the Master UMWP, Doe Run may,

within forty-five (45) days after receipt of such comments, revise the Master UWMP to address

DRRC multi-media Consent Decree

the comments and submit the revised Master UWMP to EPA and MDNR.  The Master UWMP

shall, include, but not be limited to:

      a.      Source identification;

      b.      Identification and evaluation of potential source controls;

      c.      Development of Standard Operating Procedures ("SOPs") for source

control measure implementation;

      d.      Regularly scheduled personnel training for implementation of SOPs;

      e.      Performance assessment to evaluate the effectiveness of measures taken;

and

      f.      Implementation schedule.

42.    <u>Site-Specific UWMPs and Schedule</u>.  Doe Run shall develop a Site-Specific

UWMP for each Mine and Mine/Mill Facility based on the Master UWMP and the results of

UWSAP implementation for that particular Facility as presented in the UWSAP Report.  Doe

Run shall within ninety (90) Days of finalization of the UWSAP Report pursuant to Paragraph 39

and finalization of the Master UWMP pursuant to Paragraph 41, whichever is later, submit to

EPA and MDNR for review and comment a Site-Specific UWMP for one Mine or Mine/Mill

Facility, and shall submit an additional Site-Specific UWMP every thirty (30) Days thereafter

until a Site-Specific UWMP has been submitted for each of the Mine and Mine/Mill Facilities.

Doe Run shall implement each Site-Specific UWMP according to the schedule set forth therein,

but implementation as to each Site-Specific UWMP shall in no case be completed later than three

(3) years from the date it is submitted to EPA and MDNR.

DRRC multi-media Consent Decree

43.    UWMP Reporting.  As part of the semi-annual status report required pursuant to Paragraph 176, Doe Run shall provide a semi-annual report summarizing the progress of implementation of all the Site-Specific UWMPs pursuant to Section XXIII (Notices) of this Consent Decree.  Within thirty (30) Days after a request by Plaintiffs, Doe Run shall provide additional information and data regarding Site-Specific UWMP implementation, including but not limited to, the information and data that formed the basis for the annual report.

44.    UWMP Modification.  If Doe Run believes that new information or data gained through implementation of the UWMP and the SAP supports modification of the Master UWMP or any Site-Specific UWMP, Doe Run may modify the Master UWMP or any Site-Specific UWMP.  Any modifications will be noted in the semi-annual report required pursuant to Paragraph 43, and shall be subject to review and comment by Plaintiffs.  Any modifications to the Master UWMP or a Site-Specific UWMP shall not be considered "material modifications" within the meaning of Section XXVI (Modification) of the Decree.

45.    Completion of measures subject to Implementation Schedules in the Site-Specific UWMPs shall be enforceable under this Consent Decree.  Any failure to complete measures set forth in an Implementation Schedule by the scheduled deadline shall be subject to stipulated penalties as provided in Section XVII (Stipulated Penalties) of this Consent Decree unless Plaintiffs and Doe Run both agree in writing to the amendment of or deletion of measures on an Implementation Schedule.  Except for completion of measures set forth in the Implementation Schedule, the detailed requirements of the UWMPs are not specifically enforceable under this Consent Decree; however, a substantial failure to implement control measures or conduct

DRRC multi-media Consent Decree

performance assessments described in the UWMPs shall be subject to enforcement under this Consent Decree.

**7. Surface Water Management Plan**

46. <u>Surface Water Management Plans</u>.  Defendants shall carry out assessments and engineering analyses necessary to identify all measures needed to ensure that Defendants' surface water discharges comply with the requirements of the Clean Water Act, the regulations promulgated thereunder, the Missouri Clean Water Law, the regulations promulgated thereunder, MSOPs for all CWA Facilities, and the terms of this Consent Decree, and then shall implement all such measures in a timely manner.

a. <u>Master Surface Water Management Plan</u>.  Within sixty (60) Days of the Lodging Date, Defendants shall submit for review and approval by Plaintiffs pursuant to Section XII (Compliance Requirements: Approval of Deliverables) a Master Surface Water Management Plan ("SWMP") to serve as the framework for Site-Specific SWMPs developed pursuant to Paragraph 46.b.  The objectives of the SWMPs are to evaluate for all CWA Facilities the technical feasibility, practicality, and effectiveness of procedures and methodologies for management of process wastewater and stormwater, including, but not limited to, mine water pumped to the surface at the Mine and Mine/Mill Facilities. The Master SWMP shall include, but may not be limited to:

i. Water inventory, including but not limited to, an evaluation, with sampling, of inflows and outflows from surface water impoundments,

-41-

DRRC multi-media Consent Decree

including but not limited to discharges, seepage, drainage and evaporation;

   ii.   Source identification;

   iii.   Fate and transport evaluation;

   iv.   Sampling of Stormwater in accordance with EPA Industrial Stormwater Monitoring and Sampling Guide (EPA 832-B-09-003) set forth at http://www.epa.gov/npdes/pubs/msgp_monitoring_guide.pdf;

   v.   Preparation of Storm Water Pollution Prevention Plans ("SWPPP") in accordance with Guidance set forth in Appendix C;

   vi.   Identification of short and long-term control measures, including Best Management Practices ("BMPs") and capital improvements;

   vii.   Personnel training for implementation of control measures and SWPPPs;

   viii.   Performance assessment to evaluate the effectiveness of measures taken; and

   ix.   Implementation Schedule.  Notwithstanding the schedule that will be presented for any Site-Specific SWMP, the SWPPP for each CWA Facility will be completed no later than the deadline set forth in Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines) for each CWA Facility.

   b.   <u>Site-Specific Surface Water Management Plans</u>.  Defendants shall develop a Site-Specific SWMP for each CWA Facility to address the criteria in Appendix C

DRRC multi-media Consent Decree

(Storm Water Pollution Prevention Plans Guidance), the Master SWMP, and the results of SWSAP implementation as presented in the SWSAP Report.  Defendants shall also review and revise, as needed, the SWPPP for each CWA Facility as a component of Site-Specific SWMP development.  Within ninety (90) Days after the SWSAP Report is finalized pursuant to Paragraph 39 and the Master SWMP is approved or otherwise finalized pursuant to Section XII (Compliance Requirements: Approval of Deliverables), whichever is later, Defendants shall submit to EPA and MDNR for review and approval pursuant to Section XII (Compliance Requirements: Approval of Deliverables) a Site-Specific SWMP for one CWA Facility, and shall submit an additional Site-Specific SWMP every thirty (30) Days thereafter until a Site-Specific SWMP has been prepared for each of the CWA Facilities.  As to each Site-Specific SWMP submitted, unless EPA or MDNR provide notice of disapproval to Defendants within forty-five (45) Days of submittal of each Site-Specific SWMP, such Site-Specific SWMP shall be deemed approved.  After each Site-Specific SWMP is approved, deemed approved, or otherwise finalized pursuant to Section XII (Compliance Requirements: Approval of Deliverables) of the Decree, whichever is later, Defendants shall implement the approved Site-Specific SWMP according to the schedule set forth therein, but implementation of each Site-Specific SWMP shall in no case be completed later than three (3) years from the date it is deemed approved, as provided above, or the date that it is finalized pursuant to Section XII (Compliance Requirements: Approval of Deliverables), with the exception that Defendants may seek approval from Plaintiffs for a longer compliance schedule, not to

-43-

DRRC multi-media Consent Decree

exceed five (5) years from the date of approval, for those portions of a Site-Specific

SWMP that involve capital improvements which require more than three (3) years to

implement.

47.     SWMP Reporting.  As a part of the semi-annual status report required pursuant to

Paragraph 176, Defendants shall provide a semi-annual report summarizing the progress of

implementation of all the Site-Specific SWMPs pursuant to Section XXIII (Notices) of this

Consent Decree.  Within thirty (30) Days of a request by Plaintiffs, Defendants shall provide

additional information and data regarding Site-Specific SWMP implementation, including, but

not limited to, the information and data that formed the basis for the semi-annual report.

48.     SWMP Modification.  If Defendants believe that new information or data gained

through implementation of the SWMP and the SAP supports modification of the Master SWMP

or any site-specific SWMP, Defendants may modify the Master SWMP or any Site-Specific

SWMP, with the exception of capital improvements or control measures subject to an

Implementation Schedule, without prior approval by Plaintiffs, provided Defendants specifically

describe any such modifications in the semi-annual reports required pursuant to Paragraph 47.

Plaintiffs may, within sixty (60) Days of receipt of a semi-annual report describing an eligible

modification to the Master SWMP or a Site-Specific SWMP, disapprove such modification.

Such disapproval shall be subject to Section XII (Compliance Requirements: Approval of

Deliverables).  Any modifications to the Master SWMP or Site-Specific SWMP shall not be

considered "material modifications" within the meaning of Section XXVI (Modification) of this

Consent Decree.  Any proposed modifications to a SWMP Implementation Schedule or required

-44-

DRRC multi-media Consent Decree

control measures must be submitted to Plaintiffs for review and prior approval pursuant to

Section XII (Compliance Requirements: Approval of Deliverables).  Defendants shall submit all

proposed modifications to an Implementation Schedule or control measures at least sixty (60)

Days prior to the due date of the milestone for which the extension is sought and shall be deemed

approved unless Plaintiffs request additional information from Defendants regarding the

proposed modification or disapprove the proposed modification within forty-five (45) Days of

Plaintiffs' receipt thereof.  Modification of the Master SWMP or a Site-Specific SWMP,

including an Implementation Schedule or control measure, shall not automatically extend any

schedule to meet an interim or final compliance deadline for CWA Facilities under this Consent

Decree.

49.      The training requirements and the requirements to implement control measures,

conduct performance assessments, and comply with Implementation Schedules in the Site-

Specific SWMPs shall be enforceable under this Consent Decree.  Any failure to implement

control measures, conduct performance assessments, or to comply with a training requirement or

an Implementation Schedule shall also be subject to stipulated penalties as provided in Section

XVII (Stipulated Penalties) of this Consent Decree unless an amendment to a control measure or

Implementation Schedule has been approved, as provided in Paragraph 48, above.  Except as set

forth above, the detailed requirements of the Site-Specific SWMPs are not specifically

enforceable under this Consent Decree or subject to stipulated penalties as provided in Section

XVII (Stipulated Penalties) of this Consent Decree.  Nothing in this provision shall prohibit the

Plaintiffs from enforcement of a SWPPP incorporated into a CWA Facility's MSOP.

DRRC multi-media Consent Decree

**8. Site-Specific Injunctive Relief**

**<u>Herculaneum Lead Smelter Facility</u>**

50.     In order to enhance pH consistency of water delivered to the Herculaneum

wastewater treatment plant, by no later than August 1, 2010, Defendants shall install and

continuously operate a second lime slurry tank at the headworks of the Herculaneum wastewater

treatment plant pursuant to the April 12, 2010 Construction Permit Waiver issued by MDNR.

51.     By no later than July 1, 2010, Defendants shall submit a report for Plaintiffs'

review and approval pursuant to Section XII (Compliance Requirements: Approval of

Deliverables) of this Consent Decree evaluating the effectiveness of flocculating agents in the

Herculaneum wastewater clarifier.  Upon approval or finalization pursuant to Section XII

(Compliance Requirements: Approval of Deliverables), the findings of the report shall be

implemented according to the schedule set forth in the approved report.  The report shall include,

at a minimum:

>     a.     The performance of each flocculent considered for use in the Herculaneum
>
> wastewater treatment system;
>
>     b.     The flocculent chosen for the wastewater treatment system and
>
> justification therefor;
>
>     c.     An evaluation of projected compliance using the chosen flocculent;
>
>     d.     An analysis of the sludge generated by the chosen flocculent and any
>
> potential impacts on sludge disposal; and

-46-

DRRC multi-media Consent Decree

e.        An implementation schedule, if determined necessary to achieve

compliance.

52.        A Slag Storage Area Water Management Plan ("SSAWMP") shall be submitted

for Plaintiffs' review and approval pursuant to Section XII (Compliance Requirements: Approval

of Deliverables) by no later than January 31, 2011.  The SSAWMP shall be consistent with any

applicable requirements set forth in Administrative Order on Consent – Docket No. RCRA-07-

2000-0018; CERCLA-07-2000-0029, and shall include:

a.        An assessment of the characteristics of water entering the slag water

collection system;

b.        An evaluation of potential effective end uses and/or treatment of the

collected water; and

c.        A schedule for implementation.

53.        Defendants shall implement the SSAWMP according to the schedule set forth

therein upon approval of the SSAWMP by Plaintiffs pursuant to Section XII (Compliance

Requirements: Approval of Deliverables).

54.        In order to reduce hydraulic loading to the Herculaneum wastewater treatment

plant, Defendants shall install a truck wash water recycling system.  By no later than fifteen (15)

Days after the Lodging Date of this Consent Decree, Defendants shall submit a plan to Plaintiffs

for review and approval pursuant to Section XII (Compliance Requirements: Approval of

Deliverables) of this Consent Decree for recycling truck wash water.  Unless disapproved by

Plaintiffs within forty-five (45) Days of submission, the plan shall be deemed approved.  By no

-47-

DRRC multi-media Consent Decree

later than ninety (90) Days from receipt of a Missouri Clean Water Law Construction Permit or

waiver thereof, or two hundred forty (240) Days from the Lodging Date, whichever is earlier,

Defendants shall install and commence continuous operation of a truck wash water recycling

system at the Herculaneum Lead Smelter Facility.

**Glover Facility**

55.     By no later than June 1, 2010, Defendants shall submit a report to Plaintiffs for

review and approval pursuant to Section XII (Compliance Requirements: Approval of

Deliverables) evaluating the effectiveness of reagents used in the Glover Facility wastewater

treatment plant.  The report shall include a description of the evaluation steps, presentation of any

data generated during the evaluation, conclusions reached, a description of any recommended

changes in the chemicals used or the usage thereof in the wastewater treatment system, and an

implementation schedule.  Unless Plaintiffs provide notice of disapproval within thirty (30) Days

of submittal, Defendants will implement the report according to the plan and schedule.  If

Plaintiffs provide notice of disapproval, Defendants shall implement the report according to the

plan and schedule after finalization of the report pursuant to Section XII (Compliance

Requirements: Approval of Deliverables).

56.     Within thirty (30) Days after the Lodging Date, Defendants shall remove and

place in the Doe Run slag storage area any slag that has washed out of the slag storage area

containment berm.  Defendants shall immediately implement actions to stabilize and re-vegetate

the containment berm around the Doe Run slag storage area at the Glover Facility, and complete

re-vegetation by no later than October 31, 2010.

DRRC multi-media Consent Decree

57.     Within thirty (30) Days after the Lodging Date, Defendants shall submit to

Plaintiffs for review and approval pursuant to Section XII (Compliance Requirements:

Approval of Deliverables) a report on the use of sodium sulfide to reduce thallium in the Glover

Facility wastewater treatment system, and if changes are recommended, shall propose a

schedule for implementation.  Unless Plaintiffs provide notice of disapproval within thirty (30)

Days of submittal, Defendants shall implement the report according to the plan and schedule.  If

Plaintiffs provide notice of disapproval, Defendants shall implement the report, according to the

plan and schedule after finalization of the report pursuant to Section XII (Compliance

Requirements: Approval of Deliverables).

58.     Within ninety (90) Days after the Lodging Date of this Consent Decree, at the

Glover Facility domestic sewage extended aeration wastewater treatment unit Defendants shall

place and maintain a lock on the gate and shall secure and install warning signs on each side of

the fence surrounding that unit that at a minimum have letters that are two inches tall and that

state, "Wastewater Treatment Facility, Keep Out."

**Buick Resource Recycling Facility**

59.     In order to enhance hydraulic capacity, consistency of hydraulic throughput, and

ensure continuing compliance with its MSOP at the Buick Resource Recycling Facility

wastewater treatment plant, Defendants shall install and commence operation of a fourth sand

vertical gravity filter at the wastewater treatment plant pursuant to the March 24, 2010

Construction Permit Waiver issued by MDNR.  During any period of maintenance, Defendants

shall ensure back-up systems provide full treatment capacity and permit compliance.  Defendants

DRRC multi-media Consent Decree

shall install and commence operation of the equipment by no later than June 24, 2010.  The filter will serve as a backup or may be used to assist the existing three sand vertical gravity filters and shall have a maximum design capacity of no less than 235 gallons per minute ("GPM").

60.     In order to reduce hydraulic and metals loading to the Buick Resource Recycling Facility, Defendants shall:

a.      Install equipment for recycling non-contact cooling water in the battery desulfurization and crystallization areas and commence its operation by no later than October 1, 2010;

b.      Install return pumps for the blast furnace cooling water to allow reuse and recycling of non-contact cooling water by no later than November 1, 2010; and

c.      Submit to EPA and MDNR by no later than thirty (30) Days after the Effective Date of the Consent Decree, an evaluation for review and approval of a filter to capture metals from the dross and refinery granulation wastewater, and if a filter is determined feasible, a schedule for installation.  Unless disapproved by Plaintiffs within thirty (30) Days after submission, the evaluation shall be deemed approved.  If filter installation is feasible, Defendants shall within ninety (90) Days after MDNR's issuance of a Missouri Clean Water Law Construction Permit or waiver thereof, or two hundred seventy (270) Days after the Lodging Date, whichever is earlier, complete installation of the filter and commence its operation.

DRRC multi-media Consent Decree

### **West Fork Unit Facility**

61.     Defendants shall remove and replace the substrate in the north biocell of the West Fork Unit Facility wastewater treatment plant with the type of material, determined by Defendants through previous study, which supports the greatest treatment capabilities of the biocell pursuant to the March 24, 2010 Construction Permit Waiver issued by MDNR. Defendants shall install the substrate by August 30, 2010, and commence continuous operation thereof by no later than February 28, 2011.  No later than the Lodging Date of this Consent Decree and continuing thereafter with respect to all work performed pursuant to this Paragraph, Defendants shall ensure all materials removed from the biocell are properly handled and/or disposed of in compliance with all applicable federal, State and local requirements, including but not limited to stormwater, solid waste and hazardous waste requirements.

62.     No later than July 1, 2010, Defendants shall eliminate the discharge from Outfall 002 at the West Fork Unit Facility, the domestic wastewater treatment unit, until and unless the treatment unit is upgraded to ensure consistent compliance with all applicable effluent limitations.  Any action taken by Defendants to eliminate the discharge from Outfall 002 at the West Fork Unit Facility, such as pumping and hauling the wastewater, shall be in compliance with all applicable local, State and federal requirements.

63.     Within ninety (90) Days after the Lodging Date of this Consent Decree, Defendants shall secure and install signage at the West Fork Unit Facility domestic wastewater treatment unit, including but not limited to constructing a fence and locked gate around the facility and erecting warning signs. The warning signs shall at a minimum state, "Wastewater

DRRC multi-media Consent Decree

Treatment Facility, Keep Out," and be written in at least 2 inch tall letters and placed on all sides

of the fence surrounding the treatment unit.

## VII. CLEAN WATER ACT PERMITS: RESOLUTION OF MISSOURI STATE OPERATING PERMIT APPEALS AND COMPLIANCE DEADLINES

**A.      CWA Permitting Obligations**

64.     Operating Permits.  Defendants shall comply with applicable federal and/or State

permitting requirements for the CWA Facilities including, without limitation, submission of

timely MSOP applications to MDNR in accordance with this Section.  The installation of

pollution control equipment and measures required by Section VI, Subsection B (Compliance

Measures for all CWA Facilities) is injunctive relief required to achieve compliance with current

and future MSOPs, including MSOP modifications made pursuant to this Consent Decree.  This

Consent Decree is not and shall not be construed to be a permit or a ruling on a permit issued

pursuant to any federal or State statute or regulation, nor does compliance with its terms

guarantee compliance with any applicable law or regulation.  Except as specifically provided in

Section VII, Subsection I (Schedule for Compliance With Missouri State Operating Permits),

below, and Section XXI (Effect of Settlement/Reservation of Rights), this Consent Decree does

not affect or relieve Defendants of their responsibility to comply with any applicable federal,

State, or local law, regulation or permit.

65.     Construction.  Defendants shall timely apply for and obtain from MDNR all

permits necessary pursuant to State law to construct or modify any controls, processes, structures,

or facilities to implement the requirements of this Consent Decree.  If Defendants choose to

request a waiver of a Missouri Clean Water Law Construction Permit, such waiver request shall

DRRC multi-media Consent Decree

not delay completion of required injunctive relief under this Consent Decree.  Delay in receipt of

a Missouri Clean Water Law Construction Permit or waiver due to Defendants' failure to submit

an adequate, timely and complete application or waiver request to MDNR will not constitute a

Force Majeure event under Section XVIII (Force Majeure) of this Consent Decree.

66.     Permit Renewals and Modifications.  As required by State and federal law,

Defendants shall apply for renewal of any MSOPs for CWA Facilities at least one hundred eighty

(180) Days prior to their expiration.  Defendants shall apply for any necessary modification of an

MSOP for a CWA Facility at least one hundred twenty (120) Days prior to the expiration date of

any construction permit obtained to perform work required under this Consent Decree.  If

Defendants seek site-specific water quality based limitations or permit-specific limitations in any

MSOP for a CWA Facility Defendants shall timely submit information in support of such request

pursuant to Section VII, Subsection D (Site-Specific and Permit-Specific Limitations).

**B.     Resolution of Pending MSOP Appeals**

67.     The purpose of this Subsection is to set forth the mechanism for expedited

resolution of pending and anticipated appeals of conditions of CWA Facilities' MSOPs (the

issues under appeal and anticipated to be the subject of future appeals are referred to herein as

"Permit Appeal Issues").  Defendants and Plaintiffs have agreed upon a mechanism for expedited

resolution of the Permit Appeal Issues.

68.     Appealed Missouri State Operating Permits.  Certain provisions of the following

CWA Facility MSOPs are under appeal before the Missouri Administrative Hearing Commission

("Appealed MSOPs"):

-53-

DRRC multi-media Consent Decree

a. Buick Mine/Mill – MSOP No. MO-0002003, re-issued September 25, 2009, appeal filed October 23, 2009, supplement filed May 19, 2010;

b. Glover Facility – MSOP No. MO-0001121, re-issued March 23, 2007, appeal filed April 20, 2007, amended notice of appeal filed April 13, 2010;

c. Sweetwater Mine/Mill Facility – MSOP No. MO-0001881, re-issued July 10, 2009, appeal filed August 7, 2009, supplement filed May 19, 2010;

d. Fletcher Mine/Mill Facility – MSOP No. MO-0001856, re-issued November 13, 2009, appeal filed December 11, 2009, amended notice of appeal filed April 23, 2010, supplement filed May 19, 2010;

e. Viburnum Mine/Mill Facility – MSOP No. MO-0000086, re-issued December 4, 2009, appeal filed January 4, 2010, supplement filed May 19, 2010;

f. Brushy Creek Mine/Mill Facility – MSOP No. MO-0001848, re-issued February 26, 2010, appeal filed March 26, 2010, supplement filed May 19, 2010;

g. Viburnum Mine #35 (Casteel) Facility – MSOP No. MO-0100226, re-issued March 19, 2010, appeal filed April 16, 2010, supplement filed May 19, 2010; and

h. West Fork Unit Facility – MSOP No. MO-0100218, re-issued March 12, 2010, appeal filed April 9, 2010.

69. <u>Future Missouri State Operating Permits</u>.  The following CWA Facility MSOPs are expected to be reissued ("Future MSOPs"):

a. Herculaneum Lead Smelter Facility – MSOP No. MO-0000281, re-issued February 28, 2003, comments dated January 6, 2010; and

-54-

DRRC multi-media Consent Decree

b.      Buick Resource Recycling Facility – MSOP No. MO-0000337, re-issued

August 23, 2002, and modified February 23, 2007, comments dated March 15, 2010.

Defendants anticipate that permit conditions and other issues similar to those raised in the

appeals listed in Paragraph 68 above will be included in the Future MSOPs.  To the extent that

Defendants can identify these conditions and issues, such conditions and issues will be deemed

Permit Appeal Issues and will be subject to this Section VII (Clean Water Act Permits:

Resolution of Missouri State Operating Permit Appeals and Compliance Deadlines).

70.      <u>Stipulation for Waiver in Part and Abeyance in Part of Permit Appeals</u>.

a.      In consideration of the agreements of Plaintiffs and Defendants set forth

below, Defendants hereby specifically:

i.      Agree that the provisions set forth in this Section VII (Clean Water

Act Permits: Resolution of Missouri State Operating Permit Appeals and

Compliance Deadlines) of the Consent Decree are the exclusive provisions for

resolution of Permit Appeal Issues and all additional challenges to any MSOP

provision contained in any CWA Facility permit issued by MDNR and in effect as

of the Lodging Date of this Consent Decree, or in any Future MSOPs as identified

in Paragraph 69, or in any permit modification issued by MDNR after the Lodging

Date of this Consent Decree and prior to the termination of this Consent Decree

pursuant to Section XXVII (Termination) intended to resolve a Permit Appeal

Issue, and waive their right under federal, State, or local law to otherwise appeal

or challenge any provision of such CWA Facility MSOPs; and

DRRC multi-media Consent Decree

ii.      Agree that the procedures in Paragraph 82 apply to MSOP

modifications issued by MDNR after the Lodging Date of this Consent Decree

that are not intended to resolve a Permit Appeal Issue and, except for issuance of

Future MSOPs identified in Paragraph 69, to reissuance of CWA Facility MSOPs

by MDNR after the Lodging Date of this Consent Decree and prior to the

termination of this Consent Decree pursuant to Section XXVII (Termination); and

iii.      Reserve their right under federal, State and local law to appeal or

challenge any provision of any CWA Facility MSOP or MSOP modification

issued by MDNR during the term of this Consent Decree that differs significantly

and/or materially from the terms of settlement of such permit conditions as

resolved pursuant to Subsections D, F, G, or H of this Section (e.g., if, based on

public comments or pursuant to direction from the Missouri Clean Water

Commission, the final MSOP issued by MDNR differs significantly and/or

materially from the terms of the permit agreed upon by the State and Defendants

or from the recommended decision of the Special Master, as applicable), and to

appeal or challenge any provision of any CWA Facility MSOP or MSOP

modification issued after termination of this Consent Decree pursuant to Section

XXVII (Termination).

b.      Permit Appeal Issues and other challenges to provisions of any CWA

Facility MSOP issued by MDNR and in effect as of the Lodging Date of this Consent

DRRC multi-media Consent Decree

Decree, or in any Future MSOPs as identified in Paragraph 69, shall be resolved as follows:

        i.        The State and Defendants have agreed to settlement of certain CWA Facility MSOP terms and conditions appealed by Defendants or anticipated to be appealed, including dismissing some Permit Appeal Issues and modifying some MSOPs to address Permit Appeal Issues, as specifically set forth in Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Tables 1 and 2;

        ii.      Plaintiffs and Defendants have agreed to schedules of compliance to meet effluent limitations and conditions as set forth in the Schedule for Compliance with Missouri State Operating Permits pursuant to Subsection I (Schedule for Compliance With Missouri State Operating Permits) hereunder and the provisions set forth in Section XXI (Effect of Settlement/Reservation of Rights) of this Consent Decree;

        iii.      The State and Defendants have agreed to engage in resolution processes, as set forth in Subsection D hereunder (Site-Specific and Permit-Specific Limitations), regarding site-specific and permit-specific effluent limitations and conditions specifically identified in Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Tables 3 and 5, and as may be identified pursuant to Subsection C (Identification of Remaining Permit Appeal Issues), below, and as identified in Appendix D (Resolution of Permit

DRRC multi-media Consent Decree

Appeal Issues for Clean Water Act Facility MSOPs), Table 6, including

monitoring requirements and numeric effluent limitations or the methodology

used for calculating the numeric limits for metals, including, but not limited to

arsenic, cadmium, copper, lead, mercury, nickel, selenium, thallium, and zinc, and

for other pollutant parameters, including BOD, COD, TSS, ammonia, bacteria and

WET; and

      iv.    Plaintiffs and Defendants have agreed to processes, as set forth in

Subsection E hereunder (WET Sampling and Testing Procedures) and the

provisions set forth in Section XXI (Effect of Settlement/Reservation of Rights)

of this Consent Decree, for Defendants to seek alternative Whole Effluent

Toxicity ("WET") testing methodologies as specifically identified in Appendix D

(Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Table

4, and as may be identified pursuant to Subsection C (Identification of Remaining

Permit Appeal Issues), below, for Future MSOPs.

c.    Within thirty (30) Days after the Lodging Date of this Consent Decree or

within thirty (30) Days after issuance of all CWA Facilities permit modifications to

reflect resolved appeal provisions pursuant to Subparagraph 70.b.i., whichever is later,

Defendants and MDNR through the Attorney General of Missouri shall, consistent with

the provisions of Subparagraph 70.b. above, file with the Missouri Administrative

Hearing Commission a Joint Stipulation to Dismiss in Part and Hold in Abeyance in Part

Permit Appeals for all Appealed MSOPs identified in Paragraph 68 and all Future

DRRC multi-media Consent Decree

MSOPs identified in Paragraph 69 for which appeals have been filed within thirty (30) Days after the Lodging Date of this Consent Decree.  Those appeal provisions identified in Subparagraph 70.b.i. above that are resolved shall be identified as dismissed in the Joint Stipulation.  The Joint Stipulation to Dismiss in Part and Hold in Abeyance in Part Permit Appeals shall stipulate abeyance of the permit appeal proceedings not otherwise dismissed under this Paragraph until the final decision of the Missouri Clean Water Commission as to each CWA Facility MSOP pursuant to Section VII, Subsection H (Procedure for Finality of Permit Appeal Resolution).  If a Future MSOP is not issued within the time necessary for the appeal period for such MSOP to fall within the time period identified above, then Defendants shall file an appeal of such Future MSOP, and together with that filing, the State and Defendants shall file a Joint Stipulation to Hold in Abeyance any such permit appeal in accordance with Paragraph 72.

       d.      An appeal, a request for a permit modification, or any other challenge by Defendants of any condition in any MSOP for any CWA Facility required to comply with this Consent Decree shall not relieve Defendants of their obligation to comply with the compliance dates set forth in Section VI, Subsection B (Compliance Measures for all CWA Facilities), above, or be cause for extension of the deadlines for compliance established pursuant to Section VII, Subsection I (Schedule for Compliance With Missouri State Operating Permits) of this Consent Decree and Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines), and will not constitute a Force Majeure event under Section XVIII (Force Majeure) of the Consent Decree.

DRRC multi-media Consent Decree

## C.     Identification of Remaining Permit Appeal Issues

71.     Within forty-five (45) Days after the Lodging Date of this Consent Decree,

Defendants shall provide to MDNR a comprehensive list confirming the Permit Appeal Issues for

all of the CWA Facilities that remain to be resolved.  The identification of Permit Appeal Issues

shall only include issues that Defendants have raised in the MSOP appeals, as amended and/or

supplemented, specifically identified in Paragraph 68 above and issues regarding Future MSOP

permits identified in Paragraph 69 that are included in appeals filed as of the thirty (30) Day

period after the Lodging Date.  However, Defendants shall not include as a Permit Appeal Issue

any permit-specific or global issue identified as resolved in Paragraph 70.b.i and Appendix D

(Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Table 2.

a.     Each Permit Appeal Issue identified by Defendants shall include a brief

statement of the basis for appeal, the desired alternative permit condition or limitation,

and the anticipated date by which Defendants will submit information in support of the

same, not to exceed the time frames set forth in Subsections D (Site-Specific and Permit-

Specific Limitations) and E (WET Sampling and Testing Procedures), below, as

applicable.

b.     To the extent that Permit Appeal Issues across the various MSOPs are

similar in, for example, the application of science, regulatory interpretation, or methods

of calculation, such similar bases may be referenced in articulating the Permit Appeal

Issues for the purpose of streamlining the identification process.

DRRC multi-media Consent Decree

72.     With the exclusion of any issue that has been determined resolved pursuant to Paragraph 70.b.i and Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Table 2, Defendants' identification of issues that reasonably can be anticipated to arise with respect to Future MSOPs based upon the draft permits for public notice for each of the Future MSOPs does not preclude Defendants from identifying further issues within thirty (30) Days after public notice by the MDNR of another draft permit or a final permit for reissuance in accordance with 10 CSR 20-6.020(1)(B) where such draft or final permit is materially changed from the earlier draft permit(s).

   a.     In such case(s) where MDNR issues a final permit, Defendants shall file a permit appeal with the Missouri Administrative Hearing Commission within thirty (30) Days after the public notice date, and Defendants shall simultaneously submit to MDNR a copy of the appeal, a revised version of the comprehensive list of Permit Appeal Issues required by Paragraph 71 to incorporate such new Permit Appeal Issues, and a draft Joint Stipulation to Hold in Abeyance Permit Appeals addressing such new Permit Appeal Issues.  Defendants and MDNR shall finalize the Joint Stipulation and file it with the Missouri Administrative Hearing Commission within twenty-one (21) Days of the Defendants' submission of the draft Joint Stipulation to MDNR; and

   b.     In such case(s) where MDNR issues an additional public notice of a draft permit that is materially changed from the original draft permit, Defendants shall submit comments to MDNR on such changes, if any, within thirty (30) Days of the date of the public notice of the draft permit.  When MDNR issues the final permit, if Defendants

DRRC multi-media Consent Decree

wish to appeal such changed terms or permit appeal issues previously identified in Table

6 of Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility

MSOPs), Defendants shall file a permit appeal with the Missouri Administrative Hearing

Commission within thirty (30) Days after the permit issuance date, and Defendants shall

simultaneously submit to MDNR a copy of the appeal and a revised version of the

comprehensive list of Permit Appeal Issues required by Paragraph 71 to incorporate such

new Permit Appeal Issues, and a draft Joint Stipulation to Hold in Abeyance Permit

Appeals addressing such new Permit Appeal Issues.  Defendants and MDNR shall

finalize the Joint Stipulation and file it with the Missouri Administrative Hearing

Commission within twenty-one (21) Days of the Defendants' submission of the draft

Joint Stipulation to MDNR.

**D.**     **Site-Specific and Permit-Specific Limitations**

73.     <u>Time Limitations for Good Faith Negotiations</u>.  Defendants shall engage in good

faith negotiations to resolve site-specific and permit-specific Permit Appeal Issues identified in

Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Tables

3, 5 and 6, as may be amended pursuant to Subsection C, above, as follows:

a.     Defendants and MDNR shall engage in an initial period of good faith

negotiations until August 1, 2011, for resolution of Permit Appeal Issues, specifically

including but not limited to provisions identified in Appendix D (Resolution of Permit

Appeal Issues for Clean Water Act Facility MSOPs), Table 3, and as specified in

Subparagraph 79.a.i.;

DRRC multi-media Consent Decree

       b.    If Defendants present an application for a permit modification to MDNR pursuant to Subparagraph 79.a.ii., regarding a site-specific water quality based limitation Permit Appeal Issue for a Future MSOP identified in Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Table 6, or pursuant to Paragraph 71, above, Defendants and MDNR shall engage in an initial period of good faith negotiations until February 1, 2012;

       c.    If Defendants present an application for a permit modification to MDNR pursuant to Subparagraph 79.a.ii., regarding Permit Appeal Issues identified in Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Tables 5 and 6, other than the site-specific water quality-based permit limit Permit Appeal Issues addressed in Subparagraph 73.b, above, Defendants and MDNR shall engage in an initial period of good faith negotiations for resolution of the Permit Appeal Issues for ninety (90) Days following MDNR's receipt of such application;

       d.    If MDNR requires additional time to make an initial determination regarding the disposition of one or more Permit Appeal Issues or requests Defendants to provide additional information and data regarding one or more Permit Appeal Issues under review, the period for good faith negotiation set forth in Subparagraphs a, b, or c, above may be extended upon a joint request by MDNR and Defendants and ratification by ruling of the Special Master appointed pursuant to Subsection F, below.  A total extension of ninety (90) Days or less of the good faith negotiation period shall not be

DRRC multi-media Consent Decree

considered a "material modification" within the meaning of Section XXVI

(Modification) of the Decree.

74.     Defendants shall utilize the procedural framework for resolution of Permit Appeal

Issues set forth in Paragraphs 78 through 81, below.

75.     Throughout the period of good faith negotiations, including any approved period

of extension, MDNR shall keep EPA informed of the status of negotiations and the issues under

review.  At a minimum, the MDNR shall invite EPA to participate in a joint phone conference

with Defendants to discuss the specific matters under review, beginning within the first fifteen

(15) Days of the period of good faith negotiations and recurring at least every sixty (60) Days

thereafter until every Permit Appeal Issue is either resolved pursuant to Paragraph 76 below or

referred to the Special Master pursuant to Paragraph 77, below.

76.     Permit Appeal Issues under this Subsection D that are resolved during the period

of good faith negotiation shall be stipulated as agreed to by the MDNR and Defendants in a Joint

Stipulation of Agreement to the Missouri Administration Hearing Commission. Any

modification to a CWA Facility MSOP as agreed to by MDNR and Defendants is subject to

Section VII, Subsection H (Procedures for Finality of Permit Appeal Resolution).

77.     Permit Appeal Issues that are not resolved during the period of good faith

negotiation shall be referred by the Defendants and MDNR for review by the Special Master

appointed pursuant to Subsection G (Procedures for Permit Appeal Issues Before the Special

Master), below.

DRRC multi-media Consent Decree

78.     <u>Information Required and Time Limitations Regarding Site-Specific and Permit-Specific Limitations</u>.  Defendants shall, consistent with the provisions set forth in this Paragraph through Paragraph 81 below, submit information in support of Permit Appeal Issues where Defendants seek site-specific water quality based limitations and/or permit-specific limitations or conditions.  Such information submitted by Defendants shall be in the form of an application to MDNR for modification of the MSOP for a CWA Facility to establish site-specific and/or permit-specific limitations and conditions, which may include, but are not limited to, monitoring requirements and numeric effluent limitations for metals, including, but not limited to arsenic, cadmium, copper, lead, mercury, nickel, selenium, thallium, and zinc, and for other pollutant parameters, including BOD, COD, TSS, ammonia, bacteria, and WET.

79.     Any information in support of a request for a site-specific or permit-specific limitation or conditions in a MSOP must be submitted by Defendants to MDNR by the times set forth in Subparagraphs 79.a through b, below.  Failure by Defendants to comply with the time limits set forth below shall be deemed a waiver by Defendants of their option to seek site-specific and/or permit-specific limitations or conditions for that permit.  MDNR may, after consultation with EPA, extend the time period for Defendants to submit information under this Paragraph for up to sixty (60) additional Days.  Such extension of sixty (60) Days or less shall not be considered a "material modification" within the meaning of Section XXVI (Modification) of the Decree.  Denial of a request for an extension shall not be subject to Dispute Resolution pursuant to Section XIX of this Consent Decree.

DRRC multi-media Consent Decree

a. For any CWA Facility MSOP in effect as of the Effective Date of this Consent Decree or any Future MSOP for which Defendants seek a modification of a site-specific or permit-specific limitation, consistent with the identified remaining Permit Appeal Issues, such application shall be submitted:

i. For dissolved metals limitations, and permit mixing zone allowances identified in Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Table 3, no later than January 15, 2011; and

ii. For all other remaining Permit Appeal Issues identified in Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Tables 5 and 6, as may be amended pursuant to Subsection C, above, at such time as the application for a permit modification is complete.

b. For any CWA Facility MSOP for which Defendants believe completion of work required pursuant to Section VI, Subsection B of this Consent Decree (Compliance Measures for all CWA Facilities) has or will result in a material and/or substantial change in the nature of the discharge, the pollutant characteristics, or the pollution control processes such that a modification to the terms and conditions of the applicable MSOP are necessary and appropriate, Defendants shall submit an application for a permit modification within ninety (90) Days after completing such Permanent Injunction and Compliance Measures or within sixty (60) Days of completing analysis of discharge information collected following completing such Permanent Injunction and Compliance

DRRC multi-media Consent Decree

Measures, whichever is later, but in no instance later than one hundred eighty (180) Days after completing such Permanent Injunction and Compliance Measures.

80.     Each submission in support of a site-specific or permit-specific limitation or condition submitted by Defendants to MDNR pursuant to this Subsection D (Site-Specific and Permit-Specific Limitations), shall be submitted as an application for, or an application for a modification of, an MSOP, consistent with the requirements of 10 CSR 20-6 and 7.

a.     With respect to each request for site-specific metals limits,  Defendants' submittal shall include, at a minimum, the following information:

i.     Site-Specific Dissolved Metals Translator Studies prepared consistent with *The Metals Translator: Guidance for Calculating A Total Recoverable Permit Limit From A Dissolved Criterion* (EPA 823-B-96-007, June 1996);

ii.     Site-specific stream hardness data; and

iii.     All raw data for samples collected or measurements taken in preparation of the application for site-specific permit limitations or permit-specific limitations, including, at a minimum, all data for samples collected or measurements taken from January 1, 2008, to thirty days prior to the date of submittal of the application.

b.     With respect to each request for site-specific or permit-specific limitation or conditions other than metals limits, Defendants' submittal shall include site-specific information to support the request, including, as appropriate, the following information:

-67-

DRRC multi-media Consent Decree

       i.      If an alternative WET sampling or testing methodology is approved pursuant to the provisions of Subsection E (WET Sampling and Testing Procedures), below, information justifying use of such approved alternative methodology;

       ii.      Biological assessments of receiving and reference waters;

       iii.      If flow-tiered or flow-variable limitations are sought, hydrologic investigations to support such flow-tiered or flow-variable effluent limitations; and

       iv.      All raw data for samples collected or measurements taken in preparation of the application for site-specific permit limitations or permit-specific limitations, including, at a minimum, all data for samples collected or measurements taken from January 1, 2006, to thirty days prior to the date of submittal of the application.

81.     The process for review of and action on an application by Defendants to MDNR under this Subsection D (Site-Specific and Permit-Specific Limitations) is as follows:

      a.      Upon receipt of an application for site-specific permit limitations submitted by Defendants under this Subsection, MDNR shall evaluate the application and information contained therein for completeness.

      b.      If MDNR determines the information is not complete, MDNR shall notify Defendants in writing of the information missing from the application.  Defendants shall

DRRC multi-media Consent Decree

have forty-five (45) Days from receipt of MDNR's written notice of incompleteness to submit to MDNR additional information.

c.      Within sixty (60) Days of notifying Defendants that an application for site-specific permit limits by Defendants is complete or notifying Defendants  that their application was incomplete, MDNR shall, in consultation with EPA, complete its review of the application and either:

i.      provide to Defendants a draft MSOP or permit modification, as appropriate, and a draft fact sheet (including a water quality analysis and an anti-degradation analysis) incorporating all limitations, conditions and requirements MDNR determines appropriate to address the issues raised and information provided in Defendants' application; or

ii.      provide to Defendants a written determination, i.e., draft permit denial, that no change is warranted and include therein specific information regarding the basis for that determination.

d.      Except as provided in Paragraph 82, below, receipt by Defendants of the draft MSOP and fact sheet or draft permit denial or expiration of the period for good faith negotiations set forth in this Subsection D (Site-Specific and Permit-Specific Limitations) triggers an event subject to review by a Special Master pursuant to the provisions of Subsection G (Procedures for Permit Appeal Issues Before the Special Master), below. Defendants shall within fifteen (15) Days of receipt of the draft MSOP and fact sheet or draft permit denial, or within fifteen (15) Days of the expiration of the period for good

-69-

DRRC multi-media Consent Decree

faith negotiations set forth in Subsection D (Site-Specific and Permit-Specific Limitations), submit a written request to the Special Master initiating review by the Special Master pursuant to Subsection G (Procedures for Permit Appeal Issues Before the Special Master), below, together with all pertinent documentation, including but not limited to, Defendants' application(s) and all supporting information regarding the Permit Appeal Issue, any subsequent data provided to MDNR regarding the Permit Appeal Issue, and the decision, if any, by MDNR in response to Defendants' application.  Defendants expressly agree that, except as provided in Subparagraph f, below, their only means of contesting the site-specific or permit-specific limitation or condition in any CWA Facility MSOP or denial thereof shall be through invocation of review by a Special Master pursuant to Subsection G (Procedures for Permit Appeal Issues Before the Special Master) of this Consent Decree.

      e.      Upon: (1) MDNR's receipt of notification from Defendants that MDNR's draft action on the site-specific permit limit application submitted pursuant to this Subsection is acceptable, or (2) the lapse of the time period for invoking review by the Special Master without action by Defendants, MDNR shall either:

      i.      place on public notice and proceed with the permit issuance process, consistent with the provisions and requirements of the Missouri Clean Water Law and implementing regulations; or

      ii.      take no action, if the permit application is denied.

Either course of action by MDNR under this Subparagraph 81.e. shall reflect the outcome

-70-

DRRC multi-media Consent Decree

of any Dispute Resolution completed pursuant to this Consent Decree.

       f.     No provision of this Consent Decree precludes informal communications between MDNR and Defendants prior to a determination by MDNR regarding any application for site-specific permit limits by Defendants under this Subsection.  All communications with MDNR regarding a permitting matter, however, are subject to Chapter 610, RSMo, and are considered part of the administrative record for the permit or permit denial.

       g.     No provision of this Consent Decree shall be construed to prevent Defendants from petitioning the Missouri Clean Water Commission for site-specific water quality criteria pursuant to 10 C.S.R. 20-7.031(4).

82.    <u>MSOP Reissuance or Application for Permit Modifications Not Related to Resolution of Permit Appeal Issues</u>.  The following shall apply until termination of the Consent Decree pursuant to Section XXVII (Termination) to any application made after the Lodging Date of this Consent Decree for reissuance of a CWA Facility MSOP and for modification of any CWA Facility MSOP, except that this Paragraph shall not apply to a Permit Appeal Issue in any permit reissuance or modification of a CWA Facility MSOP to implement resolution of a Permit Appeal Issue under this Consent Decree:

       a.     Defendants' application for renewal of each MSOP shall include the information identified in Paragraph 80 and be submitted as part of the complete permit application package at least one hundred and eighty (180) Days prior to expiration of the permit;

DRRC multi-media Consent Decree

      b.      Defendants' application for a permit modification that seeks to change a site-specific or permit-specific limitation or condition shall include the information identified in Paragraph 80;

      c.      With regard to a request by Defendants for site-specific or permit-specific limitations or conditions within an application for renewal of a CWA Facility MSOP, MDNR shall provide Defendants the draft MSOP and fact sheet or draft permit denial and will thereafter process the permit renewal application in accordance with Sections 621.250, 640.013 and 644.051, RSMo; and

      d.      Defendants reserve their right under federal, State and local law to appeal or challenge any provision of any reissued MSOP or MSOP modification or denial of a permit modification request for any CWA Facility covered by this Paragraph, except that Defendants agree that for MSOPs reissued during the relevant period of this Consent Decree, Defendants shall not raise as an appeal issue any of the issues set forth in Table 2 of Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), unless a change in circumstances at the CWA Facility or a change in the applicable law, regulations and/or guidance warrants such an appeal, in which case Defendants shall bear the burden to clearly and specifically demonstrate that such a change has occurred.

## E.    WET Sampling and Testing Procedures

83.     Defendants may, at their option, and consistent with the provisions set forth in this Subsection E (WET Sampling and Testing Procedures), submit information in support of Permit

DRRC multi-media Consent Decree

Appeal Issues where Defendants seek alternative WET sampling or testing procedures as identified in Appendix D (Resolution of Permit Appeal Issues for Clean Water Act Facility MSOPs), Table 4, as confirmed pursuant to Subsection C (Identification of Remaining Permit Appeal Issues).

84.     If such alternative procedures are testing methodologies required pursuant to 40 C.F.R. Part 136, Defendants shall submit an application to the Director of MDNR pursuant to the requirements of 40 C.F.R. § 136.4, Application for Alternative Test Procedures for approval of an alternate test methodologies.  An application under this provision will be evaluated and acted upon by the State and EPA according to the provisions of 40 C.F.R. §§ 136.4 and 136.5.

85.     Any request for alternative WET sampling or testing procedures must be submitted by Defendants to MDNR together with all raw data for samples collected or measurements taken in preparation of the request for alternative WET sampling or testing procedures, including, at a minimum, all data for samples collected or measurements taken from January 1, 2006, to thirty days prior to the date of submittal of the request.  The process for review of and action on a request by Defendants to MDNR under this Subsection D (Site-Specific and Permit-Specific Limitations) is as follows:

a.     Upon receipt of an application for alternative WET sampling or testing procedures submitted by Defendants under this Subsection, MDNR shall, in consultation with EPA, evaluate the request and information contained therein for completeness and also to determine whether the issue raised in Defendants' request may be resolved by

-73-

DRRC multi-media Consent Decree

MDNR or must be forwarded to EPA for action pursuant to the requirements of the CWA

and its implementing regulations.

        b.      If MDNR and/or EPA determine the information is not complete,

Defendants shall be notified in writing by the appropriate agency of the information

missing from the application.  Defendants shall have forty-five (45) Days from receipt of

the written notice of incompleteness to submit the additional information.

        c.      The appropriate agency shall complete its review of the application and

provide to Defendants a written determination that such request for alternative WET

sampling or testing procedures is granted, is granted in part and denied in part, or is

denied.

86.     Defendants may include in an application for a site-specific or permit-specific

limitation or condition under Subsection D, above, information supporting the use of any

alternative WET sampling or testing procedures approved pursuant to this Subsection E.

87.     Denial of Defendants' application for alternative WET sampling or testing

procedures by EPA pursuant to 40 C.F.R. Part 136 and/or under this Subsection E shall not be

subject to further review or dispute under this Consent Decree, including but not limited to,

review by a Special Master pursuant to the provisions of Subsection F, below, or Dispute

Resolution pursuant to Section XIX.

## F.    Special Master and Consultant to the Special Master Appointment and Decision-Making Process

88.     Within sixty (60) Days after the Lodging Date of this Consent Decree, the MDNR

and Defendants each shall submit to the other three candidates for appointment as Special

DRRC multi-media Consent Decree

Master.  Each party shall include with its submittal of the list of candidates a signed statement verifying that the party submitting the list of candidates has performed a due diligence investigation to assess actual and potential conflicts, biases, and personal affiliations as well as past, present, and potential future business affiliations between that party and each candidate or against the other party, and that no such actual or potential conflicts are known or such conflicts are clearly articulated.  The submittal shall include the curriculum vitae of each candidate and a clear articulation for each such candidate explaining the appropriate training, experience, and expertise to conduct the proceedings to resolve the Permit Appeal Issues and that each such candidate will be available for the duration of the proceedings.

      a.      MDNR and Defendants each shall select from the other party's list of candidates the one candidate that the selecting party will agree should be appointed Special Master.  The selection must be made within thirty (30) Days after the candidates are submitted for consideration.  If one party does not make its selection within such thirty (30) Day period, the other party may select its own candidate and a candidate from the other party's list.

      b.      MDNR and Defendants shall make every effort to come to consensus on a single candidate to serve as the Special Master within ninety (90) Days after the Lodging Date of this Consent Decree.  If MDNR and Defendants are unable to agree upon selection of a Special Master within that ninety (90) Day period, MDNR and Defendants shall submit a joint list of the remaining candidates (without indication of the nominating party) to the

DRRC multi-media Consent Decree

Judge appointed to this case who will be asked to select the Special Master from the joint list as expeditiously as possible.

      c.    The Special Master shall be engaged under the form of engagement letter issued jointly by MDNR and Defendants consistent with the applicable terms of this Consent Decree.

89.    <u>Appointment of a Consultant to the Special Master</u>.  Within sixty (60) Days after the Lodging Date of this Consent Decree, the MDNR and Defendants each shall submit to the other three candidates for Consultant to the Special Master.  The Consultant shall be qualified in the science and regulations regarding the development of wastewater and stormwater discharge permits and implementation of water quality standards pursuant to federal and state regulations. Each party shall include with its submittal of the list of candidates a signed statement verifying that the party submitting the list of candidates has performed a due diligence investigation to assess actual and potential conflicts, biases, and personal affiliations as well as past, present, and potential future business affiliations between that party and each candidate or against the other party, and that no such actual or potential conflicts are known or such conflicts are clearly articulated.  The submittal shall include the curriculum vitae of each candidate and a clear articulation for each such candidate explaining the appropriate training, experience, and expertise regarding the matters raised by the Permit Appeal Issues and that each such candidate will be available for the duration of the proceedings.

      a.    MDNR and Defendants each shall select from the other party's list of candidates the one candidate that the selecting party will agree should be appointed

DRRC multi-media Consent Decree

Consultant to the Special Master.  The selection must be made within thirty (30) Days after the candidates are submitted for consideration.  If one party does not make its selection within thirty (30) Days, the other party may select its own candidate and a candidate from the other party's list.  The two selected candidates shall be jointly presented to the Special Master by the MDNR and the Defendants without identification as to the nominating party.

b.     The Special Master shall select the Consultant from the two Consultant candidates identified as above.

90.     Decisions regarding Permit Appeals Issues shall be made by the Special Master in consultation with the Consultant, except that procedural and legal decisions are vested in the Special Master alone.

## G.     Procedure for Permit Appeal Issues Before the Special Master

91.     The Special Master shall apply the procedures in 1 CSR Division 15, Chapter 3, Procedures for Contested Cases, to hear the Permit Appeal Issues that are referred by the Defendants or MDNR for resolution following the period of good faith negotiation.  The burden of proof in the hearing before the Special Master shall be shared equally by the MDNR and Defendants.

92.     Defendants agree to pay all fees and expenses for the Special Master and the Consultant to the Special Master associated with resolution of Permit Appeal Issues under this Consent Decree.

-77-

DRRC multi-media Consent Decree

93.     Upon receipt of a written request by Defendants to initiate the Special Master review process for a Permit Appeal Issue, the Special Master shall issue scheduling orders and other orders, as appropriate, directed to expeditiously decide Permit Appeal Issues.

94.     The MDNR and Defendants agree that the Special Master may, at any time during the period of review by the Special Master, require the parties to engage in good faith negotiation of any Permit Appeal Issue for no longer than sixty (60) Days and report to the Special Master regarding the outcome of such negotiations.

95.     Ex parte contact with the Consultant to the Special Master is strictly forbidden.  If the MDNR or Defendants wish to have discussion with the Consultant to the Special Master, a request for the same may be made of the Special Master.  The Special Master in his or her discretion may allow such discussion provided that both the MDNR and Defendants are present for the discussion.  The Special Master shall set forth the time and purpose for such discussion at times convenient for each party.

96.     The MDNR and Defendants agree that nothing in this Consent Decree or in 1 CSR Division 15, Chapter 3 shall be argued to prevent the Special Master from requesting additional information from the MDNR or Defendants or from requesting MDNR and Defendants to engage in settlement negotiations at any time.

97.     Within one hundred twenty (120) Days of concluding proceedings before the Special Master regarding Permit Appeal Issues pertaining to a particular CWA Facility, the Special Master shall provide a recommendation to the Administrative Hearing Commission, which will forward the recommendation along with its files to the Clean Water Commission on

DRRC multi-media Consent Decree

all Permit Appeal Issues for that CWA Facility.  The recommendations of the Special Master as to each Permit Appeal Issue, may include, but are not limited to interim effluent limitations, final effluent limitations, interim permit conditions, final permit conditions, requirements for development of additional data and information, and other terms and conditions as determined by the Special Master.  Excluded from review by the Special Master are matters related to schedules and deadlines for compliance with the terms and limitations of CWA Facility MSOPs, which shall be exclusively addressed under the provisions set forth in Subsection I (Schedule for Compliance With Missouri State Operating Permits), below.

98.     The State and Defendants agree that each party may make good faith arguments supported by evidence before the Special Master regarding matters before the Special Master, including injunctive measures necessary to achieve compliance with MSOPs and the time necessary to implement them.  The MDNR and Defendants agree that the recommended decisions of the Special Master shall not be contested by either party in proceedings before the Missouri Clean Water Commission and shall have the same force and effect that a recommended decision from the Administrative Hearing Commission would have pursuant to RSMo 621.250 and will form the basis for the decision of the Clean Water Commission pursuant to 10 CSR 20-1.020.

**H.     Procedures for Finality of Permit Appeal Resolution**

99.     The decision of the Missouri Clean Water Commission shall have the force and effect as provided by 10 CSR 20- 1.020, however, Defendants agree pursuant to this Consent Decree to not appeal a decision of the Missouri Clean Water Commission regarding any Permit

DRRC multi-media Consent Decree

Appeal Issue pursuant to RSMo 644.051.7, which does not significantly and materially deviate

from the recommendations of the Special Master.

100.    Defendants further agree pursuant to this Consent Decree to not appeal a final

MSOP issued by MDNR after notice and public comment, which does not significantly and

materially deviate from the draft permit placed on public notice addressing Permit Appeal Issues

resolved and stipulated to by MDNR and Defendants or incorporating the recommendation of the

Special Master.

101.    With regard to any final permit decisions, including decisions of the Clean Water

Commission, the EPA shall have oversight authority as provided by 40 C.F.R. § 123.44.  No

provision of this Consent Decree affects the rights or responsibilities of Defendants in any

proceedings pursuant to 40 C.F.R. § 123.44.

**I.    Schedule for Compliance With Missouri State Operating Permits**

102.    Except to the extent that alternative limits are specifically provided in this

Subsection and as established in Appendix B (MSOP Alternative Effluent Limitations and

Compliance Deadlines), or are established pursuant to any revision of such limits pursuant to this

Consent Decree, Defendants shall comply with all terms, conditions and interim and final

limitations for each CWA Facility as set forth in the MSOP for such facility.  Commencing from

the Lodging Date of this Consent Decree and continuing until deadlines established for

compliance with final limits in Appendix B (MSOP Alternative Effluent Limitations and

Compliance Deadlines), or deadlines revised pursuant to the terms of this Consent Decree for

each CWA Facility, Defendants shall comply with the respective alternative limits established for

DRRC multi-media Consent Decree

each CWA Facility in Appendix B (MSOP Alternative Effluent Limitations and Compliance

Deadlines), or any revision of such limit pursuant to this Consent Decree.  For each pollutant for

which an alternative limit is established in Appendix B (MSOP Alternative Effluent Limitations

and Compliance Deadlines), or for which any revisions of such limits are made pursuant to this

Consent Decree, Defendants shall comply with the measurement frequency and sample type as

specified for that pollutant at that respective CWA Facility in Appendix B (MSOP Alternative

Effluent Limitations and Compliance Deadlines).  Defendants shall submit the results of each

sample on the Discharge Monitoring Report ("DMR") submitted for each CWA Facility in

accordance with its respective MSOP.

     103.    <u>Total Recoverable Cadmium</u>.  Defendants may, no later than one hundred eighty

(180) Days prior to the end of the applicable CWA Facility MSOP interim effluent limitation

period, request that Plaintiffs authorize an alternative limit for the discharge of total recoverable

cadmium for one or more of the CWA Facility MSOP outfalls identified in Subparagraph 103.a,

below, as follows:

     a.    This provision is limited to the following outfalls at the specified CWA

Facilities: Outfall 001 at Brushy Creek Mine/Mill Facility; Outfall 002 at Buick

Mine/Mill Facility; Outfall 002 at Sweetwater Mine/Mill Facility; Outfall 004 at

Viburnum Mine/Mill Facility; Outfalls 001 and 003 at Viburnum Mine #35 (Casteel)

Facility; and Outfall 001 at West Fork Unit Facility;

     b.    Defendants must, for a minimum of twelve (12) Months, sample, analyze,

and report on the appropriate CWA Facility MSOP monthly DMRs total dissolved

DRRC multi-media Consent Decree

cadmium using an approved 40 C.F.R. Part 136 method with an analytical detection limit

sensitive enough to determine compliance with the final effluent limitations in the

MSOPs for each respective outfall;

      c.     Any proposed alternative limit shall: (i) be supported by all data and

calculations used to derive the requested Monthly Average and Daily Maximum

Limitations, which shall be included with the request; (ii) extend no longer than the

permit compliance deadlines identified for other pollutant parameters at the same outfall

in Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines); (iii)

not exceed a Daily Maximum Limitation that is 2.13 times the average sampling data

collected for that outfall in accordance with Subparagraph 103.b, above; and (iv) not

exceed a Monthly Average Limitation that is 1.38 times the average sampling data

collected for that outfall in accordance with Subparagraph 103.b, above; and

      d.     Plaintiffs will, in their sole unreviewable discretion, determine whether to

grant Defendants' request for each outfall and, if granted, will amend the appropriate

table in Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines)

with the approved alternative limit for total recoverable cadmium.  Any revision made to

Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines) in

accordance with this Paragraph 103 shall be a non-material modification to the Consent

Decree agreed to in writing by the Parties.

104.     Upon expiration of the deadlines for alternative limits set forth in Appendix B

(MSOP Alternative Effluent Limitations and Compliance Deadlines), or alternative limits revised

DRRC multi-media Consent Decree

pursuant to the terms of this Consent Decree, or at such time that any MSOP is modified or reissued with limits different from an interim limit, whichever is later, Defendants must comply with all terms, conditions and limitations set forth in the MSOP as issued or modified pursuant to the terms of this Consent Decree by negotiation, decision of the Special Master, or the Clean Water Commission.  However, Defendants may, no later than ninety (90) Days prior to the expiration date of an alternative limit, request from EPA and the State an extension of the alternative limit or limits for a CWA Facility set forth in Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines) if Defendants demonstrate that they have:

        a.      Complied with all relevant requirements in Section VI, Subsection B (Compliance Measures for all CWA Facilities) of this Consent Decree;

        b.      Submitted necessary information required by this Consent Decree and by the reporting requirements of all MSOPs for the CWA Facilities;

        c.      Submitted timely and complete applications to MDNR, pursuant to Section VII, Subsection B (Resolution of Pending MSOP Appeals) above, for issuance of or modification, as applicable, of each MSOP for which they intend to seek such modification;

        d.      Completed all necessary analysis and planning, including development of complete plans and specifications and a schedule for compliance to implement all necessary work to achieve compliance with the final MSOP terms, conditions, and limitations for each CWA Facility for which Defendants seek an extension; and

DRRC multi-media Consent Decree

      e.     Included with the request for extension a description of: (i) the steps Defendants have taken to comply with each final MSOP, including final MSOP conditions established pursuant to this Consent Decree, for which an extension of interim limits is requested, (ii) the additional work to be performed to meet the final MSOP limitations, and (iii) the amount of time needed for the extension of the interim limits.

105.    The determination by EPA and the State regarding whether or not to grant Defendants' request, pursuant to Paragraph 104 above, to extend the interim limits shall not be subject to the provisions of Section XIX (Dispute Resolution).

## VIII. COMPLIANCE REQUIREMENTS: RCRA

**A.**    **Buick Mine/Mill Facility**

106.    SPCC Plan.  Within sixty (60) Days of the Effective Date of the Consent Decree, Doe Run shall submit to EPA and MDNR for review an updated and certified Spill Prevention Control and Countermeasures ("SPCC") Plan for the Buick Mine/Mill Facility that complies with all applicable federal requirements.

107.    Hazardous Waste Training Materials.  Within fifteen (15) Days of the Effective Date of the Consent Decree, Doe Run shall submit to EPA and MDNR RCRA generator training materials for employees at the Buick Mine/Mill Facility that comply with all applicable federal and state requirements.

108.    Hazardous Waste Training.  Within fifteen (15) Days of the Effective Date of the Consent Decree, Doe Run shall commence implementation of a RCRA generator training program that complies with all applicable federal and state requirements for all personnel

DRRC multi-media Consent Decree

responsible for RCRA regulated waste materials at the Buick Mine/Mill Facility, and is

consistent with the training materials submitted pursuant to Paragraph 107.

109.   Hazardous Waste Determination SOPs.   Pursuant to RCRA and the Missouri

Hazardous Waste Management Law and their implementing regulations, Doe Run is responsible,

as the generator, for determining whether the waste streams it generates constitute hazardous

waste.  Within forty-five (45) Days of the Lodging Date of the Consent Decree, Doe Run shall

submit to EPA and MDNR SOPs for making and documenting hazardous waste determinations

pursuant to 40 C.F.R. § 262.11 and managing hazardous waste in accordance with 40 C.F.R.

§ 262.34, both incorporated by reference in 10 CSR 25-7.262(1) for waste generated at the Buick

Mine/Mill Facility.

110.   Hazardous Waste Determinations.   Within sixty (60) Days of the Effective Date of

the Consent Decree, Doe Run shall submit to EPA and MDNR a report describing all hazardous

waste streams generated at the Buick Mine/Mill Facility and the storage, handling, and disposal

practices for each hazardous waste stream.

111.   General Housekeeping.   Within sixty (60) days of the Effective Date of the

Consent Decree, Doe Run shall submit to EPA and MDNR for review and comment general

housekeeping practices for the surface operations at the Buick Mine/Mill Facility to reduce track

out of Lead-Bearing Materials and hazardous wastes outside of the Doe Run property boundary.

Unless EPA and/or MDNR provide comments within thirty (30) Days, Doe Run shall commence

implementation of those procedures within one hundred and twenty (120) Days of the Effective

Date of the Consent Decree.  If EPA and/or MDNR provide comments that require revision of

-85-

DRRC multi-media Consent Decree

the procedures then Doe Run shall, subject to the provisions of Section XIX (Dispute Resolution) of this Decree, revise the procedures accordingly and commence implementation thereof within ninety (90) Days of the receipt of EPA's and/or MDNR's comments.  For purposes of this Paragraph 111, the Buick Mine/Mill Facility shall not include the tailings piles or tailings impoundment areas.

112.    Buick Used Oil Storage Tank Work Plan. Within thirty (30) Days of the Effective Date of the Consent Decree, Doe Run shall provide a work plan ("Buick Used Oil Storage Tank Work Plan") to the EPA and MDNR for approval pursuant to Section XII (Compliance Requirements: Approval of Deliverables).  The Buick Used Oil Storage Tank Work Plan shall include provisions for the removal and proper disposal of the partially underground containment structure, and any material contained therein, that is used for the temporary storage of used oil collected and stored adjacent to the surface maintenance shop at the Buick Mine/Mill Facility in accordance with all applicable federal and state laws.  The Buick Used Oil Storage Tank Work Plan shall also include provisions to investigate any used oil impacts in soil and gravel around the containment structure and around the used oil temporary storage area located adjacent to the surface maintenance shop at the Buick Mine/Mill Facility, and provide for the removal and proper disposal of all gravel and soil that has been contaminated by used oil releases in accordance with all applicable federal and state laws.

113.    The Buick Used Oil Storage Tank Work Plan shall include a Field Sampling Plan, QAPP, and Health and Safety Plan ("HASP") to assess on-site contamination.

DRRC multi-media Consent Decree

      a.      The QAPP must conform to "EPA Requirements for Quality Assurance Project Plans for Environmental Data Operations" (EPA QA/R5. EPA/240/B-01/003 (March, 2001)) and "Guidance for Quality Assurance Plans" (EPA QA/G5. EPA/240/R-02/009 (December, 2002)).  Doe Run shall use laboratories that participate in a QA/QC program compliant with these requirements and guidance.  Doe Run shall notify EPA and MDNR of the laboratories chosen by Doe Run.  Upon Plaintiffs' request, Doe Run shall have the laboratories analyze samples provided by Plaintiffs to demonstrate laboratory QA/QC and performance.  If the audit reveals deficiencies in a laboratory's performance or QA/QC, Plaintiffs may require re-sampling and additional analysis and Doe Run shall submit and begin implementation of a plan to address the deficiencies within ninety (90) Days of receipt of the results of the audit.

      b.      The Field Sampling Plan and QAPP shall describe the sampling procedures that will be used, the proposed sampling locations, and shall ensure that samples collected are analyzed using EPA and MDNR-approved protocols.  In addition, the QAPP shall describe the number of samples and type of samples to be collected, the method(s) of collection and analyses, and the criteria for determining sampling locations.

      c.      The Buick Used Oil Storage Tank Work Plan shall include a schedule for completion of activities.  Within thirty (30) Days of approval of the Buick Used Oil Storage Tank Work Plan, Doe Run shall begin implementation of the activities in the Buick Used Oil Storage Tank Work Plan in accordance with the approved schedule.

DRRC multi-media Consent Decree

Upon request by EPA or MDNR, Doe Run shall allow EPA, MDNR or their authorized representatives to take split and/or duplicate samples of any samples collected by Doe Run while performing work under this Section.  Doe Run shall notify EPA and MDNR not less than thirty (30) Days in advance of any sample collection activity.  In addition, EPA or MDNR shall have the right to take any additional samples that they deem necessary.

114.    Within sixty (60) Days of the Effective Date, unless a later deadline is specified in Paragraphs 106 through 113 herein, Doe Run shall correct the RCRA areas of noncompliance Nos. 1 through 6 and 8, and provide information in response to the RCRA areas of concern A through H, that were identified in the inspection report compiled by EPA following RCRA inspections conducted in February 2006 at the Buick Mine/Mine.  The Parties agree that the obligations in Paragraphs 112 and 113 (Buick Used Oil Storage Tank Work Plan) will address the RCRA area of noncompliance referenced as No. 7 in the inspection report.  The Parties also agree that the obligations in Paragraphs 107 through 111 will address the RCRA areas of noncompliance referenced as Nos. 1 and 2 in the inspection report.  After completion of the actions required by Paragraphs 106 through 113, as part of the next semi-annual status report required pursuant to Paragraph 176, Doe Run shall submit a Compliance Report to EPA and MDNR for review and approval pursuant to Section XII (Compliance Requirements: Approval of Deliverables) that demonstrates compliance with this Paragraph.

DRRC multi-media Consent Decree

115.    The Compliance Report shall include the following:

a.    A description of the actions that have been taken to comply with the RCRA areas of noncompliance Nos. 1 through 6 and 8, and information provided in response to the RCRA areas of concern A through H as identified in the inspection report compiled by EPA following RCRA inspections conducted in February 2006;

b.    Copies of all results of any chemical or physical analyses conducted pursuant to Paragraph 110 or actions taken to comply with RCRA areas of noncompliance Nos. 1 through 6 and 8, and, if applicable, in connection with information provided in response to RCRA areas of concern A through H as identified in the inspection report compiled by EPA following RCRA inspections conducted in February 2006, including any waste profiles, the results of any field screening or other analyses, and analyses of any samples; and

c.    Copies of all hazardous waste manifests, certificates of disposal or other appropriate disposal shipping papers (i.e., Land Disposal Restriction Notifications) from the previous twelve (12) Months that describe the origin and destination, dates, amount, and description of any hazardous or universal waste, Lead-Bearing Materials, or used oil being transported off-site.

116.    The Compliance Report shall be certified by a responsible corporate official as provided in Section XVI (Reporting Requirements) of this Consent Decree.

DRRC multi-media Consent Decree

## B.     Buick Resource Recycling Facility

117.    Defendants shall comply with all applicable requirements of RCRA and the

Missouri Hazardous Waste Management Law and their implementing regulations and Missouri

Hazardous Waste Management Facility Permit Number MOD059200089 with respect to the

Buick Resource Recycling Facility.

118.    Within sixty (60) Days of the Effective Date of this Consent Decree, Defendants

shall correct all violations identified (1) in the Notice of Violation provided as Attachment 6 to

the inspection report following a RCRA inspection conducted in March 2009; (2) in the Notice

of Violation attached to the inspection report following the RCRA inspection conducted in

September 2009; (3) as Unsatisfactory Features in February 2, 2010 correspondence following a

RCRA inspection conducted in November 2009; and (4) in the Notice of Violation attached to

the inspection report following a RCRA inspection conducted in December 2009 and that relate

to the following hazardous waste laws and regulations and Permit Conditions and Compliance

Provisions of Permit Number MOD059200089 at the Buick Resource Recycling Facility:

> a.  Condition III.C.8.a (40 CFR § 264.1101);
>
> b.  Condition III.C.6.a (40 CFR § 264.1101);
>
> c.  Condition I.G.1 (40 CFR § 264.175);
>
> d.  Condition III.C.1 (40 CFR § 264.1101);
>
> e.  Schedule of Compliance Provision I.F and Special Permit Condition III.C.9;
>
> f.  Condition III.C.8.c (40 CFR § 264.1101);
>
> g.  Condition VI.C.10 (10 CSR 25-7.264(2)(N));

DRRC multi-media Consent Decree

     h.  Condition III.C.12 (40 CFR § 264.1101);

     i.  Condition VI.A. (40 CFR Part 268, Land Disposal Restrictions);

     j.  Condition III.B.3 and III.C.5;

     k.  260.390.1(1) RSMo – Storage of hazardous waste;

     l.  10 CSR 25-5.262(1) incorporating by reference 40 CFR § 262.11 – Hazardous

waste determinations; and

     m.  Requirement to construct and operate the facility in accordance with section

F.3.5 (Leak Detection Liquid Collection and Removal System) of the final permit

application.

119.    As part of the next semi-annual status report required pursuant to Paragraph 176,

Doe Run shall submit a Compliance Report to EPA and MDNR for review and approval

pursuant to Section XII (Compliance Requirements: Approval of Deliverables) that demonstrates

compliance with the preceding Paragraph 118.  The Compliance Report shall include the

following:

     a.     A description of the actions that have been taken to comply with each of

the Permit Conditions and Compliance Provisions referenced in Paragraph 118 and that

were identified as violations or unsatisfactory features as referenced in Paragraph 118;

     b.     Copies of all results of any chemical or physical analyses conducted

pursuant to actions to comply with Paragraph 118, including any waste profiles, the

results of any field screening or other analyses conducted on-site or off-site, and analyses

of any samples; and

DRRC multi-media Consent Decree

      c.      Copies of all hazardous waste manifests, certificates of disposal or other appropriate disposal shipping papers (i.e., Land Disposal Restriction Notifications) from the previous twelve (12) Months that describe the origin and destination, dates, amount, and description of any hazardous or universal wastes, Lead-Bearing Materials, or used oil being transported off-site.

120.     The Compliance Report shall be certified by a responsible corporate official as provided in Section XVI (Reporting Requirements) of this Consent Decree.

**C.    Herculaneum Lead Smelter Facility**

121.     <u>SPCC Plan and Contingency Plan</u>.  Within sixty (60) Days of the Effective Date of the Consent Decree, Doe Run shall submit to EPA and MDNR for review an updated and certified SPCC Plan and Contingency Plan for the Herculaneum Lead Smelter Facility that complies with all applicable requirements.

122.     <u>Training Plan</u>.  Within fifteen (15) Days of the Effective Date of the Consent Decree, Doe Run shall submit to EPA and MDNR for review and begin implementation of a revised training plan that complies with all applicable requirements of 40 C.F.R. § 265.16 and 10 CSR 25-5.265(1).

123.     <u>Housekeeping</u>.  Within sixty days (60) Days of the Effective Date of the Consent Decree, Doe Run shall submit to EPA and MDNR for review and comment revised general housekeeping practices for the Herculaneum Lead Smelter Facility to reduce track out of Lead-Bearing Materials and hazardous wastes from the Herculaneum Lead Smelter Facility property boundary.  Unless EPA and/or MDNR provide comments within thirty (30) Days of submission,

DRRC multi-media Consent Decree

Doe Run shall commence implementation of those procedures within one hundred twenty (120) Days of the Effective Date of the Consent Decree.  If EPA and/or MDNR provide comments that require revision of the procedures then Doe Run shall, subject to the provisions of Section XIX (Dispute Resolution) of this Decree, revise the procedures accordingly and commence implementation thereof within ninety (90) Days of the receipt of EPA's and/or MDNR's comments.

124.    Within sixty (60) Days of the Effective Date of this Consent Decree, Doe Run shall correct all violations identified in the Notice of Violation provided as Attachment 8 to the RCRA inspection report compiled by EPA and MDNR following RCRA inspections conducted at the Herculaneum Lead Smelter Facility in June 2005.  As part of the next semi-annual status report required pursuant to Paragraph 176, Doe Run shall submit a Compliance Report to EPA and MDNR for review and approval pursuant to Section XII (Compliance Requirements: Approval of Deliverables) that demonstrates compliance with this Paragraph.

125.    The Compliance Report shall include:

a.    A description of the actions that have been taken to comply with each of the violations that were identified in the Notice of Violation provided as Attachment 8 to the RCRA inspection report compiled by EPA and MDNR following RCRA inspections conducted at the Herculaneum Lead Smelter Facility in June of 2005;

b.    Copies of all results of chemical or physical analyses conducted pursuant to Paragraph 124, including any waste profiles, the results of any field screening or other analyses, and analyses of any samples;

-93-

DRRC multi-media Consent Decree

       c.     Copies of all hazardous waste manifests, certificates of disposal or other appropriate disposal shipping papers (i.e., Land Disposal Restriction Notifications) from the previous twelve (12) Months that describe the origin and destination, dates, amount, and description of any hazardous or universal waste, Lead-Bearing Materials, or used oil being transported off-site; and

       d.     A description of the actions taken to remediate the sulfuric acid release and used oil release observed and documented in the RCRA inspections conducted in June 2005.

126.    The Compliance Report shall be certified by a responsible corporate official as provided in Section XVI (Reporting Requirements) of this Consent Decree.

## IX.  SITE REMEDIATION – HERCULANEUM

127.    <u>Remediating Site Contamination</u>.  For purposes of this Section IX (Site Remediation – Herculaneum) of the Consent Decree, "Herculaneum Lead Smelter Facility" and "Remedial Action" shall have the definitions provided in Appendix E (Financial Assurance for Herculaneum Lead Smelter Facility).  Doe Run has agreed to cease the smelting of lead concentrates at the Herculaneum Lead Smelter Facility and allow redevelopment of the property.  An ongoing re-purposing study may assist Doe Run in determining the future use of the Herculaneum Lead Smelter Facility.  Doe Run may continue to use a portion of the property for lead refining, casting, and alloying purposes.  The actions to address the contamination at the Herculaneum Lead Smelter Facility, will be affected by the determination of the future use of the property.  In accordance with this Paragraph and Appendix E (Financial Assurance for

DRRC multi-media Consent Decree

Herculaneum Lead Smelter Facility) of this Consent Decree, Doe Run agrees to implement and

complete a Remedial Action, similar to RCRA corrective action, to address all site contamination

at the Herculaneum Lead Smelter Facility, including any slag located at the north end of the

Herculaneum facility, prior to the redevelopment or reuse of any of the property at the facility.

The remediation process will be implemented and completed after cessation of the smelting

operations pursuant to Paragraph 14 and prior to the redevelopment or reuse of the property at

Herculaneum Lead Smelter Facility.  For purposes of this Consent Decree, the south slag storage

area is not part of the Herculaneum Lead Smelter Facility, as defined in Appendix E (Financial

Assurance for Herculaneum Lead Smelter Facility) and is being addressed under Administrative

Order on Consent, Docket No. RCRA-7-2000-0018/CERCLA-7-2000-0029.

     128.    Doe Run agrees to remediate all site contamination at the Herculaneum Lead

Smelter Facility to health-based cleanup levels appropriate for the future use of the property.  To

initiate the Remedial Action Doe Run shall develop a work plan for approval by EPA and the

State by January 1, 2013, unless this deadline is extended by EPA, to investigate all sources of

site contamination.  This work plan shall address the identification of all sources of site

contamination; provide recommendations for the appropriate Remedial Action to address site

contamination, similar to a RCRA Facility Investigation and Corrective Measures Study

("RFI/CMS"); and provide a schedule for completion of the investigation work and study, and

completion of the RFI/CMS-type documents, which completion shall be no later than

December 31, 2013, unless this deadline is extended pursuant to the terms of this Consent

Decree.  After submittal of the RFI/CMS-type documents in accordance with the EPA-approved

DRRC multi-media Consent Decree

work plan and schedules therein, EPA, after consultation with the State, will develop a Remedial

Action proposal to address site contamination.  After public comment, EPA, after consultation

with the State, will complete a decision document describing the selected Remedial Action.  Doe

Run shall develop a work plan to implement the final Remedial Action at the Herculaneum Lead

Smelter Facility.  EPA and the State will coordinate with Doe Run to develop an appropriate

schedule for completion of these activities.  The development of documents for planning,

scheduling and implementing the Remedial Action at the Herculaneum Lead Smelter Facility

shall be non-material modifications to the Consent Decree agreed to in writing by the Parties.

129.    Following the cessation of operations required by Paragraph 14 of this Consent

Decree, Doe Run shall not transport lead concentrate to the Herculaneum Lead Smelter Facility

unless and until the Remedial Action required by this Section and Appendix E (Financial

Assurance for Herculaneum Lead Smelter Facility) of this Consent Decree is deemed complete

by EPA and the State.  This restrictive timeframe does not include post-remedial care and

maintenance that may be required after the Remedial Action is completed at the Herculaneum

Lead Smelter Facility.

## X. FINANCIAL ASSURANCES

130.    Herculaneum.  For purposes of this Section X (Financial Assurances) of the

Consent Decree, "Herculaneum Lead Smelter Facility" shall have the definition as provided in

Appendix E (Financial Assurance for Herculaneum Lead Smelter Facility).  Doe Run shall secure

and maintain Financial Assurance for the benefit of the Plaintiffs pursuant to the requirements of

Appendix E (Financial Assurance for Herculaneum Lead Smelter Facility) and Appendix F

DRRC multi-media Consent Decree

(Trust Agreement for Herculaneum Lead Smelter Facility) of this Consent Decree, in order to

ensure coverage for the remediation of the Herculaneum Lead Smelter Facility, including any

slag located at the north end of the facility.  Doe Run's inability to secure and/or maintain

adequate Financial Assurance shall in no way excuse performance of the remediation of the

Herculaneum Lead Smelter Facility as set forth in Section IX (Site Remediation – Herculaneum)

or any other requirement of this Consent Decree.

131.    In addition to the Financial Assurance information included in the reports

provided in Section XVI (Reporting Requirements) of this Consent Decree, within thirty (30)

Days of any request by EPA or the State, Doe Run shall provide requested information or reports

regarding the financial status of Doe Run, the trust provided by Doe Run to meet its obligation

for Financial Assurance pursuant to Appendix E (Financial Assurance for Herculaneum Lead

Smelter Facility) and Appendix F (Trust Agreement for Herculaneum Lead Smelter Facility) of

this Consent Decree, and the financial institution providing the trust to secure Doe Run's

obligation.

132.    <u>Work Takeover Provisions for Herculaneum.</u>

a.      In the event that EPA or the State determines that Doe Run (i) has ceased

implementation of any portion of the Remedial Action (as defined in Appendix E), (ii) is

significantly or repeatedly deficient or late in its performance of the Remedial Action (as

defined in Appendix E), or (iii) is implementing the Remedial Action (as defined in

Appendix E) in a manner that may cause an endangerment to human health or the

environment, EPA, after consultation with the State may issue a written notice

-97-

DRRC multi-media Consent Decree

("Performance Failure Notice") to both Doe Run and the Financial Assurance provider of

Doe Run's failure to perform.  The Performance Failure Notice will specify the grounds

upon which such a notice was issued and will provide Doe Run with a period of thirty

(30) Days within which to remedy the circumstances giving rise to the issuance of such

notice.

      b.     Failure by Doe Run to remedy the relevant Performance Failure to EPA's

and the State's satisfaction before the expiration of the thirty (30)-day notice period

specified in Paragraph 132.a shall trigger EPA's and the State's right to have immediate

access to and benefit of the Financial Assurance provided by the trust fund.  EPA may,

after consultation with the State, at any time thereafter direct the Financial Assurance

provider to immediately arrange for payment to other parties for performance of the

Remedial Action (as defined in Appendix E).

      c.     If EPA or the State has determined that any of the circumstances described

in clauses (i), (ii), or (iii) of Paragraph 132.a have occurred, and if EPA and the State are

nevertheless unable after reasonable efforts to secure the payment of funds or

performance of the Remedial Action (as defined in Appendix E) from the Financial

Assurance provider pursuant to this Consent Decree, then, upon receiving written notice

from EPA, after consultation with the State, Doe Run shall within ten (10) Days

thereafter, deposit into a newly created trust fund approved by EPA, after consultation

with the State, immediately available funds and, without setoff, counterclaim, or

condition of any kind, a cash amount equal to the estimated cost of the remaining

DRRC multi-media Consent Decree

Remedial Action (as defined in Appendix E) as of such date, as determined by EPA, after consultation with the State.

        d.     Doe Run may invoke the procedures set forth in Section XIX (Dispute Resolution), to dispute EPA's and the State's determination that any of the circumstances described in clauses (i), (ii), or (iii) of Paragraph 132.a have occurred.  Invoking the dispute resolution provisions shall not excuse, toll or suspend the obligation of the Financial Assurance provider, under Paragraph 132.b of this Section, to fund the trust fund or perform the Remedial Action (as defined in Appendix E).  Furthermore, notwithstanding Doe Run's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA, after consultation with the State, may in its sole discretion direct the trustee of such trust fund to make payments from the trust fund to any person that has performed the Remedial Action (as defined in Appendix E) until the earlier of (i) the date that Doe Run remedies, to EPA's and the State's satisfaction, the circumstances giving rise to the issuance of the relevant Performance Failure Notice or (ii) the date that a final decision is rendered in accordance with Section XIX (Dispute Resolution), that Doe Run has not failed to perform the Remedial Action (as defined in Appendix E) in accordance with this Consent Decree.

133.    <u>Mine/Mills</u>.  Doe Run shall secure and maintain Financial Assurance for the benefit of the EPA and the State pursuant to the requirements of Appendix G (Financial Assurance for Mine/Mill Facilities) and Appendix L (Trust Agreement for Mine/Mill Facilities) of this Consent Decree, in order to ensure coverage for Remedial Actions (as defined in

DRRC multi-media Consent Decree

Appendix G) for the Sweetwater Mine/Mill, Brushy Creek Mine/Mill, Buick Mine/Mill, Fletcher

Mine/Mill, Viburnum Mine/Mill (Mine #28 and 29), and the West Fork Mine.  Doe Run's

inability to secure and/or maintain adequate Financial Assurance shall in no way excuse

performance of Remedial Actions (as defined in Appendix G) required at the Mine/Mills by

applicable federal, state, or local law or any other requirement of this Consent Decree.

134.    In addition to the financial assurance information included in the reports provided

in Section XVI (Reporting Requirements) of this Consent Decree, within thirty (30) Days of any

request by EPA or the State, Doe Run shall provide requested information or reports regarding

the financial status of Doe Run, the trust provided by Doe Run to meet its obligation for

Financial Assurance pursuant to Appendix G (Financial Assurance – Mine/Mill Facilities) and

Appendix L (Trust Agreement for Mine/Mill Facilities) of this Consent Decree, and the financial

institution providing the trust to secure Doe Run's obligation.

135.    <u>Work Takeover Provisions for Mine/Mills.</u>

a.    In the event that EPA or the State determines that Doe Run (i) has ceased

implementation of any portion of the Remedial Actions (as defined in Appendix G), (ii) is

significantly or repeatedly deficient or late in its performance of the Remedial Actions (as

defined in Appendix G), or (iii) is implementing the Remedial Actions (as defined in

Appendix G) in a manner that may cause an endangerment to human health or the

environment, EPA, after consultation with the State may issue a written notice

("Performance Failure Notice") to both Doe Run and the Financial Assurance provider of

Doe Run's failure to perform.  The Performance Failure Notice will specify the grounds

DRRC multi-media Consent Decree

upon which such a notice was issued and will provide Doe Run with a period of thirty

(30) Days within which to remedy the circumstances giving rise to the issuance of such

notice.

       b.      Failure by Doe Run to remedy the relevant Performance Failure to EPA's

and the State's satisfaction before the expiration of the thirty (30)-day notice period

specified in Paragraph 135.a shall trigger EPA's and the State's right to have immediate

access to and benefit of the Financial Assurance provided by the trust fund(s) established

for the specific Mine/Mill Facilities (as defined in Appendix G) at issue in the

Performance Failure Notice.  EPA may, after consultation with the State, at any time

thereafter direct the Financial Assurance provider to immediately arrange for payment to

other parties for performance of the Remedial Actions (as defined in Appendix G).

       c.      If EPA or the State has determined that any of the circumstances described

in clauses (i), (ii), or (iii) of Paragraph 135.a have occurred, and if EPA and the State are

nevertheless unable after reasonable efforts to secure the payment of funds or

performance of the Remedial Actions (as defined in Appendix G) from the Financial

Assurance provider pursuant to this Consent Decree, then, upon receiving written notice

from EPA, after consultation with the State, Doe Run shall within ten (10) Days

thereafter, deposit into a newly created trust fund approved by EPA, after consultation

with the State, immediately available funds and, without setoff, counterclaim, or

condition of any kind, a cash amount equal to the estimated cost of the remaining

Remedial Actions (as defined in Appendix G) as of such date for the specific Mine/Mill

-101-

DRRC multi-media Consent Decree

Facilities (as defined in Appendix G) at issue in the Performance Failure Notice, as determined by EPA, after consultation with the State.

        d.     Doe Run may invoke the procedures set forth in Section XIX (Dispute Resolution) to dispute EPA's and the State's determination that any of the circumstances described in clauses (i), (ii), or (iii) of Paragraph 135.a have occurred.  Invoking the dispute resolution provisions shall not excuse, toll or suspend the obligation of the Financial Assurance provider, under Paragraph 135.b of this Section, to fund the trust funds or perform the Remedial Actions (as defined in Appendix G).  Furthermore, notwithstanding Doe Run's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA, after consultation with the State, may in its sole discretion direct the trustee of such trust fund to make payments from the trust fund to any person that has performed the Remedial Actions (as defined in Appendix G) until the earlier of (i) the date that Doe Run remedies, to EPA's and the State's satisfaction, the circumstances giving rise to the issuance of the relevant Performance Failure Notice or (ii) the date that a final decision is rendered in accordance with Section XIX (Dispute Resolution), that Doe Run has not failed to perform the Remedial Actions (as defined in Appendix G) in accordance with this Consent Decree.

## XI.  TRANSPORTATION ORDER

136.    There is currently in effect an Administrative Order on Consent, <u>In the Matter of The Doe Run Transportation and Haul Routes, Southeastern Missouri</u>, Docket No. RCRA-07-2007-0008, entered into by Doe Run and the EPA pursuant to Section 7003 of RCRA and filed

DRRC multi-media Consent Decree

on May 9, 2007 ("Transportation AOC").  Contemporaneous with the execution of this Consent

Decree, the parties have completed negotiations of modifications to the Transportation AOC and

will file a First Modification to the Transportation AOC with the EPA Region 7 Regional Docket

Clerk ("Modified Transportation AOC"), following public notice and comment.  The

Transportation AOC, as amended by the Modified Transportation AOC, is herein incorporated by

reference into this Consent Decree.  Incorporation of the Transportation AOC into this Consent

Decree does not modify the terms of the Transportation AOC, as amended by the Modified

Transportation AOC.  Except for disputes regarding the assessment of stipulated penalties, the

dispute resolution procedures of the Transportation AOC shall continue to be the exclusive

mechanism to resolve disputes arising under or with respect to the Transportation AOC, as

amended by the Modified Transportation AOC.  Disputes regarding the assessment of stipulated

penalties for violations of the Transportation AOC, as amended by the Modified Transportation

AOC, shall be resolved pursuant to Section XIX (Dispute Resolution) of this Consent Decree,

with the exception that the State shall not be a party to any such disputes.  All deliverables

required by the Transportation AOC, as amended by the Modified Transportation AOC, shall be

provided pursuant to the terms therein.

137.    Doe Run shall comply with all terms of the Transportation AOC, as amended by

the Modified Transportation AOC, as part of their obligations under this Consent Decree.  In any

action by the United States or EPA to enforce the terms of this Paragraph or to otherwise require

compliance with the Transportation AOC, as amended by the Modified Transportation AOC,

Doe Run agrees not to contest the United States' or EPA's jurisdiction and/or authority to bring

-103-

DRRC multi-media Consent Decree

such action.  The United States reserves all legal and equitable remedies available to enforce the terms of this Paragraph of this Consent Decree.  Nothing in the Transportation AOC shall be construed to limit the United States' right to seek judicial enforcement of the terms of the Transportation AOC, as amended by the Modified Transportation AOC, pursuant to this Paragraph.  Doe Run reserves all other legal and equitable defenses available in response to any action by the United States to enforce the terms of this Paragraph or the terms of the Transportation AOC, as amended by the Modified Transportation AOC.

138.    Violations of the terms of the Transportation AOC, as amended by the Modified Transportation AOC, shall be the basis for Stipulated Penalties under this Consent Decree, in accordance with the provisions of Section XVII (Stipulated Penalties).

139.    The Parties agree that any future modifications to the Transportation AOC, as amended by the Modified Transportation AOC, will be made in accordance with the provisions of the Transportation Order and are non-material modifications of this Consent Decree, not subject to the provisions of Section XXVI (Modification).

## XII. COMPLIANCE REQUIREMENTS: APPROVAL OF DELIVERABLES

140.    Approval of Deliverables.  After review of any plan, report, or other item that is required to be submitted for approval pursuant to this Consent Decree, EPA, after consultation with MDNR, shall in writing:  a) approve the submission; b) approve the submission upon specified conditions; c) approve part of the submission and disapprove the remainder; or d) disapprove the submission.

DRRC multi-media Consent Decree

141.    If the submission is approved pursuant to Paragraph 140.a, Defendants shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part, pursuant to Paragraph 140.b or .c, Defendants shall, upon written direction from EPA, after consultation with MDNR, take all actions required by the approved plan, report, or other item that EPA, after consultation with MDNR, determines are technically severable from any disapproved portions, subject to Defendants' right to dispute only the specified conditions or the disapproved portions or whether the work is technically severable, under Section XIX (Dispute Resolution) of this Decree.

142.    If the submission is disapproved in whole or in part pursuant to Paragraph 140.c or .d, Defendants shall, within thirty (30) Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Defendants shall proceed in accordance with the preceding Paragraph.

143.    Any stipulated penalties applicable to the original submission, as provided in Section XVII (Stipulated Penalties) of this Decree, shall accrue during the thirty (30)-Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that if the original submission was so deficient as to constitute a material breach of Defendants' obligations under this Decree, the stipulated penalties

DRRC multi-media Consent Decree

applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

144.    If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with the MDNR, may again require Defendants to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself/themselves correct any deficiencies, subject to Defendants' right to invoke Dispute Resolution and the right of the United States and the State to seek stipulated penalties as provided in the preceding Paragraphs.

145.    Any portion of a submission that is not specifically disapproved by EPA, in consultation with MDNR, in a notice of disapproval shall be considered approved, and Defendants shall proceed to implement the approved portion of the submission, provided that implementation of the approved portion of the report, plan, or other item is technically severable from the disapproved portion.

146.    For purposes of deliverables submitted pursuant to Appendix I (Statement of Work for Bee Fork Creek Mitigation), EPA has delegated approval authority to MDNR. Therefore, with respect to Appendix I (Statement of Work for Bee Fork Creek Mitigation), the phrase "EPA, after consultation with MDNR" or "EPA, in consultation with MDNR" in Paragraphs 140 through 145 above, shall be read as "MDNR, after consultation with EPA."

147.    Upon approval, approval upon conditions, or modification by EPA or MDNR under Paragraph 140 or 144 of any plan, report, or other deliverable, or any portion thereof, such

DRRC multi-media Consent Decree

plan, report, or other deliverable, or portion thereof, shall be incorporated into and enforceable under this Consent Decree.

XIII. <u>COMPLIANCE REQUIREMENTS:  PERMITS</u>

148.    <u>Permits</u>.  Unless expressly stated otherwise in this Consent Decree, where any compliance obligation under this Consent Decree or otherwise applicable law requires Defendants to obtain a federal, state, or local permit or approval, including, but not limited to, a permit to authorize construction, reconstruction, or operation of any device, Defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XVIII (Force Majeure) of this Consent Decree for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely and complete applications and have taken all other actions necessary to obtain all such permits or approvals.

149.    When permits are required as described in Paragraph 148, Defendants shall complete and submit such permit applications to MDNR and any other appropriate authorities to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the permitting authorities.  Any failure by Defendants to submit a timely permit application shall bar any use by Defendants of Section XVIII (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

DRRC multi-media Consent Decree

150.    Using the procedures set forth in Section XXIII (Notices), Defendants shall provide the EPA with a copy of each application for a federally enforceable permit necessary to implement the requirements of this Consent Decree that is filed after the Effective Date, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.  If, as of the Effective Date, Defendants have received any permit necessary to implement the requirements of this Consent Decree, then no later than thirty (30) Days after the Effective Date, Defendants shall submit copies of such permits to EPA and the State using the procedure set forth in Section XXIII (Notices).  EPA, in consultation with the State, may excuse in writing all or part of the latter submission if copies of such permits have already been submitted to EPA and the State before the Effective Date.

151.    If Defendants sell or transfer part or all of their ownership interest in any of the Doe Run Facilities covered under this Consent Decree, Defendants shall comply with the requirements of Paragraph 8 (Transfer of Ownership or Operation) with regard to that Doe Run Facility before any such sale or transfer unless, following any such sale or transfer, Defendants remain the holder of the Title V or other federally-enforceable permit for such Doe Run Facility.

152.    Notwithstanding the reference to Title V permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Clean Air Act and its implementing regulations, including the federally approved Missouri Title V permit program.  The Title V permit shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent

-108-

DRRC multi-media Consent Decree

Decree regardless of whether such term has or will become part of a Title V permit, subject to the terms of Section XXVII (Termination).

153.    Within one hundred and eighty (180) Days after the Effective Date of this Consent Decree, Defendants shall amend any applicable Title V permit application, or apply for amendments of its Title V permits to include a schedule for all Unit-specific and Facility-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree including, but not limited to: emission rates, tonnage limitation, emission monitoring, and production limits.

## XIV.  ADDITIONAL INJUNCTIVE RELIEF

154.    Enclosure of Lead Concentrate Storage and Handling.  Doe Run shall install and operate a building enclosure/ventilation system at the lead concentrate handling, storage and loading areas at each of the following mill facilities owned and operated by Doe Run: Buick Mine/Mill, Brushy Creek Mine/Mill, Sweetwater Mine/Mill, and Fletcher Mine/Mill in accordance with all provisions of Appendix H (Enclosure of Lead Concentrate Storage and Handling) and other terms of this Consent Decree.  The enclosure/ventilation systems installed pursuant to this Paragraph shall be installed and begin operation in accordance with the schedule set forth in Appendix H (Enclosure of Lead Concentrate Storage and Handling).

155.    Stream Mitigation.  Doe Run shall implement a stream mitigation project for 8.5 miles of Bee Fork Creek in Reynolds County, Missouri, in accordance with all provisions of Appendix I (Statement of Work for Bee Fork Creek Mitigation) and other terms of this Consent Decree.  The stream mitigation project implemented pursuant to this Paragraph shall be

-109-

DRRC multi-media Consent Decree

completed in accordance with the schedules set forth in and developed pursuant to Appendix I (Statement of Work for Bee Fork Creek Mitigation).

156.    Doe Run is responsible for the satisfactory completion of the Additional Injunctive Relief under this Section in accordance with the requirements of this Consent Decree and Appendices H (Enclosure of Lead Concentrate Storage and Handling) and I (Statement of Work for Bee Fork Creek Mitigation).  Doe Run may use contractors or consultants in planning and implementing the Additional Injunctive Relief.

157.    For all requirements under this Section, Doe Run certifies the truth and accuracy of each of the following:

a.      that, as of the date of executing this Consent Decree, Doe Run is not required to perform or develop any portion of this Additional Injunctive Relief by any federal, state, or local law or regulation and are not required to perform or develop this Additional Injunctive Relief by agreement, grant, or as injunctive relief awarded in any other action in any forum;

b.      that Doe Run was not planning or intending to perform this Additional Injunctive Relief other than in settlement of the claims resolved in this Consent Decree; and

c.      that Doe Run has not received and shall not receive credit for any portion of this Additional Injunctive Relief in any other enforcement action.

DRRC multi-media Consent Decree

158.    Defendants shall comply with the reporting requirements of Appendix H (Enclosure of Lead Concentrate Storage and Handling), Appendix I (Statement of Work for Bee Fork Creek Mitigation), and this Consent Decree.

159.    <u>Completion Report: Enclosure of Lead Concentrate Storage and Handling Project</u>. Following completion of the Enclosure of Lead Concentrate Storage and Handling project pursuant to Appendix H, Doe Run shall submit an Enclosure of Lead Concentrate Storage and Handling Project Completion Report to the Plaintiffs with the next semi-annual status report required pursuant to Paragraph 176, in accordance with Section XXIII (Notices) of this Consent Decree.  The Enclosure of Lead Concentrate Storage and Handling Project Completion Report shall contain the following information:

a.      a detailed description of the project as implemented;

b.      a detailed description of any material changes in the project from what was proposed in the original plans and specifications;

c.      certification that the project has been fully implemented pursuant to the provisions of this Consent Decree and Appendix H (Enclosure of Lead Concentrate Storage and Handling); and

d.      a description of the environmental and public health benefits resulting from implementation of the project (with a quantification of the benefits and pollutant reductions, if feasible).

160.    EPA may, in its sole discretion, upon written request require Doe Run to submit information in addition to that described in Paragraph 159, in order to evaluate Doe Run's

-111-

DRRC multi-media Consent Decree

Enclosure of Lead Concentrate Storage and Handling Project Completion Report.  After

receiving the Enclosure of Lead Concentrate Storage and Handling Project Completion Report,

the EPA shall notify Doe Run whether or not Doe Run has satisfactorily completed the Enclosure

of Lead Concentrate Storage and Handling project.  If Doe Run has not completed the Enclosure

of Lead Concentrate Storage and Handling project in accordance with this Consent Decree,

stipulated penalties may be assessed under Section XVII (Stipulated Penalties) of this Consent

Decree.

     161.    <u>Completion Report: Stream Mitigation Project</u>.  In accordance with the

requirements and schedule set forth in Appendix I (Statement of Work for Bee Fork Creek

Mitigation), Doe Run shall submit to EPA and MDNR a copy of the final progress report for the

Stream Mitigation Project ("Stream Mitigation Project Completion Report"), in accordance with

Section XXIII (Notices) of this Consent Decree.  The report shall contain all information required

pursuant to Appendix I (Statement of Work for Bee Fork Creek Mitigation) and the following

information:

        a.    a detailed description of the project as implemented;

        b.    certification that the project has been fully implemented pursuant to the

provisions of this Consent Decree and Appendix I (Statement of Work for Bee Fork

Creek Mitigation); and

        c.    a description of the environmental and public health benefits resulting

from implementation of the project (with a quantification of the benefits and pollutant

reductions, if feasible).

DRRC multi-media Consent Decree

162.    MDNR may, in its sole discretion, upon written request require Doe Run to submit information in addition to that described in the Paragraph 161, in order to evaluate Doe Run's Stream Mitigation Completion Report.  After receiving the Stream Mitigation Project Completion Report, MDNR shall notify Doe Run whether or not Doe Run has satisfactorily completed the Stream Mitigation Project.  If Doe Run has not completed the Stream Mitigation Project in accordance with this Consent Decree, stipulated penalties may be assessed under Section XVII (Stipulated Penalties) of this Consent Decree.

163.    Each submission required under this Section shall be signed by an official with knowledge of the project and shall bear the certification language set forth in Paragraph 181.

164.    Disputes concerning the satisfactory performance of the Enclosure of Lead Concentrate Storage and Handling Project and the Stream Mitigation Project may be resolved under Section XIX (Dispute Resolution) of this Decree.  Subject to Doe Run's right to invoke Dispute Resolution regarding the approval of deliverables required pursuant to Appendix H (Enclosure of Lead Concentrate Storage and Handling) and Appendix I (Statement of Work for Bee Fork Creek Mitigation) as provided in Section XII (Compliance Requirements: Approval of Deliverables), no other disputes arising under Paragraphs 154 through 163 of this Section shall be subject to Dispute Resolution.

165.    New Facilities.

a.    Upon the Date of Lodging, in the event that Defendants elect to build or operate a new lead concentrate unloading facility at the Herculaneum Lead Smelter Facility (as defined in Appendix E) following the Remedial Action required pursuant to

-113-

DRRC multi-media Consent Decree

Section IX (Site Remediation – Herculaneum) of this Consent Decree, or any new Doe Run owned and/or operated lead concentrate unloading facility in Missouri, Defendants shall:

        i.      Notify EPA and the State of such plans as soon as practicable;

        ii.      Obtain all required federal, State and local environmental construction and operating permits;

        iii.      Install and operate an enclosure/ventilation system for all lead concentrate handling (including conveyance systems), loading, unloading and storage area at such facility that is equivalent to the system requirements set forth in Appendix H of this Consent Decree or as may be required by federal, State or local requirements, whichever is more stringent.  Any loading or unloading of lead concentrate from vehicles shall only occur within buildings meeting the requirements herein; and,

        iv.      If not subject to the Transportation AOC by the terms of that order, Defendants shall request a modification to include the facility as a "Doe Run facility" as that term is defined in the Transportation AOC.

b.      Upon the Date of Lodging, in the event that Defendants elect to build or operate a new facility in Missouri using a hydrometallurgical-electrochemical process for producing lead metal from concentrates, Defendants shall:

        i.      Notify EPA and the State of such plans as soon as practicable;

-114-

DRRC multi-media Consent Decree

      ii.     Obtain all required federal, State and local environmental construction and operating permits;

      iii.     Install and operate an enclosure/ventilation system for all lead concentrate handling (including conveyance systems), loading, unloading and storage area at such facility that is equivalent to the system requirements set forth in Appendix H of this Consent Decree or as may be required by federal, State or local requirements, whichever is more stringent.  Any loading or unloading of lead concentrate from vehicles shall only occur within buildings meeting the requirements herein; and,

      iv.     If not subject to the Transportation AOC by the terms of that order, Defendants shall request a modification to include the facility as a "Doe Run facility" as that term is defined in the Transportation AOC.

## XV.  ENVIRONMENTAL MITIGATION PROJECTS

166.    Defendants shall implement the Environmental Mitigation Projects ("Projects") described in Appendix J to this Consent Decree in compliance with the approved plans and schedules for such Projects and other terms of this Consent Decree.  Defendants shall spend no less than $2 million in Project Dollars implementing the Projects identified in Appendix J in accordance with the schedules provided in Appendix J.  Defendants shall implement such Projects over a period of no later than four (4) years from the Effective Date of this Consent Decree.

DRRC multi-media Consent Decree

167.    Defendants shall maintain, and present to EPA and MDNR upon request, all documents to substantiate the Project Dollars expended to implement the Projects described in Appendix J, and shall provide these documents to EPA and MDNR within thirty (30) days of a request for the documents.

168.    All plans and reports prepared by Defendants pursuant to the requirements of this Section of the Consent Decree and required to be submitted to EPA shall be made publicly available from Defendants without charge.

169.    Defendants are responsible for the satisfactory completion of the Projects in accordance with the requirements of this Decree.  Defendants may use contractors or consultants in planning and implementing the Projects.

170.    Defendants shall certify, as part of each plan submitted to EPA pursuant to Appendix J for any of the Projects, the truth and accuracy of each of the following:

a.      that all cost information provided to EPA in connection with EPA's approval of the Projects is complete and accurate and that Defendants have estimated the costs of the Projects in good faith;

b.      that, as of the date of executing this Decree, Defendants are not required to perform or develop the Projects by any federal, state, or local law or regulation and are not required to perform or develop the Projects by agreement, grant, or as injunctive relief awarded in any other action in any forum;

-116-

DRRC multi-media Consent Decree

      c.      that the Projects are not projects that Defendants were planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

      d.      that Defendants have not received and will not receive credit for the Projects in any other enforcement action; and

      e.      that Defendants will not receive any reimbursement for any portion of the Projects from any other person.

171.     <u>Environmental Mitigation Projects Completion Report</u>

      a.      Following the date set for completion of the Projects pursuant to Appendix J, with the next semi-annual status report required pursuant to Paragraph 176, Defendants shall submit an Environmental Mitigation Projects Completion Report to the Plaintiffs, in accordance with Section XXIII (Notices) of this Consent Decree.  The Environmental Mitigation Projects Completion Report shall contain the following information:

      i.      a detailed description of the Projects as implemented;

      ii.      a description of any material changes in the project from what was proposed in the original plans and specifications;

      iii.      an itemized list of all eligible Project costs expended;

      iv.      certification that the Project has been fully implemented pursuant to the provisions of this Consent Decree and Appendix J; and

DRRC multi-media Consent Decree

v.      a description of the environmental and public health benefits resulting from implementation of the Projects (with a quantification of the benefits and pollutant reductions, if feasible).

172.    EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate Defendants' Completion Report.

173.    After receiving the Environmental Mitigation Projects Completion Report, the United States shall notify Defendants whether or not Defendants have satisfactorily completed the Projects.  If Defendants have not completed the Projects in accordance with this Consent Decree, stipulated penalties may be assessed under Section XVII (Stipulated Penalties) of this Consent Decree.

174.    Disputes concerning the satisfactory performance of the Projects and the amount of eligible Project costs may be resolved under Section XIX (Dispute Resolution) of this Decree.  EPA's decision regarding whether to approve an additional project Defendants choose to submit pursuant to paragraph A. in section I. of Appendix J (Environmental Mitigation Projects) is not subject to Dispute Resolution.  Subject to Doe Run's right to invoke Dispute Resolution regarding the approval of deliverables required pursuant to Appendix J (Environmental Mitigation Projects) as provided in Section XII (Compliance Requirements: Approval of Deliverables), no other disputes arising under Paragraphs 166 through 173 of this Section shall be subject to Dispute Resolution.

175.    Each submission required under this Section shall be signed by an official with knowledge of the Projects and shall bear the certification language set forth in Paragraph 181.

DRRC multi-media Consent Decree

## XVI.  REPORTING REQUIREMENTS

176.    In addition to any other express reporting requirement in this Consent Decree, on each April 30 and October 31 following the Effective Date of this Consent Decree until termination of this Decree pursuant to Section XXVII (Termination), Defendants shall submit to EPA and MDNR a status report that shall describe the Defendants' actions taken and to be taken to comply with this Consent Decree.  The status report due April 30 shall provide information for the preceding period from October 1 through March 31.  The status report due October 31 shall provide information for the preceding period from April 1 through September 30.  If Defendants indicate in a status report that an obligation under this Consent Decree has been completed and EPA, after consultation with MDNR, agrees that the obligation has been completed, Defendants are not required to include the completed obligation in future status reports.  Each status report shall include:

a.    a progress report on the implementation of Sections V through X, XIV, and XV above (all injunctive relief sections except Section XI (Transportation Order));

b.    the status of and likely target date of cessation of operation required by Section V (Compliance Requirements: Clean Air Act);

c.    any significant problems encountered in complying with Sections V through X, XIV, and XV (all injunctive relief sections except Section XI (Transportation Order)) of this Consent Decree, together with implemented or proposed solutions;

d.    a summary of the $SO_2$ emissions monitoring data collected pursuant to the Consent Decree including the mass of $SO_2$ emitted;

-119-

DRRC multi-media Consent Decree

e.     a summary of the Sinter Production data collected pursuant to the Consent

Decree;

f.     a summary of the Blast Furnace Sinter Consumption data collected

pursuant to the Consent Decree

g.     a summary of all the Refined Lead Metal Production data collected

pursuant to the Consent Decree;

h.     the date and time identifying each period during which the CERMS was

inoperative except for zero and span checks and the nature of any system repairs or

adjustments; and

i.     all substitute data used to determine compliance with the $SO_2$ emission

limits established in Paragraph 20.c. of this Consent Decree along with supporting

calculations.

177.     Except for MSOP violations as addressed in Paragraph 178, in addition to the

report required by the preceding Paragraph 176, if Defendants violate any requirement of this

Consent Decree, Defendants shall notify the United States and the State of such violation and its

duration or anticipated likely duration, in writing, within ten (10) business days of first becoming

aware of the violation, with an explanation of the cause or likely cause of the violation and any

measures taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation

cannot be fully explained at the time the report is due, Defendants shall so state in the report.

Defendants shall investigate the cause of the violation and shall then submit an amendment to the

report, including a full explanation of the cause of the violation, within fifteen (15) Days of

DRRC multi-media Consent Decree

becoming aware of the cause of the violation.  Nothing in this Paragraph or the following

Paragraph relieves Defendants of their obligation to provide the notice required by Section XVIII

(Force Majeure).

178.     Defendants shall report exceedances of final and interim CWA Facility permit

limitations applicable at the time of reporting as a part of the facility monthly DMRs submitted to

MDNR.  In addition to the information required to be submitted to MDNR in the DMRs,

Defendants shall include a supplemental statement regarding any exceedances of alternative

CWA permit limitations, as identified in Appendix B (MSOP Alternative Effluent Limitations

and Compliance Deadlines) and an explanation of the cause or likely cause of the exceedance

and any measures taken, or to be taken, to prevent or minimize such exceedance.  At the same

time such information is submitted to MDNR, Defendants shall submit to EPA, in accordance

with the provisions of Section XXIII (Notices), an electronic copy of the DMRs and

supplemental statement of exceedances specified in this Paragraph.  Upon written request,

Defendants shall also submit to EPA a hard copy of such information.

179.     Whenever any violation of this Consent Decree or any applicable permit or any

other event related to Defendants' performance under this Consent Decree poses an immediate

threat to the public health or welfare of the environment, Defendants shall notify EPA and the

State, orally or by electronic or facsimile transmission as soon as possible, but no later than 24

hours after Defendants first knew of, or should have known of, the violation or event.  This

notification procedure is in addition to the requirements set forth in the preceding Paragraph.

DRRC multi-media Consent Decree

180. All reports shall be submitted to the persons designated in Section XXIII (Notices) of this Consent Decree.

181. Each report or notice submitted by Defendants under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that I have examined and am familiar with the information submitted in this document and all attachments and that this document and its attachments were prepared either by me personally or under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gather, evaluate, and present the information contained therein.  I further certify, based on my personal knowledge or on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, that the information submitted is true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

182. The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligations required by the CAA, CWA, RCRA EPCRA, or CERCLA, or their implementing regulations, or by any other federal, state or local law, regulation, permit, or other requirement.  The reporting requirements of this Section are in addition to any other reports, plans, or submissions required by other Sections of this Consent Decree.

183. Any information provided pursuant to this Consent Decree may be used by the Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.  All information and documents submitted by Defendants to the United States or to the State pursuant to this Consent Decree shall be subject to public inspection, unless

-122-

DRRC multi-media Consent Decree

identified and supported as CBI by Defendants in accordance with 40 C.F.R. Part 2 and

applicable state law.

## XVII.  STIPULATED PENALTIES

184.    Defendant shall be liable for stipulated penalties to the Plaintiffs for violations of

this Consent Decree as specified below, unless excused under Section XVIII (Force Majeure) of

this Decree, including any work plan or schedule approved under this Consent Decree and

incorporated by reference into this Consent Decree, according to all applicable requirements of

this Decree and within the specified time schedules established by or approved under this Decree.

185.    Late Payment of Civil Penalty

If Defendants fail to pay the civil penalty required to be paid under Section IV (Civil

Penalty) of this Decree when due, Defendants shall pay a stipulated penalty of $10,000 per Day

for each Day that the payment is late.

186.    Cessation of Operations at Herculaneum

The following stipulated penalties shall accrue per violation per Day for each Day

Defendants fail to comply with the requirements of Paragraph 14 (Election to Cease Smelting

Operation):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $15,000 | 1st through 14th Day |
| $25,000 | 15th through 30th Day |
| $37,500 | 31st Day and beyond |

DRRC multi-media Consent Decree

187.   Interim Production and Emissions Limits at Herculaneum

The following stipulated penalties shall accrue per violation for each violation of a requirement of Paragraph 20.a. through 20.c.:

| Penalty Per Violation Per Day | Measure of Noncompliance |
|---|---|
| $2,250 | For each Day the $SO_2$ Short-term Limit is exceeded |
| $7,000 | Per ton for each ton or fraction of a ton over the $SO_2$ Mass Cap up to 100 tons above the limit |
| $12,000 | Per ton for each ton or fraction of a ton over the $SO_2$ Mass Cap exceeding 100 tons above the limit |
| $1,000 | Per Day for each violation of the lead limit at Paragraph 20.b of this Consent Decree. This penalty shall accrue until compliance is reestablished via the testing requirements of Paragraph 20.b. |
| $15,000 | Per ton for each ton or fraction of a ton over a 12-Month Rolling Tonnage up to 100 tons above the limit |
| $20,000 | Per ton for each ton or fraction of a ton over a 12-Month Rolling Tonnage exceeding 100 tons above the limit. |

188.   Emissions Testing at Herculaneum

The following stipulated penalties shall accrue for each Day for any failure to meet the testing requirements in Paragraph 20.b of this Consent Decree, except that any deliverable associated with these testing requirements is subject to the stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

-124-

DRRC multi-media Consent Decree

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,500 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $4,000 | 31st Day and beyond |

189.  Emissions Monitoring at Herculaneum

The following stipulated penalties shall accrue per violation per Day for each violation of any requirement identified in this Consent Decree regarding the installation and operation of a CERMS by the dates outlined herein, except that any deliverable associated with these requirements is subject to the stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,500 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $4,000 | 31st Day and beyond |

190.  Buick Mine/Mill CAA Injunctive Relief

The following stipulated penalties shall accrue per violation per Day for each violation of a requirement of Section V, Subsection C (Installation of Pressure Drop Monitor at Buick Mine/Mill), except that any deliverable associated with these requirements is subject to the stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |

DRRC multi-media Consent Decree

| | |
|---|---|
| $2,000 | 15th through 30th Day |
| $4,000 | 31st Day and beyond |

191.    <u>CWA Injunctive Relief Provisions</u>

The following stipulated penalties shall accrue per violation per Day for each violation of a requirement of Section VI (Compliance Requirements: Clean Water Act), except that any deliverable associated with these requirements is subject to the stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $950 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $4,000 | 31st Day and beyond |

192.    <u>CWA Interim or Alternative Effluent Limits</u>

a.      <u>Monthly Average Violations</u>.  The following stipulated penalties shall accrue per violation per Month for each violation of an interim Monthly Average effluent limitation in effect in a CWA Facility MSOP or any Monthly Average effluent limitation modified by Alternative Effluent Limitations pursuant to Subsection I (Schedule for Compliance With Missouri State Operating Permits) of this Consent Decree and specified in Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines):

| Penalty Per Monthly  Average Violation | Degree of Exceedance |
|---|---|
| $2,000 | up to, but not including, 20% over the limit |

-126-

DRRC multi-media Consent Decree

| | |
|---|---|
| $4,000 | from 20% over the limit, and up to, but not including, 50% over the limit |
| $7,500 | from 50% over the limit, and up to, but not including, 100% over the limit |
| $11,000 | 100% over limit or greater |

      b.    <u>Violations of a "No Discharge" Requirement in Appendix B</u>.  The following stipulated penalties shall accrue per outfall per Day of discharge for each violation of that outfall's "no discharge" Alternative Effluent Limitation established pursuant to Subsection I (Schedule for Compliance With Missouri State Operating Permits) of this Consent Decree, as specified in Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines):

| <u>Penalty Per Day of Discharge</u> | <u>Duration of Discharge</u> |
|---|---|
| $4,000 | for the 1st and 2nd Days during a Month on which a discharge occurs |
| $7,500 | for the 3rd and 4th Days during a Month on which a discharge occurs |
| $10,000 | for the 5th Day and for each additional Day during a Month on which a discharge occurs |

193.    <u>CWA Facility Final Effluent Limits</u>

      a.    <u>Monthly Average Violations</u>.  The following stipulated penalties shall accrue per violation per Month for each violation of a final Monthly Average effluent limitation in effect in a CWA Facility MSOP:

-127-

DRRC multi-media Consent Decree

| Penalty Per Monthly Average Violation | Degree of Exceedance |
|---|---|
| $4,000 | up to, but not including, 20% over the limit |
| $7,000 | from 20% over the limit, and up to, but not including, 50% over the limit |
| $10,000 | from 50% over the limit, and up to, but not including, 100% over the limit |
| $15,000 | 100% over limit or greater |

b.      Daily Maximum and Weekly Average Violations.  The following

stipulated penalties shall accrue per violation per Day for each violation of a final Daily

Maximum or Weekly Average effluent limitation in effect in a CWA Facility MSOP:

| Penalty Per Daily Maximum or Weekly Average Violation | Degree of Exceedance |
|---|---|
| $2,000 | up to, but not including, 20% over the limit |
| $5,000 | from 20% over the limit, and up to, but not including, 50% over the limit |
| $8,000 | from 50% over the limit, and up to, but not including, 100% over the limit |
| $12,000 | 100% over limit or greater |

194.    Acute and Chronic Whole Effluent Toxicity Limitations.

Except as specified in the Alternative Effluent Limitations pursuant to Subsection I

(Schedule for Compliance With Missouri State Operating Permits) of this Consent Decree and

specified in Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines),

the following stipulated penalties shall accrue per violation for each violation of an acute or

-128-

DRRC multi-media Consent Decree

chronic WET test limitation in a test series (i.e., the original annual, semiannual, quarterly or monthly test, as applicable, and follow-up tests required due to test failure) in effect in a CWA Facility MSOP:

| Penalty Per WET Test Event | Number of Violations in Test Series |
|---|---|
| $4,000 | first violation |
| $7,000 | second violation |
| $10,000 | third and subsequent violation |

195.   MSOP Violations other than Effluent Limitation and WET Limitation Violations

The following stipulated penalties shall accrue per Day for each violation of a requirement of a CWA Facility MSOP other than an effluent discharge limitation, an effluent discharge prohibition, or WET limitation:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1,500 | 15th through 30th Day |
| $3,000 | 31st Day and beyond |

196.   Modified Transportation AOC.   Stipulated penalties shall accrue per violation per Day for each violation of any requirement of the Transportation AOC, as amended by all modifications thereto, in accordance with the stipulated penalty provisions set forth in paragraph 114 of the Modified Transportation AOC.

DRRC multi-media Consent Decree

197.    RCRA Injunctive Relief

The following stipulated penalties shall accrue per violation per Day for each Day

Defendants fail to comply with the requirements of Section VIII (Compliance Requirements:

RCRA), except that any deliverable associated with these requirements is subject to the

stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $3,000 | 15th through 30th Day |
| $5,000 | 31st Day and beyond |

198.    Site Remediation - Herculaneum

The following stipulated penalties shall accrue per violation per Day for each Day

Defendants fail to comply with the requirements of Section IX (Site Remediation -

Herculaneum), except that any deliverable associated with these requirements is subject to the

stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $5,000 | 31st Day and beyond |

199.    Financial Assurances

The following stipulated penalties shall accrue per violation per Day for each Day

Defendants fail to comply with the requirements of Section X (Financial Assurances), except that

DRRC multi-media Consent Decree

any deliverable associated with these requirements is subject to the stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $3,000 | 15th through 30th Day |
| $5,000 | 31st Day and beyond |

200.   <u>Additional Injunctive Relief Compliance</u>

The following stipulated penalties shall accrue for each Day Defendants fail to timely or satisfactorily complete the Additional Injunctive Relief Projects by the deadline set forth in Section XIV, Appendix I (Statement of Work for Bee Fork Creek Mitigation) and Appendix H (Enclosure of Lead Concentrate Storage and Handling), or schedules approved pursuant to this Consent Decree, except that any deliverable associated with these requirements is subject to the stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $3,000 | 1st through 15th day |
| $6,000 | 15th day and beyond |

201.   <u>Environmental Mitigation Projects Compliance</u>

The following stipulated penalties shall accrue for each Day Defendants fail to timely or satisfactorily complete the Environmental Mitigation Projects by the deadline set forth in Section XV (Environmental Mitigation Projects), Appendix J (Environmental Mitigation Projects), or schedules approved pursuant to this Consent Decree, except that any deliverable associated with

-131-

DRRC multi-media Consent Decree

these requirements is subject to the stipulated penalty provisions at Paragraph 202 (Deliverable Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $1,000 | 1st through 15th day |
| $5,000 | 15th day and beyond |

202.   <u>Deliverable Requirements</u>.  The following stipulated penalties shall accrue per violation per Day for each failure to timely submit, modify, or implement, as approved, the reports plans, studies, analyses, protocols, or other deliverables required by this Consent Decree, except as otherwise specified in Paragraphs 184 through 201 above:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $1,000 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $3,000 | 31st Day and beyond |

203.   The following stipulated penalties shall accrue per violation per Day for Defendants' failure to comply with any other requirement of this Consent Decree not specifically referenced in Paragraphs 184 through 202 within the specified time established by or approved under this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $750 | 1st through 14th Day |
| $1,500 | 15th through 30th Day |
| $3,000 | 31st Day and beyond |

DRRC multi-media Consent Decree

204.    Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree, but only one stipulated penalty may be assessed per violation in accordance with Paragraphs 184 through 201. Any stipulated penalty shall be assessed only to the Defendant that is obligated to perform the work or obligation pursuant to this Consent Decree.

205.    Defendants shall pay stipulated penalties to the Plaintiffs within thirty (30) Days of a written demand by either Plaintiff.  Defendants shall pay fifty (50) percent of the total stipulated penalty amount due to the United States and fifty (50) percent to the State, with the exception of stipulated penalties paid pursuant to Paragraph 196 (Modified Transportation AOC), which shall be paid entirely to the United States.  Except for penalties involving the Modified Transportation AOC, the Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

206.    Either Plaintiff may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

207.    Stipulated penalties shall continue to accrue as provided in Paragraph 204, during any Dispute Resolution, but need not be paid until the following:

a.    If the dispute is resolved by agreement or by a decision of EPA or the State that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owed, together with interest, to the United States or the State within thirty (30) Days of

DRRC multi-media Consent Decree

the effective date of the agreement or the receipt of EPA's or the State's decision or order.

b.      If the dispute is appealed to the Court and the United States or the State prevails in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owed, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph 207.c, below.

c.      If any Party appeals the District Court's decision, Defendants shall pay all accrued penalties determined to be owed, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

208.    <u>Obligations Prior to the Effective Date</u>.  Upon the Effective Date of this Consent Decree, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to any and all violations of this Consent Decree that have occurred between the Lodging Date and the Effective Date of the Consent Decree, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

209.    Defendants shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.  Defendants shall pay stipulated penalties owing to the State in the manner set forth in Paragraph 13.  The checks and the signed Consent Decree shall be mailed to:

Collections Specialist
Office of the Attorney General

-134-

DRRC multi-media Consent Decree

P.O. Box 899
Jefferson City, MO 65102-0899

210.    If Defendants fail to pay stipulated penalties according to the terms of this

Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in

28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall

be construed to limit the United States or the State from seeking any remedy otherwise provided

by law for Defendants' failure to pay any stipulated penalties.

211.    Subject to the provisions of Section XXI (Effect of Settlement/Reservation of

Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall

be in addition to any other rights, remedies, or sanctions available to the United States or the

State for Defendants' violation of this Consent Decree or applicable law.  Where a violation of

this Consent Decree is also a violation of relevant statutory or regulatory requirements,

Defendants shall be allowed a credit for any stipulated penalties paid against any statutory

penalties imposed for such violation.

## XVIII.  <u>FORCE MAJEURE</u>

212.    "Force majeure," for purposes of this Consent Decree, is defined as any event

arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or

of Defendants' contractors, that delays or prevents the performance of any obligation under this

Consent Decree despite Defendants' best efforts to fulfill the obligation.  The requirement that

Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate

any potential force majeure event and best efforts to address the effects of any such event (a) as it

is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the

DRRC multi-media Consent Decree

greatest extent possible.  "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

213.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendants shall provide notice orally or by electronic or facsimile transmission to EPA and MDNR, within seventy-two (72) hours of when Defendants first knew that the event might cause a delay.  Within seven (7) Days thereafter, Defendants shall provide in writing to EPA and the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

214.    If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for

DRRC multi-media Consent Decree

performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

215.    If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendants in writing of its decision.

216.    If Defendants elect to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution), they shall do so no later than fifteen (15) Days after receipt of EPA's notice.  In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 212 and 213, above.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to EPA and the Court.

-137-

DRRC multi-media Consent Decree

## XIX.  DISPUTE RESOLUTION

217.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

218.    Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the United States and the State a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed twenty (20) Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States and the State shall be considered binding unless, within twenty (20) Days after the conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

219.    Formal Dispute Resolution.  Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and the State a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

220.    The Plaintiffs shall serve their Statement of Position within sixty (60) Days of receipt of Defendants' Statement of Position.  The Plaintiffs' Statement of Position shall include,

-138-

DRRC multi-media Consent Decree

but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the Plaintiffs.  The Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

221.    Defendants may seek judicial review of the dispute by filing with the Court and serving on the Plaintiffs, in accordance with Section XXIII (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute.  The motion must be filed within ten (10) Days of receipt of the Plaintiffs' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

222.    The United States and the State shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court.  Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

223.    <u>Standard of Review</u>

a.    <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought pursuant to the formal dispute resolution procedures of this Section XIX (Dispute Resolution) of this Consent Decree, pertaining to the adequacy of the performance of the Stream Mitigation Project work undertaken pursuant to Section XIV (Additional Injunctive Relief) of this Consent

-139-

DRRC multi-media Consent Decree

Decree and the Remedial Action work undertaken pursuant to Section IX (Site

Remediation – Herculaneum) of this Consent Decree, Defendants shall have the burden

of demonstrating, based on the administrative record, that the position of the United

States and/or the State is arbitrary and capricious or otherwise not in accordance with law.

       b.    <u>Other Disputes</u>.  Except as otherwise provided in this Consent Decree, in

any other judicial proceeding brought pursuant to the formal dispute resolution

procedures of this Section XIX (Dispute Resolution) of this Consent Decree, Defendants

shall bear the burden of demonstrating that their position clearly complies with and

furthers the objectives of this Consent Decree and the relevant statutes and that

Defendants are entitled to relief under applicable law.  The United States and the State

reserve their right to argue that their position is reviewable only on the administrative

record and must be upheld unless arbitrary and capricious or otherwise not in accordance

with law.

224.    The invocation of dispute resolution procedures under this Section shall not, by

itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent

Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with

respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but

payment shall be stayed pending resolution of the dispute as provided in Paragraph 207.  If

Defendants do not prevail on the disputed issue, stipulated penalties may be assessed by

Plaintiffs and, if assessed, shall be paid as provided in Section XVII (Stipulated Penalties).

DRRC multi-media Consent Decree

225.    As part of the resolution of any dispute under this Section, in appropriate

circumstances the disputing Parties may agree, or this Court may order, an extension or

modification of the schedule for the completion of the work required under this Consent Decree.

## XX.  INFORMATION COLLECTION AND RETENTION

226.    The United States, the State, and their representatives, including attorneys,

contractors, and consultants, shall have the right of entry into any facility covered by this Consent

Decree, at all reasonable times, upon presentation of credentials, to:

        a.    monitor the progress of activities required under this Consent Decree;

        b.    verify any data or information submitted to the United States or the State

in accordance with the terms of this Consent Decree;

        c.    obtain samples and, upon request, splits of any samples taken by

Defendants or their representatives, contractors, or consultants;

        d.    obtain documentary evidence, including photographs and similar data; and

        e.    assess Defendants' compliance with this Consent Decree.

227.    Upon request, Defendants shall provide EPA and the State or their authorized

representatives splits of any samples taken by Defendants pursuant to this Consent Decree.  Upon

request, EPA and the State shall provide Defendants splits of any samples taken by EPA or the

State pursuant to this Consent Decree.

228.    Until five years after the termination of this Consent Decree, Defendants shall

retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all

documents, records, or other information (including documents, records, or other information in

-141-

DRRC multi-media Consent Decree

electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of its obligations under this Consent Decree.  This information retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information retention period, upon request by the United States or the State, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

229.    At the conclusion of the information retention period provided in the preceding Paragraph, Defendants shall notify the United States and the State at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, Defendants shall deliver any such documents, records, or other information to EPA or the State.  Defendants may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendants assert such a privilege, it shall provide the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendants.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

-142-

DRRC multi-media Consent Decree

230.    Defendants may also assert that information required to be provided under this Section is protected as CBI under 40 C.F.R. Part 2.  As to any information that Defendants seek to protect as CBI, Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.

231.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

XXI.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

232.    Definitions. For purposes of this Section XXI (Effect of Settlement/Reservation of Rights), the following definitions apply:

a.    "Applicable NSR/PSD Requirements" shall mean:

i.    PSD requirements at Part C of Subchapter I of the CAA, 42 U.S.C. § 7475, and the regulations promulgated thereunder at 40 C.F.R. §§ 52.21 and 51.166, as amended from time to time;

ii.    "Plan Requirements for Non-Attainment Areas" at Part D of Subchapter I of the CAA, 42 U.S.C. §§ 7502-7503, and the regulations promulgated thereunder at 40 C.F.R. §§ 51.165 (a) and (b); 40 C.F.R. Part 51, Appendix S; and 40 C.F.R. § 52.24, as amended from time to time;

-143-

DRRC multi-media Consent Decree

> iii.     Any Title V regulations that implement, adopt, or incorporate the specific regulatory requirements identified above, as amended from time to time; and

> iv.     Any applicable state or local laws or regulations that implement, adopt, or incorporate the specific federal regulatory requirements identified above regardless of whether such state or local laws or regulations have been formally approved by EPA as being a part of the applicable state implementation plan.

b.      "Applicable NSPS Subparts A and R Requirements" shall mean the standards, monitoring, testing, reporting and recordkeeping requirements, found at 40 C.F.R. §§ 60.180 through 60.186 (Subpart R), relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart R.

233.    This Consent Decree resolves the civil claims of the United States and the State for the violations alleged in the Complaint filed in this action through the Lodging Date.  The claims so resolved include claims for:

a.      Liability Resolution Regarding the Applicable NSR/PSD Requirements. With respect to emissions of $SO_2$ and lead from the Herculaneum Lead Smelter Sinter Machine, Sinter Bed, Sintering Machine Discharge End, and Sulfuric Acid Plant units, entry of this Consent Decree shall resolve all civil liability of Doe Run to the Plaintiffs for alleged violations of the Applicable NSR/PSD Requirements resulting from

-144-

DRRC multi-media Consent Decree

construction or modification from the date of the pre-Lodging construction or

modification up to the Lodging Date;

      b.      <u>Liability Resolution Regarding the Applicable NSPS Requirements</u>. With

respect to emissions of $SO_2$ from the Herculaneum Lead Smelter Sinter Machine, Sinter

Bed, and Sintering Machine Discharge End units, entry of this Consent Decree shall

resolve all civil liability of Doe Run to the Plaintiffs for alleged violations of the

Applicable NSPS Subparts A and R Requirements from the date that claims of the

Plaintiffs resulting from pre-Lodging construction or modification (including

reconstruction) accrued up to the Lodging Date;

      c.      <u>Liability Resolution Regarding Additional CAA Claims Alleged</u>

<u>Concerning the Herculaneum Lead Smelter</u>.  Entry of this Consent Decree shall resolve

all civil liability of Doe Run to the Plaintiffs for the following alleged past violations:  (i)

alleged violations of Title V of the CAA based on an alleged past failure to comply with

the 2007 Consent Judgment incorporated by reference into Doe Run's Title V/Part 70

Operating Permit No. OP2006-011B as Condition PW008; (ii) alleged violations of

National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Primary

Lead Smelters, set forth at 40 C.F.R. Part 63, Subpart TTT based on an alleged past

failure to submit required reports; and (iii) violations of any corresponding state or local

laws or regulations arising out of any acts or omissions by Doe Run which formed the

basis for such alleged CAA violations;

DRRC multi-media Consent Decree

      d.    <u>Liability Resolution Regarding Additional Claims Alleged Concerning the</u>
<u>Herculaneum Lead Smelter</u>.  Entry of this Consent Decree shall resolve all civil liability
of Doe Run to the Plaintiffs for the following alleged past violations: (i) alleged
violations of reporting requirements under CERCLA Section 103, 42 U.S.C. § 9603, and
EPCRA Section 304, 42 U.S.C. § 11004 based on an alleged release on or about March
22, 2005; (ii) alleged violations of RCRA, 42 U.S.C. § 6901 <u>et seq.</u>, as alleged in
inspection reports compiled by EPA following a RCRA inspection conducted at the
Herculaneum Lead Smelter in June 2005 and MDNR following a RCRA inspection
conducted at Herculaneum in May 2009, based on alleged past unauthorized treatment
storage, and/or disposal of certain hazardous waste at the Herculaneum Lead Smelter,
failure to comply with applicable hazardous waste generator requirements at the
Herculaneum Lead Smelter, and failure to comply with applicable used oil management
requirements at the Herculaneum Lead Smelter; (iii) alleged violations of RCRA, 42
U.S.C. § 6901 <u>et seq.</u>, based on violations alleged in inspection reports compiled by EPA
following a RCRA inspection conducted at the Herculaneum Lead Smelter in June 2005
and MDNR following a RCRA inspection conducted at Herculaneum in May 2009; and
(iv) violations of any corresponding state or local laws or regulations arising out of any
acts or omissions by Doe Run which formed the basis for such alleged CERCLA,
EPCRA, and RCRA violations;

      e.    <u>Liability Resolution Regarding Claims Alleged at the Buick Mine/Mill</u>.
Entry of this Consent Decree shall resolve all civil liability of Doe Run to the Plaintiffs

-146-

DRRC multi-media Consent Decree

for the following alleged past violations:  (i) alleged violations of Title V of the CAA and

the Missouri SIP based on an alleged past failure to submit accurate emissions inventory

questionnaires for Buick Mine/Mill and to comply with the Buick Mine/Mill Part 70

Operating Permit No. OP2003-011 requirements to install pressure drop monitors for

emission units EU0020 and EU0030 and notify the State when the wet cyclones for

emission unit EU0010 were removed in 2005; (ii) alleged violations of RCRA, 42 U.S.C.

§ 6901 et seq., as alleged in inspection reports compiled by EPA following a multi-media

inspection conducted at Buick Mine/Mill in February 2006, based on alleged past

unauthorized treatment storage, and/or disposal of certain hazardous waste at Buick

Mine/Mill, unauthorized transportation of hazardous waste from Buick Mine/Mill to

Buick Resource Recycling Facility, failure to comply with applicable hazardous waste

generator requirements at Buick Mine/Mill, failure to complete hazardous waste

determinations for all solid waste generated at Buick Mine/Mill, and failure to comply

with applicable used oil management requirements at  Buick Mine/Mill; (iii) alleged

violations of RCRA, 42 U.S.C. § 6901 et seq., the CWA 33 U.S.C. § 1251 et seq., the

CAA 42 U.S.C. § 7401 et seq., and EPCRA Section 313, 42 U.S.C. § 11023 based on

violations alleged in inspection reports compiled by EPA following a multi-media

inspection conducted at Buick Mine/Mill in February 2006; and (iv) violations of any

corresponding state or local laws or regulations arising out of any acts or omissions by

Doe Run which formed the basis for such alleged CAA, CWA, EPCRA, and RCRA

violations;

DRRC multi-media Consent Decree

      f.      <u>Liability Resolution Regarding RCRA Claims Alleged at Buick Resource</u>

<u>Recycling Facility</u>.  Entry of this Consent Decree shall resolve all civil liability of

Defendants to the Plaintiffs for the following alleged past violations: (i) alleged violations

of RCRA, 42 U.S.C. § 6901 <u>et seq.</u>, as alleged in inspection reports compiled by EPA

following a RCRA inspection conducted at the Buick Resource Recycling Facility in

March 2009 and by MDNR following RCRA inspections conducted at the Buick

Resource Recycling Facility in September, November, and December of 2009, based on a

failure to properly label hazardous waste containers at the Buick Resource Recycling

Facility, a failure to complete hazardous waste determinations for all solid waste

generated at the Buick Resource Recycling Facility, and a failure to comply with Buick

Resource Recycling Facility Hazardous Waste Management Facility, Part I Permit

Number MOD059200089 Special Permit Conditions I.G.1, III.B.3, III.C.1, III.C.5,

III.C.6.a, III.C.8.a, III.C.8.c, III.C.9, III.C.12, VI.A., VI.C.10, Schedule of Compliance

Provision I.F, and the requirement to construct and operate the facility in accordance with

section F.3.5 (Leak Detection Liquid Collection and Removal System) of the final permit

application; (ii) alleged violations of RCRA, 42 U.S.C. § 6901 <u>et seq.</u>, based on

violations alleged in inspection reports compiled by EPA following a RCRA inspection

conducted at the Buick Resource Recycling Facility in March 2009 and by MDNR

following RCRA inspections conducted at the Buick Resource Recycling Facility in

September, November, and December of 2009; and (iii) violations of any corresponding

DRRC multi-media Consent Decree

state or local laws or regulations arising out of any acts or omissions by Doe Run which formed the basis for such alleged RCRA violations;

       g.     <u>Liability Resolution Regarding CWA Claims Alleged at Several Facilities:</u> Entry of this Consent Decree shall resolve all civil liability of Defendants to the Plaintiffs for the following alleged past violations: (i) alleged past violations of the CWA 33 U.S.C. § 1251 <u>et seq.</u>, at Brushy Creek Mine/Mill, Buick Mine/Mill, Buick Resource Recycling Facility, Fletcher Mine/Mill, Glover Lead Smelter, Herculaneum Lead Smelter, Viburnum Mine/Mill, Viburnum #35 Mine/Mill, West Fork Unit Facility based on alleged discharges of pollutants in excess of allowable permit limits to navigable waters of the United States and alleged failures to conduct required effluent monitoring and/or submit complete accurate DMRs, as listed in the table of alleged violations attached as Appendix K (Clean Water Act Alleged Effluent Violations and Alleged WET Violations); (ii) alleged past violations of the CWA 33 U.S.C. § 1251 <u>et seq.</u>, based on violations alleged in inspection reports compiled by EPA following CWA inspections conducted at Brushy Creek Mine/Mill in August 2006, Buick Mine/Mill in February and March 2005, Fletcher Mine/Mill in August 2006, Glover Lead Smelter and Doe Run/ASARCO Slag Piles in July 2008, Herculaneum Lead Smelter in March 2007, and West Fork Unit Facility in February 2005 and by MDNR following CWA inspections conducted at Glover Lead Smelter and West Fork Unit Facility in April 2010; and (iii) violations of any corresponding state or local laws or regulations arising out of any acts or omissions by Doe Run which formed the basis for such alleged CWA violations;

DRRC multi-media Consent Decree

h.    Liability Resolution Regarding Claims Alleged in Certain NOVs/FOVs.

Entry of this Consent Decree shall resolve all civil liability of Doe Run to the Plaintiffs

for the alleged past violations set forth in: (i) the March 9, 2010, Notice of Violation and

Finding of Violation EPA issued to Doe Run alleging violations of the CAA and the

Missouri SIP at the Herculaneum Lead Smelter and the Buick Mine/Mill; and (ii) the

January 11, 2008 Notice of Violation MDNR issue to Doe Run alleged violations of the

CAA NESHAPs at the Herculaneum Lead Smelter.

234.    Claims Based on Violations in EPA's September 2008 Transportation AOC

Inspection Report.  Satisfaction of the requirements in Section IV (Civil Penalty) and Section XI

(Transportation Order) of this Consent Decree shall resolve Doe Run's civil and administrative

liability to the United States arising out of the violations alleged in the Complaint as specified in

EPA's September 2008 Transportation AOC Inspection Report and attachments thereto.

Notwithstanding the resolution of liability in Paragraphs 233 and 234, the release of liability by

the United States to Doe Run for claims arising out of the alleged violations specified in EPA's

September 2008 Transportation AOC Inspection Report shall be rendered void if Doe Run

materially fails to comply with the obligations and requirements of Section IV (Civil Penalty)

and Section XI (Transportation Order) of this Consent Decree; provided, however, that the

release in this Paragraph shall not be rendered void if Doe Run remedies such failure and pays

any stipulated penalties due as a result of such material failure.

235.    The Plaintiffs covenant not to sue Defendants for civil claims that could be

asserted for each violation of an effluent limit, monitoring or reporting requirement where there

DRRC multi-media Consent Decree

is an alternative effluent limit, monitoring or reporting requirement established pursuant to

Section VII, Subsection I (Schedule for Compliance With Missouri State Operating Permits) of

this Consent Decree and Appendix B (MSOP Alternative Effluent Limitations and Compliance

Deadlines) for the CWA Facilities, as may be modified pursuant to Paragraph 104 above, that

occurs from the Lodging Date of this Consent Decree until the deadlines set forth pursuant to

Section VII, Subsection I (Schedule for Compliance With Missouri State Operating Permits) and

Appendix B (MSOP Alternative Effluent Limitations and Compliance Deadlines), when

Defendants are in compliance with that alternative effluent limit, monitoring, or reporting

requirement.

236.    The Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights

against Defendants with respect to all matters not expressly included within Plaintiffs' covenant

not to sue.  Notwithstanding any other provision of this Consent Decree, the United States and

State reserve all rights against Defendants with respect to:

a.     Claims based on a failure by Defendants to meet any requirement of this

Consent Decree;

b.     Criminal liability; and

c.     Liability for damages for injury to, destruction of, or loss of natural

resources, and for the costs of any natural resource damage assessments.

237.    The resolution of the Plaintiffs' civil claims as set forth in Paragraphs 232 through

233 is expressly conditioned upon substantial completion and satisfactory performance of the

requirements set forth in this Consent Decree, including the Appendices hereto.  The United

-151-

DRRC multi-media Consent Decree

States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree independently and jointly with the State, except as expressly stated in Paragraphs 232 through 235.  With the exception of the obligations set forth in Section XI (Transportation Order) of this Consent Decree, the State reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree independently and jointly with the United States, except as expressly stated in Paragraphs 232 through 235.  This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under the CAA, CWA, RCRA, EPCRA, CERCLA, or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraphs 232 through 235.

238.    The Plaintiffs further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by the Doe Run Facilities, whether related to the violations addressed in this Consent Decree or otherwise.

239.    In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, or other appropriate relief relating to the Doe Run Facilities subject to this Consent Decree, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding

-152-

DRRC multi-media Consent Decree

were or should have been brought in the instant case, except with respect to claims that have

been specifically resolved pursuant to Paragraphs 233 through 235 of this Section.

240.    This Consent Decree is not a permit, or a modification of any permit, under any

federal, State, or local laws or regulations.  Defendants are responsible for achieving and

maintaining complete compliance with all applicable federal, State, and local laws, regulations,

and permits; and Defendants' compliance with this Consent Decree shall be no defense to any

action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.

The United States and the State do not, by their consent to the entry of this Consent Decree,

warrant or aver in any manner that Defendants' compliance with any aspect of this Consent

Decree will result in compliance with provisions of the CAA, CWA, CAA, RCRA, CERCLA, or

EPCRA, or with any other provisions of federal, State, or local laws, regulations, or permits.

241.    Defendants hereby relinquish their rights under State and federal law to appeal

and/or challenge any provision in a CWA Facility MSOP regarding the matters addressed by, and

time periods of permit issuance covered in, Section VII (Clean Water Act Permits: Resolution of

Missouri State Operating Permit Appeals and Compliance Deadlines) above, but reserve any and

all rights to request a modification of the provisions of any CWA Facility MSOP not addressed

by Section VII (Clean Water Act Permits: Resolution of Missouri State Operating Permit

Appeals and Compliance Deadlines) above, and to request a modification of, or appeal and/or

contest of, the provisions of any Future MSOP not addressed by Section VII (Clean Water Act

Permits: Resolution of Missouri State Operating Permit Appeals and Compliance Deadlines)

DRRC multi-media Consent Decree

above, and to appeal and/or contest the provisions of any CWA Facility MSOP issued after the date of Termination of this Consent Decree pursuant to Section XXVII (Termination).

242.    Defendants shall not object to MDNR's jurisdiction to issue new MSOPs for the CWA Facilities.  Defendants nevertheless reserve any and all rights to object to and/or contest the substantive requirements of any MSOP to be issued by MDNR following termination of this Consent Decree pursuant to Section XXVII (Termination) or to appeal or challenge any provision of a MSOP for a MSOP not addressed by the provisions of Section VII (Clean Water Act Permits: Resolution of Missouri State Operating Permit Appeals and Compliance Deadlines).

243.    Except as provided in Paragraphs 239, 241, and 242, Defendants reserve any defenses or arguments that may be available to it in resisting or defending against any action or proceeding that may be brought by the United States or the State under any of the rights or authorities reserved by the Plaintiffs under this Consent Decree or otherwise.

244.    This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

245.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XXII.  COSTS

246.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the State shall be entitled to collect the costs (including

DRRC multi-media Consent Decree

attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any

stipulated penalties due but not paid by Defendants.

XXIII.  <u>NOTICES</u>

247.    Unless otherwise specified herein, whenever notifications, submissions, or

communications, hereafter referred to generally as "notices", are required by this Consent

Decree, they shall be made in writing and addressed as follows:

<u>To the United States (in addition to the EPA addresses below)</u>:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611 Ben Franklin Station
Washington, D.C.  20044-7611
Re: DOJ No. 90-5-2-1-0370/1


<u>To EPA</u>:
Chief, Waste Enforcement and Materials Management Branch
Air and Waste Management Division
U.S. Environmental Protection Agency
Region 7
901 N. 5th Street
Kansas City, KS 66101
Facsimile: 913-551-7201

and

Office of Regional Counsel
U.S. Environmental Protection Agency
Region 7
901 N. 5th Street
Kansas City, KS 66101
Facsimile: 913-551-7925

With electronic copy to: Sanders.Steven@epa.gov and Toensing.Donald@epa.gov

DRRC multi-media Consent Decree

<u>To the State or MDNR</u>:
Director, Division of Environmental Quality
Missouri Department of Natural Resources
1101 Riverside Drive
P.O. Box 899
Jefferson City, Missouri 65102
Facsimile:  (573) 751-9277

With electronic copy to: leanne.tippett.mosby@dnr.mo.gov and betsy.crawford@dnr.mo.gov

<u>To Defendants</u>:
Stacy Stotts
Partner
Stinson Morrison Hecker LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106-2150

Louis J. Marucheau
The Doe Run Company
Vice President Law and Assistant Secretary
1801 Park 270 Drive, Suite 300
St. Louis, Missouri 63146

Aaron W. Miller
The Doe Run Company
Environmental Management Coordinator
881 Main St.
Herculaneum, MO 63048

With electronic copy to: sstotts@stinson.com, lmarucheau@doerun.com, and
amiller@doerun.com

DRRC multi-media Consent Decree

248.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

249.    Unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing, all notices submitted pursuant to this Section shall be sent by certified registered mail and deemed submitted upon mailing.

## XXIV.  EFFECTIVE DATE

250.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendants hereby agree that they shall be bound to perform duties scheduled to occur prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XXV.  RETENTION OF JURISDICTION

251.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XIX (Dispute Resolution) and XXVI (Modification), or effectuating or enforcing compliance with the terms of this Decree.

DRRC multi-media Consent Decree

## XXVI.  MODIFICATION

252.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all of the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.  For purposes of this Consent Decree, non-material modifications shall include, but are not limited to the frequency of reporting obligations and modifications to schedules that do not extend final dates for compliance with emissions limitations or effluent limitations, provided that such changes are agreed upon in writing between EPA and MDNR.  A Party's refusal to agree to a modification of this Consent Decree shall not be subject to dispute resolution or judicial review.

253.    Application for construction grants, State Revolving Loan Funds, or any other grants or loans, or other delays caused by inadequate facility planning or plans and specifications on the part of Defendants shall not be cause for extension of any required compliance date in this Consent Decree.

## XXVII.  TERMINATION

254.    Partial Termination.

a.    Partial Termination for Shorter Term Obligations.  After Defendants have completed the requirements of Section V (Compliance Requirements: Clean Air Act), Section VI (Compliance Requirements: Clean Water Act), Section VII (Clean Water Act Permits: Resolution of Missouri State Operating Permit Appeals and Compliance Deadlines), Section VIII (Compliance Requirements: RCRA), the Enclosure of Lead

-158-

DRRC multi-media Consent Decree

Concentrate Storage and Handling provisions in Section XIV (Additional Injunctive Relief), Section XV (Environmental Mitigation Projects), and the applicable provisions of Section XIII (Compliance Requirements: Permits); have thereafter maintained compliance with each of those requirements for a period of at least one year; and have paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendants may serve upon the Plaintiffs a Request for Partial Termination, stating that Defendants have satisfied those requirements, together with all necessary supporting documentation.  If the United States, after consultation with the State, agrees that the Decree may be partially terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating those provisions of the Decree.

      b.    <u>Partial Termination for Longer Term Obligations</u>.  After Defendants have completed the requirements of Section IX (Site Remediation – Herculaneum), the Herculaneum Financial Assurances provisions in Section X (Financial Assurance), and the Stream Mitigation provisions in Section XIV (Additional Injunctive Relief); have thereafter maintained compliance with each of those requirements for a period of at least one year; have paid any accrued stipulated penalties as required by this Consent Decree; and have satisfied all of the requirements for partial termination pursuant to Paragraph 254.a, Defendants may serve upon the Plaintiffs a Request for Partial Termination, stating that Defendants have satisfied those requirements, together with all necessary supporting documentation.  If the United States, after consultation with the State, agrees that the

-159-

DRRC multi-media Consent Decree

Decree may be partially terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating those provisions of the Decree.

255.    <u>Complete Termination</u>.  After Defendants have completed the requirements of Sections V through XI of this Decree, have complied with all other requirements of this Consent Decree, including those relating to the projects required by Sections XIV (Additional Injunctive Relief) and XV (Environmental Mitigation Projects) of this Consent Decree, and have paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendants may serve upon the Plaintiffs a Request for Complete Termination, stating that Defendants have satisfied those requirements, together with all necessary supporting documentation.  If the United States, after consultation with the State, agrees that the Decree may be terminated in whole, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

256.    If the United States, after consultation with the State, does not agree that the Decree may be terminated as a whole or in part, Defendants may invoke Dispute Resolution under Section XIX (Dispute Resolution) of this Decree.  However, Defendants shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 218 of Section XIX (Dispute Resolution), until one hundred twenty (120) Days after service of its Request for Termination.

## XXVIII.  <u>PUBLIC PARTICIPATION</u>

257.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the

DRRC multi-media Consent Decree

Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  This Consent Decree is also subject to the opportunity for a public meeting in the affected area requirement in accordance with RCRA Section 7003(d), 42 U.S.C. § 6973(d).  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Decree.

## XXIX.  SIGNATORIES/SERVICE

258.    Each undersigned representative of Defendants, the State of Missouri, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

259.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXX.  INTEGRATION

260.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and

DRRC multi-media Consent Decree

supersedes all prior agreements and understandings, whether oral or written, concerning the

settlement embodied herein.  Other than deliverables that are subsequently submitted and

approved pursuant to this Decree, no other document, nor any representation, inducement,

agreement, understanding, or promise, constitutes any part of this Decree or the settlement it

represents, nor shall it be used in construing the terms of this Decree.

## XXXI.  FINAL JUDGMENT

261.    Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment of the Court as to the United States, the State, and

Defendants.

## XXXII.  APPENDICES

262.    The following appendices are attached to and part of this Consent Decree:

"Appendix A" is the spreadsheet for tracking compliance with interim milestones;

"Appendix B" are the MSOP Alternative Effluent Limitations and Compliance

Deadlines;

"Appendix C" is the Storm Water Pollution Prevention Plans ("SWPPP") Guidance;

"Appendix D" are the tables listing the Resolution of Permit Appeal Issues for Clean

Water Act Facility MSOPs;

"Appendix E" is the Financial Assurance for Herculaneum Lead Smelter Facility;

"Appendix F" is the Trust Agreement for the Herculaneum Lead Smelter Facility;

"Appendix G" is the Financial Assurance for the Mine/Mill Facilities;

"Appendix H" is the Enclosure of Lead Concentrate Storage and Handling;

-162-

DRRC multi-media Consent Decree

"Appendix I" is the Statement of Work for Bee Fork Creek Mitigation; and

"Appendix J" is the Environmental Mitigation Projects;

"Appendix K" are the lists of Clean Water Act Alleged Effluent Violations and Alleged

WET Violations; and

"Appendix L" is the Trust Agreement for Mine/Mill Facilities.

Dated and entered this 21ˢᵗ day of December, 2011.

UNITED STATES DISTRICT COURT JUDGE
Eastern District of Missouri

-163-

DRRC multi-media Consent Decree

FOR PLAINTIFF UNITED STATES OF AMERICA:

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611 Benjamin Franklin Station
Washington, D.C. 20044-7611

CYNTHIA M. FERGUSON
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611 Benjamin Franklin Station
Washington, D.C. 20044-7611
Telephone: (202) 616-6560
Fax: (202) 514-4180
Email: cynthia.ferguson@usdoj.gov


LOCAL COUNSEL:

RICHARD G. CALLAHAN
United States Attorney
Eastern District of Missouri

SUZANNE J. MOORE
Assistant United States Attorney
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102
Telephone: (314) 539-2200

-164-

DRRC multi-media Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

ADAM M. KUSHNER
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

-165-

DRRC multi-media Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION 7:

KARL BROOKS
Regional Administrator
United States Environmental Protection Agency,
Region 7
901 N. 5th Street
Kansas City, Kansas 66101

DAVID COZAD
Regional Counsel
United States Environmental Protection Agency,
Region 7
901 N. 5th Street
Kansas City, Kansas 66101

STEVEN L. SANDERS
DANA SKELLEY
PATRICIA GILLISPIE MILLER
SARA HERTZ WU
Office of Regional Counsel
United States Environmental Protection Agency,
Region 7
901 N. 5th Street
Kansas City, Kansas 66101

DRRC multi-media Consent Decree

FOR PLAINTIFF STATE OF MISSOURI:


CHRIS KOSTER
Attorney General

KARA VALENTINE                    9/17/10
Assistant Attorney General
Missouri Bar No. 40926
221 West High Street
P.O. Box 899
Jefferson City, MO  65102
phone: (573) 751-3640
fax:    (573) 751-8796
Email: kara.valentine@ago.mo.gov

DRRC multi-media Consent Decree

FOR THE MISSOURI DEPARTMENT OF NATURAL RESOURCES:


DAVIS D. MINTON
Deputy Director for Operations
P.O. Box 176
Jefferson City, MO 65102

DRRC multi-media Consent Decree

FOR DEFENDANTS THE DOE RUN RESOURCES CORPORATION, THE DOE RUN
RESOURCES CORPORATION D/B/A THE DOE RUN COMPANY:

JERRY L. PYATT
Vice President-Domestic Operations
and Chief Operating Officer
The Doe Run Resources Corporation
1801 Park 270 Drive, Suite 300
St. Louis, Missouri 63146

DRRC multi-media Consent Decree

FOR DEFENDANT THE BUICK RESOURCE RECYCLING FACILITY, LLC:

JERRY L. PYATT
Chief Operating Officer
The Buick Resource Recycling Facility LLC
1801 Park 270 Drive, Suite 300
St. Louis, Missouri 63146

-170-